**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

ADILSON MONTEIRO, KAREN
GINSBURG, JASON LUTAN, and
BRIAN MINSK, Individually and as
representatives of a class of similarly
situated persons, on behalf of the
CHILDREN'S HOSPITAL
CORPORATION TAX-DEFERRED
ANNUITY PLAN,

            Plaintiffs,

v.

THE CHILDREN'S HOSPITAL
CORPORATION, THE BOARD OF
DIRECTORS OF THE CHILDREN'S
HOSPITAL CORPORATION, THE
CHILDREN'S HOSPITAL
CORPORATION RETIREMENT
COMMITTEE, and DOES No. 1-20,
Whose Names Are Currently Unknown,

            Defendants.

Case No: 1:22-cv-10069

**ORAL ARGUMENT REQUESTED**

---

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I.    INTRODUCTION ................................................................................................... 1

II.   RELEVANT FACTUAL BACKGROUND ............................................................ 3

    A.    Key Features of the Plan. ............................................................................. 3

    B.    The Plan's Investment and Recordkeeping Expenses. .................................. 4

    C.    Plaintiffs and Their Plan Investments. ........................................................ 4

    D.    Plaintiffs' Claims. ....................................................................................... 5

III.  ARGUMENT .......................................................................................................... 5

    A.    Legal Standards Governing Motion to Dismiss. ........................................... 5

    B.    Plaintiffs Do Not Plausibly Allege That Children's Breached Its Fiduciary
        Duties by Offering the Freedom Funds. ...................................................... 6

        1.    Plaintiffs Cannot State a Viable Claim by Comparing the Actively
                Managed Freedom Funds to the Passively Managed Index Funds. ........... 6

        2.    Plaintiffs' Comparisons to Other "Popular" Target-Date Funds
                Does Not Plausibly Infer Imprudence. ....................................................... 8

        3.    Plaintiffs' Critiques of the Performance of a Subset of the Freedom
                Funds' Underlying Investments Do Not Plausibly Suggest the
                Freedom Funds Were Imprudent Investments. ......................................... 11

        4.    "Outflows" from the Freedom Funds Do Not Suggest Imprudence........ 12

        5.    Plaintiffs Do Not Plausibly Allege the Freedom Funds Were "Too
                Risky." ..................................................................................................... 13

    C.    Plaintiffs Cannot Plausibly Allege a Flawed Fiduciary Process Regarding
        Recordkeeping Merely by Identifying Seven Plans That Paid a Lower Fee. ...... 14

    D.    Plaintiffs' Allegation That Children's Offered an "Excessively Expensive
        Investment Menu" and Higher Share Classes Does Not Plausibly Suggest
        a Flawed Fiduciary Process. ...................................................................... 16

    E.    Plaintiffs Lack Article III Standing to Pursue Their Claims............................. 18

IV.   CONCLUSION...................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Albert v. Oshkosh Corp.*,
 2021 WL 3932029 (E.D. Wis. Sept. 2, 2021).................................................14, 18

*Anderson v. Intel Corp.*,
 2022 WL 74002 (N.D. Cal. Jan. 8, 2022).........................................................7, 8, 9

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)...................................................................................................5

*Baker v. Carr*,
 369 U.S. 186, 204 (1962)..........................................................................................6

*Barchock v. CVS Health Corp.*,
 886 F.3d 43 (1st Cir. 2018)............................................................................*passim*

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007)...................................................................................................5

*Brown v. Daikin Am., Inc.*,
 2021 WL 1758898 (S.D.N.Y. May 4, 2021) .....................................................17, 18

*Brown v. Medtronic, Inc.*,
 628 F.3d 451 (8th Cir. 2018) ............................................................................19, 20

*Davis v. Wash. Univ. in St. Louis*,
 960 F.3d 478 (8th Cir. 2020) ...................................................................................7, 8

*DeBruyne v. Equitable Life Assur. Soc. of U.S.*,
 920 F.2d 457 (7th Cir. 1990) ..................................................................................10

*Dorman v. Charles Schwab Corp.*,
 2019 WL 580785 (N.D. Cal. Feb. 8, 2019) ............................................................11

*Equal Means Equal v. Ferriero*,
 3 F.4th 24 (1st Cir. 2021)...........................................................................................6

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019)........................................................17

*Fifth Third Bancorp v. Dudenhoeffer*,
 573 U.S. 409 (2014)...................................................................................................5

*Fishman Haygood Phelps Walmsley Willis & Swanson, LLP v. State St. Corp.*,
  2010 WL 1223777 (D. Mass. Mar. 25, 2010) ...........................................................20

*Forman v. TriHealth*,
  2021 WL 4346764 (S.D. Ohio Sept. 24, 2021) ...............................................16, 17

*Garthwait v. Eversource Energy Co.*,
  2021 WL 4441939 (D. Conn. Sept. 28, 2021) ........................................................20

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ...........................................................................2, 3, 6

*Hecker v. Deere & Co.*,
  569 F.3d 708 (7th Cir. 2009) ................................................................................3, 16

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) ................................................................................................19

*Hughes v. Nw. Univ.*,
  142 S. Ct. 737 (2022) ...................................................................................... *passim*

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  995 F.3d 18 (1st Cir. 2021) .......................................................................................6

*In re LinkedIn ERISA Litig.*,
  2021 WL 5331448 (N.D. Cal. Nov 16, 2021) ..................................................19, 20

*In re Omnicom ERISA Litig.*,
  2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021) ..........................................................20

*Jacobs v. Verizon Comms., Inc.*,
  2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017) ................................................10, 13

*Kirschbaum v. Reliant Energy, Inc.*,
  526 F.3d 243 (5th Cir. 2008) ..................................................................................10

*Kong v. Trader Joe's Co.*,
  2020 WL 5814102 (C.D. Cal. Sept. 24, 2020) .......................................................16

*Kong v. Trader Joe's Co.*,
  2020 WL 7062395 (C.D. Cal. Nov. 30, 2020) ...............................................3, 16, 17

*Lange v. Infinity Healthcare Physicians*,
  2021 WL 3022117 (W.D. Wis. July 16, 2021) .......................................................20

*LaRue v. DeWolff, Boberg & Assocs.*,
  552 U.S. 248 (2008) ................................................................................................19

*Leimkuehler v. Am. United Life Ins. Co.*,
   713 F.3d 905 (7th Cir. 2013) ............................................................3, 18

*Loomis v. Exelon*,
   658 F.3d 667 (7th Cir. 2011) .................................................1, 16, 17, 18

*Marks v. Trader Joe's*,
   2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ........................................17

*Mator v. Wesco Distr., Inc.*,
   2021 WL 4523491 (W.D. Pa. Oct. 4, 2021) .....................................16, 17

*Meiners v. Wells Fargo & Co.*,
   2017 WL 2303968 (D. Minn. May 25, 2017), *aff'd*, 898 F.3d 820 (8th Cir. 2018) ................3,

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ....................................................... *passim*

*Obeslo v. Great-West Cap. Mgmt., LLC*,
   2020 WL 4558982 (D. Colo. Aug. 7, 2020), *aff'd*, 6 F.4th 1135 (10th Cir. 2021) ................17

*Parmer v. Land O'Lakes, Inc.*,
   518 F. Supp. 3d 1293 (D. Minn. 2021) ............................................9, 16

*Patterson v. Morgan Stanley*,
   2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ...............................3, 11, 20

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrgs. Ret. Plan v. Morgan*
   *Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) ........................................................5, 10, 13

*Perkins v. United Surgical Partners Int'l*,
   2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ....................................16, 19

*Rosenkranz v. Altru Health Sys.*,
   2021 WL 5868960 (D. N.D. Dec. 10, 2021) ......................................9, 17

*Smith v. CommonSpirit Health*,
   2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ................................8, 12, 13

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020) ................................................................18, 19

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2015) ............................................................................11

*Wehner v. Genentech, Inc.*,
   2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ............................................10

*White v. Chevron Corp.*,
    2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd,* 752 F. App'x 453 (9th Cir. 2018) ..17, 18

*Wilcox v. Georgetown Univ.*,
    2019 WL 132281 (D.D.C. Jan. 8, 2019) ................................................................20

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) ................................................................16

## STATUTES

26 U.S.C. §§ 403(b)(1), (b)(7) ................................................................3

29 U.S.C. §§ 1104(a)(1) ................................................................5, 18

## OTHER AUTHORITIES

Dep't of Labor, EBSA, *A Look at 401(k) Plan Fees* (available at https://www.dol.gov/sites/
    dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/
    a-look-at-401k-plan-fees.pdf) ................................................................4

Dep't of Labor, EBSA, *Tips for Selecting and Monitoring Service Providers for Your Employee
    Benefit Plan* (available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-
    activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pd).
    ................................................................16

EBSA Advisory Op. 2009-04A (Dec. 4, 2009) (available at
    https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-
    opinions/2009-04a) ................................................................11

*Smith v. Commonspirit Health*,
    No. 21-59640, Dkt. 39, Fidelity Amicus Brief (6th Cir. Feb. 18, 2022) ............................6, 13

*Wehner v. Genentech Inc.*,
    No. 20-6894, Dkt. No. 46, Amended Complaint (N.D. Cal. Mar. 1, 2021) ............................9

Fed. R. Civ. P. 12(b)(6) ................................................................1, 3, 5

Fed. R. Civ. P. 12(b)(1) ................................................................6, 18

## I.    <u>INTRODUCTION</u>

This is one of dozens of lawsuits filed in the last two years by the same plaintiffs' law firms targeting the fiduciaries of retirement plans.  The claims in these cases are based on the faulty premise that there is only one way to fulfill the duties of prudence and loyalty under the Employee Retirement Income Security Act ("ERISA"): offer the cheapest investments, guarantee those investments will be the best performing, and pay the lowest fee to plan service providers regardless of the scope of those services.  This Complaint follows the same pattern, attempting to impose categorical rules on fiduciaries of the Children's Hospital Corporation Tax-Deferred Annuity Plan ("Plan").  As a matter of law, it fails to state a fiduciary breach claim.

Plaintiffs are four former Plan participants.  Their Complaint alleges that Children's[1] breached ERISA's fiduciary duties of loyalty and prudence, and did not monitor other fiduciaries, by (1) selecting and retaining the actively-managed[2] Fidelity Freedom target-date funds ("Freedom Funds") as Plan investment options; (2) allowing participants to pay "excessive" recordkeeping fees; and (3) failing to select the share classes with the lowest gross expense ratios for seven funds.  These allegations fail to state a claim for relief under Rule 12(b)(6).

To start, Plaintiffs must plausibly allege the Freedom Funds were so imprudent that offering them was outside the "range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).  Plaintiffs fail this basic requirement.  Instead, they allege the Freedom Funds cost more than the passively-managed Fidelity Index target-date funds ("Index Funds"), and underperformed four other "popular" target-

---

[1] "Children's" refers collectively to Defendants the Children's Hospital Corporation, the Board of Directors of the Children's Hospital Corporation, and the Children's Hospital Corporation Retirement Committee ("Committee").

[2] Actively-managed funds "try to find and buy underpriced securities while selling ones that the advisers think are overvalued." *Loomis v. Exelon,* 658 F.3d 667, 669-70 (7th Cir. 2011).  In contrast, passively-managed funds, also known as index funds, "simply track a designated portfolio." (*Id.* at 670).

date fund families as of December 31, 2015. In doing so, Plaintiffs talk out of both sides of their mouth: arguing that cost is the most important factor when comparing the Freedom Funds to the Index Funds, and then suggesting performance is the most important factor when comparing to select other "popular" more expensive target date funds. Notably, Plaintiffs' Complaint does not allege that *any* of the comparator target date funds were both cheaper *and* performed better than the Freedom Funds. But, regardless, ERISA does not require Children's to select the least expensive or best performing investment, and Plaintiffs cannot plausibly allege a breach merely by pointing to alternative target date funds that have some similarities and that purportedly cost a bit less or performed a bit better. *See*, *e.g.*, *Barchock v. CVS Health Corp.*, 886 F.3d 43, 48-55 (1st Cir. 2018) (affirming Rule 12(b)(6) dismissal of breach of duty of prudence claims that were premised on the alleged poor performance of a stable value fund based on a comparison to other stable value funds); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823-24 (8th Cir. 2018) (affirming Rule 12(b)(6) dismissal of a similar challenge to target date fund investments); *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) ("*Hecker I*").

Plaintiffs' challenge to the Plan's recordkeeping fees fares no better. For starters, even if the Plan had higher fees than *seven* other retirement plans (out of hundreds of thousands of plans), that does not mean the fees were so excessive as to fall outside the "range of reasonable judgments" that fiduciaries make. This is especially true considering Plaintiffs' few cherry-picked alternative plans are not comparable to the Plan—including in terms of participant size which Plaintiffs allege is the "primary driver" for determining fees. Moreover, many of those comparator plans specifically note that the *employer* (rather than plan participants) pays some or all of the plans' administrative expenses, and those employer-paid amounts are excluded from Plaintiffs' calculations. In any event, Plaintiffs focus exclusively on the cost of recordkeeping, while ignoring

the services the Plan received for those fees compared to the services that the Complaint's alternative plans allegedly received for less. Thus, Plaintiffs' recordkeeping allegations cannot state a claim. *See, e.g.*, *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009) ("*Hecker II*").

Plaintiffs' share class challenge fails because the Complaint *admits* that the Plan pays for recordkeeping services through "revenue sharing."[3] That is fatal to Plaintiffs' claim: the only way to pay for recordkeeping *through* revenue sharing is to offer investments in a higher cost share class that includes revenue sharing.

Finally, while the Court should dismiss the Complaint in its entirety under Rule 12(b)(6), Plaintiffs also have not suffered an Article III injury-in-fact with respect to their claims.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Key Features of the Plan.[4]

One of the ways Children's helps its employees prepare for retirement is through the Plan, a "participant-directed 403(b) plan." (Compl. ¶ 21).[5] Throughout the putative class period, participants could choose from a diverse menu of investment options covering different asset classes, investment styles and risk-reward profiles—including the actively-managed suite of Freedom Funds target date funds. (*Id.* ¶ 61).[6]

---

[3] Revenue sharing is "an arrangement allowing mutual funds to share a portion of the fees that they collect from investors with entities that provide services to the mutual funds," which "has been commonplace for years." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013).

[4] The Court can consider disclosures to the Plan's participants regarding the Plan's investments and fees, plan annual reports (Form 5500s) filed with the Internal Revenue Service, certain publicly available documents, and documents referenced in the Complaint. *Hecker I*, 556 F.3d at 582-83; *Kong v. Trader Joe's Co.*, 2020 WL 7062395, at *3 (C.D. Cal. Nov. 30, 2020) ("*Kong II*"); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019). *See also* Compl. ¶¶ 24, 52-56, 61 (relying on Form 5500s for the Plan and other plans).

[5] 403(b) plans can only be sponsored by tax-exempt organizations. They are similar to 401(k) plans but with several differences, including that they may offer only annuities and mutual funds as investment options. *See* 26 U.S.C. §§ 403(b)(1), (b)(7).

[6] "A target date fund is an investment in which the allocation of equity, bonds, and cash" automatically shifts "as the target date approaches." *Meiners v. Wells Fargo & Co.*, 2017 WL 2303968, at *1 n.2 (D. Minn. May 25, 2017), *aff'd*, 898 F.3d 820 (8th Cir. 2018).

## B.    The Plan's Investment and Recordkeeping Expenses.

Like all 403(b) plans, there are expenses associated with participating in the Plan.  First, the Plan's investments each charge an investment-management fee.  *See* Dep't of Labor, *A Look at 401(k) Plan Fees*, at p. 3, 4 (available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf) (last visited April 7, 2022).  An investment management fee is reflected as an "expense ratio"—a percentage-based deduction against a participant's total assets in the investment.  (*Id.*; *see also* Compl. ¶ 77).

Second, Plan participants must pay for recordkeeping services.  (Compl. ¶ 51).  The scope of those services varies significantly from plan to plan and recordkeeper to recordkeeper.  Basic services provided to all plans include things like maintaining plan records, tracking participant account balances, and processing participant investment instructions.  A plan, however, "also may offer a host of additional services . . . ."[7]  Of course, there are increased fees associated with these optional services.[8]  Plan participants typically pay for recordkeeping via a flat fee to the recordkeeper (i.e., $50 per participant per year), an asset-based fee, "revenue sharing," or some combination of the three.  (Compl. ¶¶ 30, 48).  Plaintiffs allege Plan participants paid for Fidelity's recordkeeping services through revenue sharing.  (*Id.* ¶ 51).  The Complaint does not allege that all participants paid the same fees for recordkeeping services.

## C.    Plaintiffs and Their Plan Investments.

Plaintiffs are former Children's employees and former Plan participants.  (*Id.* ¶¶ 9-12).  They each allegedly invested *only* in the following funds: Plaintiff Monteiro (Fidelity Freedom

---

[7] *A Look at 401(k) Plan Fees*, at 3 (explaining a plan may offer additional services such as "telephone voice-response systems, access to customer service representatives, educational seminars, retirement planning software, investment advice, electronic access to plan information, daily valuation, and online transactions").

[8] *A Look at 401(k) Plan Fees*, at 3 ("Either way, generally the more services provided, the higher the fees.").

2045 Fund); Plaintiff Ginsberg (Fidelity Freedom 2025 Fund); Plaintiff Lutan (Fidelity Freedom 2040 Fund); and Plaintiff Minsk (Fidelity Freedom 2055 Fund).  (*Id*).  Plaintiffs do not allege how much they personally paid in recordkeeping fees (if any), and none participated in the Plan after 2019.  *See* Ex. 1 (Plaintiffs' last quarterly statements).

> **D.    Plaintiffs' Claims.**

In Count I, Plaintiffs allege that Children's breached the fiduciary duties of prudence and loyalty under ERISA, 29 U.S.C. §§ 1104(a)(1), purportedly by: (1) offering the allegedly imprudent Freedom Funds (*id*. ¶¶ 60-82); (2) allowing the Plan's participants to pay "excessive" recordkeeping fees (*id.* ¶¶ 50-59); and (3) offering an "excessively expensive" investment menu (*id.* ¶¶ 83-85).  In Count II, Plaintiffs allege that Children's and the Committee failed to monitor. (*Id.* ¶¶ 110- 118).  Plaintiffs allege in Count III that any non-fiduciary defendant is liable for knowing participation in a breach of trust.  (*Id.* ¶ 119-121).

## III.    ARGUMENT

> **A.    Legal Standards Governing Motion to Dismiss.**

***Rule 12(b)(6).***  In assessing the plausibility of fiduciary breach claims under Rule 12(b)(6), courts apply the pleading standards from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), while "giv[ing] due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."  *Hughes,* 142 S. Ct. at 742.  Rule 12 is an "important mechanism for weeding out meritless claims" in the ERISA context. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  This is because "the prospect of discovery" is "ominous," and "a plaintiff with a largely groundless claim [will] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrgs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718-19 (2d Cir. 2013) ("*St. Vincent*").

**Rule 12(b)(1).** Standing is an essential component of Article III's case-or-controversy requirement, and is an issue of subject-matter jurisdiction addressable pursuant to Rule 12(b)(1). *Equal Means Equal v. Ferriero*, 3 F.4th 24, 27-28 (1st Cir. 2021) (affirming dismissal for lack of standing under Rule 12(b)(1)). "An actual case or controversy only exists if the plaintiff has demonstrated 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 995 F.3d 18, 21 (1st Cir. 2021) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

> **B.**    **Plaintiffs Do Not Plausibly Allege That Children's Breached Its Fiduciary Duties by Offering the Freedom Funds.**
>
> > **1.**    **Plaintiffs Cannot State a Viable Claim by Comparing the Actively Managed Freedom Funds to the Passively Managed Index Funds.**

Plaintiffs claim Children's breached its fiduciary duties by offering the actively managed Freedom Funds instead of the "less costly and less risky" Index Funds. (Compl. ¶ 61). The Court can easily dispose of this claim—"[n]othing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund . . ." *Hecker I*, 556 F.3d at 586. Underscoring this point, Plaintiffs do not allege that any fee difference harmed any of them, i.e., that the Freedom Funds underperformed the Index Funds net of fees. *See generally* Compl. This is not surprising. The 2019 Morningstar Target-Date Fund Landscape report that Plaintiffs rely on in their Complaint (*id*. ¶ 79 n.18) confirms just the opposite. Ex. 2 at p. 39 ("Despite an average fee advantage of 50 basis points, the Fidelity Freedom Index series *lagged* the Fidelity Freedom series by roughly 38 basis points annually, on average, since the former's 2009 inception through 2018.") (emphasis added); *see also Smith v. Commonspirit Health,* No. 21-59640, Dkt. 39, Fidelity Amicus Br. (6th Cir. 2022) (summarizing performance data). And Plaintiffs do not allege that including

the Freedom Funds was outside the "range of reasonable judgments a fiduciary may make." *Hughes*, 142 S. Ct. at 742.  The contrary is true.  The 2019 Morningstar Target-Date Fund Landscape report incorporated into the Complaint reflects that other investors preferred the Freedom Funds to the Index Funds by a margin of *six to one*.  *See* Ex. 2, at p. 7.

Moreover, courts have repeatedly dismissed similar claims that actively-managed funds are imprudent by comparing them to index funds.  In fact, the Eighth Circuit rejected that precise claim regarding target date funds in *Meiners*.  898 F.3d at 822-24.  To plausibly allege "a prudent fiduciary in like circumstances" would have selected a different fund, Plaintiffs "must provide a sound basis for comparison—a meaningful benchmark."  (*Id.* at 822).  This is a "challenging" standard, and is not met "by alleging that cheaper alternative investments with some similarities exist in the marketplace."  (*Id.* at 823).    This requirement is logical—"[c]omparing apples and oranges is not a way to show that one is better or worse than the other."  *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484-85 (8th Cir. 2020); *accord Anderson v. Intel Corp.*, 2022 WL 74002, at *10 (N.D. Cal. Jan. 8, 2022).

Here, instead of alleging that the Index Funds represent a meaningful benchmark for the Freedom Funds, Plaintiffs highlight the differences between the two.  The most fundamental difference is that the Freedom Funds utilize an active-management model, while the Index Funds are passively managed.  As Plaintiffs explain, the Freedom Funds "invest[] predominantly in actively managed Fidelity mutual funds," whereas the Index Funds "place[] no assets under active management."  (Compl. ¶ 63; *see also* n.9 (Freedom Funds' "underlying holdings are 88.8% actively managed")).  Plaintiffs also claim that the Freedom Funds "allocate[] approximately 1.5% more of its assets to riskier international equities" than the Index Funds, while also having "higher exposure to classes like emerging markets and high yield bonds."  (*Id.* ¶ 73).  In short, Plaintiffs'

own allegations confirm the Index Funds are inapt benchmarks for the Freedom Funds, with markedly different investment strategies, holdings, and risk.[9]  *Meiners*, 898 F.3d at 823 & n.2 (rejecting target date fund comparator because it had a different allocation to bonds).  Plaintiffs therefore provide an apples-to-oranges comparison that does not plausibly allege the Freedom Funds were imprudent investments.  *Hughes*, 142 S. Ct. at 742 (allegations must support inference that decision to offer a particular investment contravened "the range of reasonable judgments a fiduciary may make"); *Smith v. CommonSpirit Health*, 2021 WL 4097052, *2, *6-7 (E.D. Ky. Sept. 8, 2021) (granting motion to dismiss breach of duty of prudence claims alleging that the Index Funds were preferable alternatives to Freedom Funds because, *inter alia*, actively managed funds and passively managed funds are not ideal comparators); *Davis*, 960 F.3d at 485 (affirming dismissal of claim comparing passively-managed fund to actively-managed funds with higher fees because "they have different aims, different risks, and different potential rewards that cater to different investors"); *Meiners*, 898 F.3d at 823 (same); *Anderson*, 2022 WL 74002, at **9-11.[10]

### 2.    Plaintiffs' Comparisons to Other "Popular" Target-Date Funds Does Not Plausibly Infer Imprudence.

Plaintiffs aver a deficient fiduciary process because the Freedom Funds allegedly underperformed the "primary offerings of four of the five largest non-Fidelity managers in the TDF marketplace" as of the *fourth quarter of 2015*.  (Compl. ¶ 81).  These allegations do not plausibly suggest Children's utilized a flawed fiduciary process or that the Freedom Funds were

---

[9] For the same reasons, the Freedom Funds' higher expense ratios says nothing about the prudence of one fund versus the other.  *Meiners*, 898 F.3d at 823-24 ("the existence of a cheaper fund does not mean that a particular fund is too expensive" or imprudent, especially where the "cheaper" fund relies on passive management).

[10] Plaintiffs' allegations that the Freedom and Index Funds have "nearly identical names," and share a management team (Compl. ¶ 63), does not make the Index Funds a meaningful benchmark.  *Davis*, 960 F.3d at 486 ("some similarities" is insufficient).

imprudent.  *See Barchock*, 886 F.3d at 44-45 ("The test of prudence … is one of conduct, and not a test of the results of performance of the investment").

*First*, the only common thread between the Freedom Funds and Plaintiffs' allegedly better performing comparators is that all are target-date funds.  (Compl. ¶ 81).  The Complaint says nothing about whether the Freedom Funds and any of Plaintiffs' four "comparable" target-date funds share similar investment strategies (passive, active, blend), asset allocations (bonds vs. equities), or risk profiles (aggressive or conservative).  And the Complaint does not allege anything about the glidepath of the various funds.  As a matter of law, that is not sufficient to state a claim. *Barchock*, 886 F.3d at 44-45; *Meiners*, 898 F.3d at 822-23.  In fact, courts have rejected the *same comparisons* when plaintiffs in other cases alleged fiduciary breach claims by challenging the prudence of the *same target date funds* that Plaintiffs say the Plan should have offered.  *See, e.g.*, *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306 (D. Minn. 2021) (granting Rule 12 motion as to fiduciary breach claims challenging T. Rowe Price target date funds because target date funds from Fidelity, Vanguard, and American Funds were not meaningful comparators); *Rosenkranz v. Altru Health Sys.*, 2021 WL 5868960, at *10-11 (D. N.D. Dec. 10, 2021) (granting Rule 12 motion as to fiduciary breach claims challenging JP Morgan target date funds because target date funds from Fidelity and American Funds were not meaningful comparators).[11]  The same is true here.  Plaintiffs do not allege facts that those other target-date investments are meaningful benchmarks, so their fiduciary breach claim fails.[12]

---

[11] Plaintiffs' attorneys, who also represent the plaintiffs in *Wehner*, claim that the defendants in that case should have offered several prudent "Off-the-Shelf" TDFs, ***including the same Freedom Funds challenged here***, instead of the TDFs offered in Roche's plan.  (*Werner*, No. 20-6894, Dkt. No. 46, Am. Compl. ¶ 6 (N.D. Cal. Mar. 1, 2021)).  Those plaintiffs had no concerns with the Freedom Funds' "track record" – or their fees or performance, for that matter.

[12] *E.g.*, *Meiners*, 898 F.3d at 823 ("The fact that one [target-date] fund with a different investment strategy ultimately performed better does not establish anything about whether the Wells Fargo TDFs were an imprudent choice"); *Anderson*, 2022 WL 47002, at *10 (rejecting argument that "comparing a given target date fund . . . to peer TDFs of the same vintage is standard and reasonable practice" because target-date funds "can have differing 'investment strategies, glide paths, and investment-related fees,'" and determining an appropriate benchmark "[d]epends largely

*Second*, ERISA fiduciaries are not required to select the best performing fund. *Barchock*, 886 F.3d at 44-45; *Meiners*, 898 F.3d at 823. The necessary corollary is that allegations that some other funds performed better do not state a plausible fiduciary breach claim. *See DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) ("the ultimate outcome of an investment is not proof of imprudence"); *St. Vincent*, 712 F.3d at 718 (allegations "that better investment opportunities were available at the time of the relevant decisions" does not plausibly state imprudent conduct); *Jacobs v. Verizon Comms., Inc.*, 2017 WL 8809714, at *6 (S.D.N.Y. Sept. 28, 2017) ("Even if the Complaint plausibly alleged that Vanguard's target date funds outperformed the Verizon TDFs, '[t]he ultimate outcome of an investment is not proof of imprudence or breach of fiduciary duties.'").

*Third*, examining returns as of a *single date* prior to the putative class period for a three- or five-year period does not plausibly suggest that offering the Freedom Funds was imprudent. The Complaint says nothing about the performance as of any other quarter or year; indeed, taking the Complaint's allegations as true, one cannot tell whether the Freedom Funds performed worse than any of the comparator funds as of any other point time, including the entire putative class period.[13] And short-term fluctuations in performance are common, and "retirement investing" involves looking at the "long-term horizon." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243,

---

on the stated investment strategy and the actual investments of the fund"); *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *8 (N.D. Cal. Feb. 9, 2021) (same).

[13] Such differences can be caused by a single year's performance, or single month's performance. By way of example, a hypothetical fund could have better five-year "average" performance even if it performed worse in four of the five years:

| Year | 2010 | 2012 | 2013 | 2014 | 2015 | Average |
|------|------|------|------|------|------|---------|
| Fund 1 | 5.9% | 5.9% | 5.9% | 5.9% | 7.2% | 6.16% |
| Fund 2 | 6.1% | 6.1% | 6.1% | 6.1% | 6.1% | 6.10% |

253-54 (5th Cir. 2008); *Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019) ("[T]hree to five years . . . [is] considered [a] relatively short period[] of underperformance."). "Put simply, the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers." *Patterson*, 2019 WL 4934834, at *11.

> **3.    Plaintiffs' Critiques of the Performance of a Subset of the Freedom Funds' Underlying Investments Do Not Plausibly Suggest the Freedom Funds Were Imprudent Investments.**

Plaintiffs also ask the Court to infer an imprudent process because some of the investments *held by* the Freedom Funds underperformed their benchmarks, or had a short performance history. (Compl. ¶¶ 68-71). These investments were not offered as stand-alone funds in the Plan. Under these circumstances, the underlying holdings of the Freedom Funds are not even plan assets under ERISA. *See, e.g.*, EBSA Advisory Op. 2009-04A (Dec. 4, 2009) (available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/2009-04a) (underlying mutual funds held by target date funds are not plan assets under ERISA. Plaintiffs identify no authority for the proposition that an investment might be imprudent because some portion of its underlying holdings—which are not investable by Plan participants and thus cannot themselves have caused any harm—underperformed for some period of time or lacked a sufficient history when considered in isolation. Nor could they. ERISA imposes a duty on fiduciaries to "properly monitor investments and remove imprudent ones." *Hughes*, 142 S. Ct. at 741 (*citing Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). That might require a fiduciary to remove an underperforming fund under appropriate circumstances, but it does not require fiduciaries to ensure that each *underlying* investment within a fund is prudent. After all, funds also invest in individual securities, but no authority holds that plan fiduciaries are required to evaluate each individual security within a mutual fund. And by Plaintiffs' logic, all index funds

would be imprudent (including Plaintiffs' preferred Index Funds), because by definition they hold some securities that outperformed the index and other securities that underperformed the index. Here, moreover, Plaintiffs say nothing about how the performance of those underlying investments impacted the performance of the *Freedom Funds themselves*, nor allege that the *Freedom Funds* had an insufficient performance history.

Regardless, these allegations cannot support an inference of a flawed fiduciary process in monitoring the Freedom Funds. Plaintiffs do not allege that the Index Funds or the other "comparator" target date funds only had underlying funds with a five-year track record that outperformed their benchmarks.[14] In other words, the Complaint alleges no facts that suggest that the Freedom Funds were any different from any other target date funds in this respect, let alone fall outside the "range of reasonable judgments" that fiduciaries make. *Hughes,* 142 S. Ct. at 742.

### 4. "Outflows" from the Freedom Funds Do Not Suggest Imprudence.

Plaintiffs cite a 2018 Reuters report and 2019 Morningstar report for the argument that Children's should have realized the Freedom Funds were imprudent because some other investors withdrew assets from the Freedom Funds between 2014 and 2018. (Compl. ¶ 74 & n.13, 79 & n.18). But Plaintiffs ignore that even after the $16 billion in net "outflows," the Freedom Funds still held more than $167 billion in assets in 2018. Ex. 2 at p. 7. This meant they were still *six times* more popular than the Index Funds and were *more popular* than all but one of the other target-date funds in the market. *Id.*; *see also Smith*, 2021 WL 4097052, at *8 ("it is apparent that

---

[14] As it happens, the Fidelity Index Funds that Plaintiffs claim should have been offered instead of the Freedom Funds invest in component funds that were incepted in 2016, 2019, and 2021. *See, e.g.*, https://fundresearch.fidelity.com/mutual-funds/composition/315793869 (listing component funds); https://fundresearch.fidelity.com/mutual-funds/summary/315911537 (inception date 4/26/2019); https://fundresearch.fidelity.com/mutual-funds/summary/31635T823 (inception date 4/26/2019); https://fundresearch.fidelity.com/mutual-funds/summary/31635V620 (inception date 7/6/2016); https://fundresearch.fidelity.com/mutual-funds/summary/31638R667 (inception date 8/31/2021).

the [Freedom Funds] remained significantly more popular than the Index [Funds] as late as 2018

and was the second-most popular target-date fund in the entire industry by market share").  Giving

"due regard to the range of reasonable judgments a fiduciary may make," there can be no inference

of a flawed fiduciary process when the Freedom Funds were so popular with other investors "under

the circumstances then prevailing."  *Hughes,* 142 S. Ct. at 739, 742; *see also Smith*, 2021 WL

4097052, at *8; Fidelity Amicus Br. at 12.[15]

### 5.     Plaintiffs Do Not Plausibly Allege the Freedom Funds Were "Too Risky."

Plaintiffs' generic allegations that the Freedom Funds were "too risky" are conclusory.

Plaintiffs contend that the Freedom Funds had a "higher exposure" to international equities,

emerging markets, and high yield bonds than the Index Funds.  (Compl. ¶ 73).  That explains why

the two funds are not appropriate comparators, but it does not explain why one is better or worse

than the other.  *Cf. Barchock*, 886 F.3d at 49-55 (affirming Rule 12 dismissal of complaint alleging

fiduciary breach claims based on the defendants taking on too little risk compared to other funds);

Fidelity Amicus Br. at 19-22.  This is precisely the type of conclusory allegation that cannot state

a claim.  *See, e.g.*, *Barchock*, 886 F.3d at 49-55;  *St. Vincent*, 712 F.3d at 722 (allegations that

fiduciary "exposed the [p]lan to excessive risk due to an egregious over-concentration in high-risk

mortgage securities" failed to state a claim because the complaint "offers no insight into how risky

those unspecified investments became relative to their price"); *Jacobs*, 2017 WL 8809714, at *6

(allegation that defendants included "risky investment options" in the plan's target-date funds did

not state a claim).  Moreover, the strategy changes that Plaintiffs criticize are alleged to have been

well-known at the time.  (Compl. ¶ 74).  Other prudent investors nonetheless preferred the Freedom

---

[15] As of 2018, 30% of U.S. TDF holdings in fund firms with multiple TDFs were in Fidelity Freedom Funds. *See* Ex. 2 at p.7.

Funds to the Index Funds by a margin of six to one, *see supra* p. 7, negating any inference of imprudence. *Hughes*, 142 S. Ct. at 742 (allegations must suggest investment decision fell outside "the range of reasonable judgments a fiduciary may make").

### C.    Plaintiffs Cannot Plausibly Allege a Flawed Fiduciary Process Regarding Recordkeeping Merely by Identifying Seven Plans That Paid a Lower Fee.

Plaintiffs allege the Plan's recordkeeping fees were "excessive" because the Plan's average annual recordkeeping fees across the relevant period (as Plaintiffs calculate them) exceeded the fees of seven other plans during a single year, 2020. (Compl. ¶¶ 55-56). This fails to state a claim. The conceptual premise of Plaintiffs' recordkeeping-fee claim—that the Plan's fees are indicative of an imprudent fiduciary process because a handful of other plans allegedly paid less—is flawed. There are thousands of 401(k) plans. But Plaintiffs identify just ***seven*** plans that purportedly had lower recordkeeping fees than the Children's Plan. (*Id*). The alleged fees from that miniscule number of plans cannot create an inference that the Plan's fees were outside the "range of judgments" fiduciaries make. *Hughes*, 142 S. Ct. at 740; *see also Albert v. Oshkosh Corp.*, 2021 WL 3932029, at *5 (E.D. Wis. Sept. 2, 2021) ("[T]he mere existence of purportedly lower fees paid by other plans says nothing about the reasonableness of the Plan's fee."). Following Plaintiffs' logic, moreover, six of the seven comparator plans in the Complaint would also be subject to an inference of imprudence, because they all paid more than the $23 per participant than the cheapest plan – the Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan – allegedly paid. In a universe of thousands of plans, there is no logical or legal difference between saying that one plan paid less in recordkeeping fees and saying that seven plans paid less in recordkeeping fees.

This is especially true since Plaintiffs do not compare the Plan—which they allege had an average of 17,145 participants between 2016 and 2020—to truly "comparable" plans. Three of

Plaintiffs' comparator plans have more than 19,000 participants. (Compl. ¶ 55). Considering Plaintiffs' allegation that the "primary driver[]" of recordkeeping pricing is the "number of participants" in a plan (*id.* ¶ 51), this disparity renders meaningless the Complaint's already-limited sample set. Further, if, as Plaintiffs contend, the recordkeeping fee is directly related to the number of participants, then one would expect some correlation between the fees in Plaintiffs' "prudent" plans and the number of participants. Instead, their factual allegations prove the contrary. The least expensive plan—the FedEx plan at $23 per participant—has 19,354 participants. (*Id.* ¶ 55). The Qualcomm plan, however, is both larger (20,955 participants) and more expensive ($31 per participant) than the FedEx plan. (*Id*). And while the Viacom plan has only 12,884 participants, it allegedly nonetheless has a similar recordkeeping fee to Qualcomm of $32 per participant. (*Id*).

Plaintiffs' comparators are apples and oranges for another reason. The Form 5500s on which Plaintiffs rely indicate that some or all of the recordkeeping fees for other plans were paid *by the employer*.[16] Fees reported on the Form 5500s do not reflect these employer-paid amounts. Thus, Plaintiffs are only tallying certain administrative fees (such as loan processing fees and managed account fees) for their comparators, not recordkeeping fees at all. This is another apples-and-oranges comparison that says nothing about whether the Plan's recordkeeper here charged more than a reasonable fee for the services provided. *C.f., Loomis*, 658 F.3d at 671 (rejecting

---

[16] *See, e.g.*, Ex. 3, Form 5500, Fedex Office and Print Services, 401(k) Retirement Savings Plan, Notes to Financial Statement at 8 ("The Company pays all administrative expenses of the Plan, except for loan origination fees, hardship determination fees, managed account advice fees, and the administrative costs of certain mutual funds and individual transaction fees which are charged directly to the participants."); Ex. 4, Form 5500, Southern California Permanente Medical Group Tax Savings Retirement Plan, Notes to Financial Statement at 7 ("Expenses for maintaining the Plan including the fees paid to accountants, legal professionals, *and other plan service providers may be paid by the Plan. During the current year, these fees were paid by the Plan Sponsor.* Investment advisory fees and other participant-initiated consulting fees are allocated based on participants account balances and are included in administrative expenses.") (emphasis added); Ex. 5, Form 5500, Ecolab Savings Plan and ESOP, Notes to Financial Statement at 8 ("The Company pays a portion of the administrative expenses of the Plan, which are excluded from these financial statements. . . ."); Ex. 6, Form 5500, Michelin 401(k) Savings Plan, Notes to Financial Statement at 8 ("The majority of the Plan's administrative expenses are paid by the Company.")

argument that defendants breached their fiduciary duty because the employer should have paid

plan recordkeeping fees: "whether to cover these expenses is a question of plan design, not of

administration"). Plaintiffs' recordkeeping allegations fail to state a claim.[17]

**D.    Plaintiffs' Allegation That Children's Offered an "Excessively Expensive Investment Menu" and Higher Share Classes Does Not Plausibly Suggest a Flawed Fiduciary Process.**

Plaintiffs also contend that Children's breached its duties because the Plan's "investment-

related fees" exceeded the "average total plan fees" from an ICI study. (Compl. ¶ 83). Such

allegations are not sufficient to state a claim. *See Barchock*, 886 F.3d at 54 ("industry survey

incorporated into the complaint" did not provide a meaningful basis for inferring imprudence).

Numerous courts have rejected fiduciary breach claims based on the same ICI study Plaintiffs cite.

*See, e.g.*, *Perkins v. United Surgical Partners Int'l*, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18,

2022) (ICI study does not distinguish between actively and passively managed accounts so it

cannot be a benchmark to support claim of imprudence); *Parmer*, 518 F. Supp. 3d at 1303-04 (ICI

study results "are not meaningful benchmarks"); *Kong v. Trader Joe's Co.,* 2020 WL 5814102, at

---

[17] The Complaint's recordkeeping fee allegations are also implausible because they focus exclusively on the alleged cost associated with recordkeeping, without any facts about the scope or caliber of services provided in exchange for the challenged fees, whether for the Plan or its purported comparators. "Cost is only one factor to be considered in selecting a service provider." Dep't of Labor, EBSA, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan*, *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (last visited April 6, 2022). As here, criticisms of recordkeeping fees is meaningless where the "[p]laintiffs fail to allege that the fees were excessive *relative 'to the services rendered.'" Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (emphasis added); *Mator v. Wesco Distr., Inc.*, 2021 WL 4523491, at * 7 (W.D. Pa. Oct. 4, 2021) (dismissing claim where plaintiffs "allege[d] no facts about the level of services provided to the Plan's participants in exchange for the fees paid"); *Forman v. TriHealth*, 2021 WL 4346764, at *5-6 (S.D. Ohio Sept. 24, 2021) (same); *Kong II*, 2020 WL 7062395, at *6 (same); *see also Hecker II*, 569 F.3d at 711 (denying petition for rehearing and affirming Rule 12(b)(6) dismissal of ERISA fiduciary breach claim for excessive fees). Plaintiffs, here, fail to allege any facts concerning the breadth and level of services that Fidelity provided to the Plan's participants, let alone how those services compare to those provided to Plaintiffs' proffered plans.

*4 (C.D. Cal. Sept. 24, 2020) ("*Kong I*") (same).[18]  The Complaint's repeated focus on "average" fees ignores that in any data set, about half will always be above the average.  If these allegations were sufficient to state a claim against Children's, they could state a claim against about half of all plans.  *See Obeslo v. Great-West Cap. Mgmt., LLC*, 2020 WL 4558982, at *7 n.4 (D. Colo. Aug. 7, 2020) (that a given mutual fund has higher expenses than "industry average fees" does not render the fees excessive; otherwise, "half of all mutual funds would have 'excessive' fees"), *aff'd*, 6 F.4th 1135 (10th Cir. 2021). That, obviously, cannot be the case, and Plaintiffs cannot assert a viable claim based on "averages."  *C.f. Barchock*, 886 F.3d at 52-53 (no claim in comparing performance to industry averages).  In addition, while Plaintiffs argue that imprudence is shown by the failure of the Plan to always use the institutional share class with the lowest gross expense ratio for seven funds,[19] "ample authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach."  *White v. Chevron Corp.*, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017) ("*White II*"), *aff'd,* 752 F. App'x 453 (9th Cir. 2018).[20]  This makes sense because there are perfectly legitimate, and prudent,

---

[18] *See also, e.g.*, *Rosenkranz,* 2021 WL 5868960, at *10-11 (granting motion to dismiss challenging investment management fees as too high compared to ICI median report because it contained expense ratios from both actively managed and passively managed funds and was "an apples to oranges comparison," not a meaningful benchmark).

[19] Plaintiffs do not allege that they invested in any of those funds or paid any of those higher fees, so they lack Article III standing to press this claim.  *See infra* at p. 19.

[20] *See also, e.g.*, *Mator*, 2021 WL 4523491, at *7 (allegation that "Defendants imprudently chose mutual fund share classes with higher costs even though less expensive class shares of the same funds were available" is not enough to state a claim); *Brown v. Daikin Am., Inc.*, 2021 WL 1758898, at *7 (S.D.N.Y. May 4, 2021) (holding the mere fact that Daikin selected retail share classes for certain investment options could not state an imprudence claim); *Loomis*, 658 F.3d at 670 (rejecting claim that fiduciaries breached any duty "by offering 'retail' mutual funds" instead of "'institutional' investment" classes); *Kong II*, 2020 WL 7062395, at *4 (rejecting challenge to share class of funds because higher-cost share classes may have offered other benefits that would have offset any additional costs); *Marks v. Trader Joe's*, 2020 WL 2504333, at *7-8 (C.D. Cal. Apr. 24, 2020) (dismissing claims and holding that plaintiffs alleged no specific facts to suggest breach of fiduciary duty, and merely offering institutional class shares instead of investor class shares was not enough); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *6 (S.D.N.Y. Sept. 18, 2019) ("Plaintiffs' allegations that the Plan included high-cost share classes of investment options when lower-cost share classes of those same investment options were available to the Plan do not, as a matter of law, support an inference of a flawed fiduciary process"); *Forman*, 2021 WL 4346764, at *7 (dismissing claims that fiduciaries failed to offer the "lower-cost share classes" of certain funds where plaintiffs alleged the only difference

reasons that a fiduciary may choose not to offer the lowest-cost institutional share class of a particular fund. For instance, the modest incremental differences in expense ratios in higher-cost share classes reflect revenue sharing to pay for recordkeeping that otherwise would have to be paid directly by participants. *Leimkuehler*, 713 F.3d at 909 ("As a general matter, expense ratios and revenue-sharing payments move in tandem: the higher a given share class's expense ratio, the more the fund pays [] in revenue sharing"). And if it is proper to pay recordkeeping fees through revenue sharing (as Plaintiffs themselves allege), then it also must be proper to offer higher cost share classes. After all, that is the only way to get the revenue sharing needed to pay for recordkeeping. *See, e.g.*, *White II*, 2017 WL 2352137, at *14 (recognizing that a fiduciary used retail share class funds to "pa[y] the Plan's recordkeeping expenses"); *Daikin Am.*, 2021 WL 1758898, at *7 ("[T]he mere fact that Daikin selected retail share classes for certain investment options in the Plan does not establish a breach of fiduciary duty under ERISA."). Thus, the allegations that the Plan did not offer the share class with the lowest possible fees for seven funds does not state a claim.[21]

### E.    Plaintiffs Lack Article III Standing to Pursue Their Claims.

Plaintiffs also lack Article III standing to sue under Rule 12(b)(1). "There is no ERISA exception to Article III" and its standing requirements. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020). Where, as here, litigants allege fiduciary misconduct, each must demonstrate that

---

between the funds offered and the preferred funds was the fees but did not offer any further information on those preferred funds).

[21] Plaintiffs' ancillary claims also fail. First, they claim that Children's breached ERISA's duty of loyalty, which requires fiduciaries to act "solely in the interest of the Plan's participants and beneficiaries." (Compl. ¶ 106, citing 29 U.S.C. § 1104(a)(1)(A)). But the Complaint does not allege any disloyal acts. *See, e.g.*, *Loomis*, 658 F.3d at 671 (affirming dismissal of disloyalty claim where complaint did not separately allege facts to show that defendant selected investments "to enrich itself at participants' expense"); *Albert*, 2021 WL 3932029, at *8 (dismissing similar claim on these same grounds). Second, they claim that Children's failed to "act in accordance with the documents and instruments governing the Plan" (Compl. ¶ 106), again offering no supporting allegations (*see generally id.*), meaning this claim fails as a matter of law. Third, Plaintiffs claim that Children's and the Committee breached a duty to monitor the Committees' members, and that any non-fiduciary defendants are liable for a knowing breach of trust. (Compl. ¶¶ 110-18, 120-21). These claims are derivative of Plaintiffs' primary causes of action and collapse with them. *See, e.g.*, *Barchock*, 886 F.3d at 55.

the alleged misconduct injured him or her *personally*, even when they purport to be suing "on behalf of" an ERISA plan.  (*Id.* at 1620).

The Plan is a defined-contribution individual-account plan, which means a participant's benefit is based solely on the amounts in her individual account.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (in a defined contribution plan, "each beneficiary is entitled to whatever assets are dedicated to his individual account").  This means that the performance or fees associated with investment options that a participant did *not* select for their account does not impact that participant's benefit.  For these reasons, "district courts across the country have largely held that ERISA plaintiffs do not have standing to challenge the offering of specific funds that they did not allege that they personally invested in."  *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *4 (N.D. Cal. Nov 16, 2021) (collecting cases); *see also Perkins*, 2022 WL 824839, at *3-4 (holding that plaintiffs did not have standing to challenge selection of wrong share class, performance of funds they did not invest in, or recordkeeping fees paid for through revenue-sharing, where they did not allege that the funds in which they invested paid for such fees).

Here, Plaintiffs allege only that they invested in four vintages of the Freedom Funds (Compl. ¶¶ 9-12), but purport to challenge *all* of the Freedom Fund vintages, as well as the share classes of seven other funds in which none of them invested.  Plaintiffs do not allege they selected any of those other investments, much less experienced harm flowing from their fees or performance.  *See Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2018) (in an ERISA imprudent investment case, "at a minimum, a plaintiff must allege a net loss in investment value that is fairly traceable to the defendants' challenged actions").  As such, Plaintiffs cannot have suffered any personalized, concrete injury-in-fact related to those investments.  *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008) (confirming that ERISA "authorize[s]

recovery for fiduciary breaches that impair the value of plan assets *in a participant's individual account*") (emphasis added).[22]  And as to the Freedom Funds in which they did invest, Plaintiffs lack Article III standing because they do not allege that those funds underperformed any of the comparator funds *during the time period Plaintiffs held those investments*.  *See Medtronic, Inc.*, 628 F.3d at 455  (no Article III standing where plaintiff did not allege that he held the challenged investment at the time the alleged plan losses were suffered); *see also Fishman Haygood Phelps Walmsley Willis & Swanson, LLP v. State St. Corp.*,  2010 WL 1223777, at *7 (D. Mass. Mar. 25, 2010) (no Article III where plaintiffs did not demonstrate they suffered injury-in-fact and allegedly imprudent investments outperformed plaintiff's proposed alternative investments in short-term treasuries and money market funds).  Moreover, as to recordkeeping, Plaintiffs' allegations are all based on fees in 2020 (Compl. ¶ 56 n.6), when none of the four Plaintiffs were still participants in 2020.  *See* Ex. 2.  Nor do Plaintiffs allege that they paid any recordkeeping fees, let alone that the fees they personally paid exceeded the reasonable fees of the comparable plans they identify.  As such, they have not alleged they suffered any injury in fact and they lack Article III standing.

## IV.    **CONCLUSION**

For the reasons explained above, Children's respectfully requests that the Court dismiss the Complaint in its entirety and with prejudice.

---

[22] *See also e.g.*, *Lange v. Infinity Healthcare Physicians*, 2021 WL 3022117, at *2-4 (W.D. Wis. July 16, 2021) ("a plaintiff lacks standing [to] challenge[] investment decisions that did not personally affect her"); *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *4 (granting Rule 12(b)(1) motion where complaint did not allege that plaintiffs invested in the challenged funds); *Garthwait v. Eversource Energy Co.*, 2021 WL 4441939, at *7 (D. Conn. Sept. 28, 2021) (plaintiffs lacked standing to challenge the fees and performance of plan investments because "the Complaint is devoid of specific allegations that the named plaintiffs owned any of the mentioned funds at any point during the relevant time period"); *In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *10 (S.D.N.Y. Aug. 2, 2021) (plaintiffs lacked standing to sue for injuries resulting from products in which they did not invest because they could not have suffered cognizable injuries in fact with respect to the alleged mismanagement of those funds); *Patterson*, 2019 WL 4934834, at *5  (plaintiff lacked standing to challenge seven other investments he never personally held); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *9-10 (D.D.C. Jan. 8, 2019) (similar).

Respectfully submitted,

Dated:  April 7, 2022                      MORGAN, LEWIS & BOCKIUS LLP


By: */s/ Keri L. Engelman*
Keri L. Engelman (BBO #704360)
Joshua M. Adler (BBO# 706905)
One Federal Street
Boston, MA  02110-1726
Tel:  (617) 341-7828
Fax:  (617) 341-7701
keri.engelman@morganlewis.com
joshua.adler@morganlewis.com

Jeremy P. Blumenfeld
1701 Market Street
Philadelphia, PA 19103
Tel:  (215) 963-5000
Fax:  (215) 963-5001
jeremy.blumenfeld@morganlewis.com

Stephanie R. Reiss (*pro hac vice forthcoming*)
One Oxford Centre, 32nd Fl.
Pittsburgh, PA  15219
Tel:  (412) 560-3378
Fax:  (412) 560-3700
stephanie.reiss@morganlewis.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of April, 2022, I electronically filed the foregoing

document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice

of electronic filing to all CM/ECF participants.


*/s/ Keri L. Engelman*
Keri L. Engelman


21