# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADILSON MONTEIRO, KAREN GINSBURG, JASON LUTAN, and BRIAN MINSK, Individually and as representatives of a class of similarly situated persons, on behalf of the CHILDREN'S HOSPITAL CORPORATION TAX-DEFERRED ANNUITY PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>THE CHILDREN'S HOSPITAL CORPORATION, THE BOARD OF DIRECTORS OF THE CHILDREN'S HOSPITAL CORPORATION, THE CHILDREN'S HOSPITAL CORPORATION RETIREMENT COMMITTEE; and DOES No. 1-20, Whose Names Are Currently Unknown,<br><br>Defendants. | Case No: 1:22-cv-10069 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

Table of Authorities ..................................................................................................ii

I.      INTRODUCTION .............................................................................................. 1

II.     RELEVANT FACTUAL BACKGROUND........................................................ 3

        A.      Overview of the Plan ............................................................................. 3

        B.      Plaintiffs' Claims and Supporting Facts ............................................... 3

                1.      The Plan's Consistently Underperforming Investment Options................. 3

                2.      The Plan's Significantly-Above-Average Investment Expenses ............... 5

III.    ARGUMENT ...................................................................................................... 5

        A.      Standard of Review................................................................................ 5

        B.      Plaintiffs' Allegations Plausibly State a Claim for Breach of Fiduciary Duties..... 7

                1.      The Continued Retention of the Active Suite Supports the Inference that
                        Defendants Breached Their Fiduciary Duties............................................. 7

                2.      Plaintiffs' Comparison of the Active Suite to Other Similar TDFs
                        Supports an Inference of a Fiduciary Breach.............................................. 9

                3.      Defendants' Arguments Regarding the Underperformance of the Active
                        Suites' Underlying Funds Lack Merit....................................................... 11

                4.      Outflows from the Freedom Funds Suggest Imprudence .......................... 12

                5.      Plaintiffs Allege that the Freedom Funds Were Unsuitably High-Risk ... 13

        C.      Plaintiffs Plausibly Allege Defendants Failed to Monitor Recordkeeping Fees .. 13

        D.      Plaintiffs Plausibly Allege Defendants Failed to Monitor Investment Fees......... 15

        E.      Plaintiffs Have Standing to Bring Each of Their Claims....................................... 18

IV.     CONCLUSION................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Page(s)**

<u>**Cases**</u>

*Anderson v. Intel Corp.*,
    2022 WL 74002 (N.D. Cal. Jan. 8, 2022) ................................................................. 8

*Barchock v. CVS Health Corp.*,
    886 F.3d 43 (1st Cir. 2018) .................................................................... passim

*Bell v. Pension Committee of ATH Holding Company, LLC*,
    2017 WL 1091248 (S.D. Ind. Mar. 23, 2017) ......................................................... 3

*Boley v. Universal Health Servs., Inc.*,
    498 F. Supp. 3d 715 (E.D. Pa. 2020) ...................................................................... 20

*Bouvy v. Analog Devices, Inc.*,
    2020 WL 3448385 (S.D. Cal. June 24, 2020) ......................................................... 3

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ................................................................... 6, 15, 18

*Brown v. Medtronic, Inc.*,
    628 F.3d 451 (8th Cir. 2018) .................................................................................. 20

*Bunch v. W.R. Grace & Co.*,
    555 F.3d 1 (1st Cir. 2009) ..................................................................................... 12

*Cassell v. Vanderbilt*,
    285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ............................................................... 3

*Cassell v. Vanderbilt*,
    2018 WL 5264640 (M.D. Tenn. 2018) .................................................................. 19

*Cunningham v. Cornell Univ., ("Cunningham II")*,
    2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ....................................................... 11

*Cunningham v. Cornell Univ.*,
    2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ......................................................... 9

*Davis v. Salesforce.com, Inc.*,
    2022 WL 1055557 (9th Cir. 2022) ........................................................................ 17

*Davis v. Wash. Univ. in St. Louis*,
    960 F.3d 478 (8th Cir. 2020) .................................................................................. 8

*Falberg v. Goldman Sachs Group, Inc.*,
  2020 WL 3893285 (S.D.N.Y. July 9, 2020) ................................................................. 2, 7, 20

*Feinberg v. T. Rowe Price Group, Inc., et al.*,
  2018 WL 3970470 (D. Md. Aug. 20, 2018) .......................................................................... 2

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014) ....................................................... 13

*Fishman Haygood Phelps Walmsley Willis & Swanson, LLP v. State St. Corp.*,
  2010 WL 1223777 (D. Mass. Mar. 25, 2010) ...................................................................... 20

*García-Catalán v. United States*,
  734 F.3d 100 (1st Cir. 2013) ....................................................................................... 5, 6

*Glass Dimensions, Inc. v. State St. Bank & Trust Co.*,
  931 F. Supp. 2d 296 (D. Mass. 2013) ................................................................................. 1

*Hay v. Gucci America, Inc.*,
  2018 WL 4815558 (D.N.J. Oct. 3, 2018) ............................................................................ 19

*Hecker v. Deere & Co.*,
  569 F.3d 708 (7th Cir. 2009) ......................................................................................... 7

*Henderson v. Emory Univ.*,
  252 F. Supp. 3d 1344 (N.D. Ga. May 10, 2017) ..................................................................... 3

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) .................................................................................................. 19

*In re Biogen, Inc. ERISA Litig.*,
  2021 WL 3116331 (D. Mass. July 22, 2021) ................................................................. passim

*In re LinkedIn ERISA Litig.*,
  2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) ....................................................................... 19

*In re MedStar ERISA Litig.*,
  2021 WL 391701 (D. Md. Feb. 4, 2021) .............................................................................. 9

*In re Omnicom ERISA Litig.*,
  2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021) .......................................................................... 9

*In re Quest Diagnostics Inc. ERISA Litig.*,
  2021 WL 1783274 n.5 (D.N.J. May 4, 2021) ........................................................................ 12

*Jacobs v. Verizon Commc'ns, Inc.*,
  2017 WL 8809714 (S.D.N.Y. Sept. 28, 2017) ....................................................................... 13

*Johnson v. Providence Health & Servs.*,
  2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) ........................................................ 3

*Jones v. Coca-Cola Consol., Inc.*,
  2021 WL 1226551 (W.D.N.C. Mar. 31, 2021) .......................................................... 9

*Kong v. Trader Joe's Co.*,
  2020 WL 5814102 (C.D. Cal. Sept. 24, 2020) ........................................................ 16

*Kruger v. Novant Health, Inc.*,
  131 F. Supp. 3d 470 (M.D.N.C. 2015) .............................................................. 16, 18

*LaRue v. DeWolff, Boberg & Assocs.*,
  552 U.S. 248 (2008) ................................................................................. 20

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
  323 F.R.D. 145 (S.D.N.Y. 2017) .......................................................... 17, 19, 20

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ............................................ 6

*Main v. Amr. Airlines*,
  248 F. Supp. 3d 786 (N.D. Tex. Mar. 31, 2017) .................................................... 3

*Marshall v. Northrop Grumman Corp.*,
  2019 WL 4058583 (C.D. Cal. Aug. 14, 2019) ...................................................... 7

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ..................................................................... 8

*Moitoso v. FMR LLC*,
  451 F. Supp. 3d 189 (D. Mass. 2020) .......................................................... 14, 15

*Morales-Tañon v. Puerto Rico Elec. Power Auth.*,
  524 F.3d 15 (1st Cir. 2008) ...................................................................... 5

*Morin v. Essentia Health*,
  2017 WL 4876281 (D. Minn. Oct. 27, 2017) ...................................................... 18

*Obeslo v. Great-W. Capital Mgmt., LLC*,
  2020 WL 4558982 n.4 (D. Colo. Aug. 7, 2020) .................................................. 17

*Parmer v. Land O'Lakes, Inc.*,
  518 F. Supp. 3d 1293 (D. Minn. 2021) .......................................................... 16

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ...................................................... 9

*Pegram v. Herdrich*,
  530 U.S. 211 (2000)......................................................................................... 1

*Perkins v. United Surgical Partners Int'l*,
  2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ................................................. 16, 19

*Pinnell, et al. v. Teva Pharmaceuticals USA, Inc., et al.*,
  2020 WL 1531870 (E.D. Pa. Mar. 31, 2020).................................................... 2

*Ramos v. Banner Health*,
  461 F. Supp. 3d 1067 (D. Colo. 2020)............................................................. 11

*Rosenkranz v. Altru Health Sys.*,
  2021 WL 5868960 (D. N.D. Dec. 10, 2021)..................................................... 16

*Sacerdote v. New York Univ.*,
  2018 WL 840364 (S.D.N.Y. Feb. 13, 2018)..................................................... 19

*Schultz et al. v. Edward Jones*,
  2018 WL 1508906 (E.D. Mo. Mar. 27,2018) ................................................. 3

*Sepulveda-Villarini v. Dept. of Educ. Of Puerto Rico*,
  628 F.3d 25 (1st Cir. 2010)............................................................................. 5

*St. Vincent Catholic Med. Ctrs. Ret. Plan v. MorganStanley Inv. Mgmt. Inc.*,
  712 F.3d (2d Cir. 2013)................................................................................... 13

*Sweda v. Univ. of Pennsylvania*,
  923 F.3d 320 (3d Cir. 2019)............................................................................ 6, 15

*Thole v. U. S. Bank N.A*,
  140 S. Ct. 1615, (2020)................................................................................... 6, 20

*Tibble v. Edison Int'l*,
  135 S. Ct. 1823 (2015).................................................................................... 5

*Tibble v. Edison Int'l*,
  843 F.3d 1187 (9th Cir. 2016) ........................................................................ 2

*Tracey et al. v. MIT*,
  2017 WL 4478239 (D. Mass. Oct. 4, 2017)..................................................... 2

*Troudt v. Oracle Corp.*,
  2017 WL 1100876 (D. Col. Mar. 22, 2017) .................................................... 3

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) .......................................................................... 15, 18

*Urakhchin Allianz Asset Mgmt. of Am., L.P.*,
    2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) ........................................................ 19

*Velazquez v. Massachusetts Fin. Servs. Co.*,
    320 F. Supp. 3d 252 (D. Mass. 2018) ............................................................... 2, 18

*White v. Chevron Corp.*,
    2017 WL 2352137, (N.D. Cal. May 31, 2017) ..................................................... 17

## **Statutes**

29 U.S.C. § 1104(a)(1) .............................................................................................. 1

29 U.S.C. § 1104(a)(1)(B) ...................................................................................... 1, 5

29 U.S.C. § 1132(a)(2) ........................................................................................... 6, 18

## **Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................... 5

Fed. R. Civ. P. 12(b) ................................................................................................. 6

Plaintiffs, Adilson Monteiro, Karen Ginsburg, Jason Lutan, and Brian Minsk (collectively, "Plaintiffs"), individually and as participants of the Children's Hospital Corporation Tax-Deferred Annuity Plan ("Plan"), by and through their attorneys, respectfully submit this opposition to Defendants' Motion to Dismiss.[1]

## I.   <u>INTRODUCTION</u>

The Employee Retirement Income Security Act of 1974 ("ERISA") imposes strict fiduciary duties of loyalty and prudence upon retirement plan fiduciaries, which courts have recognized are "the highest known to the law." *Glass Dimensions, Inc. v. State St. Bank & Trust Co.*, 931 F. Supp. 2d 296, 305 (D. Mass. 2013). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with an "eye single" to the interests of such participants and beneficiaries. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). In addition, fiduciaries must exercise appropriate "care, skill, prudence, and diligence[.]" 29 U.S.C. § 1104(a)(1)(B). In this case, Defendants failed to meet their fiduciary duties to the Plan and its participants and beneficiaries by imprudently selecting and monitoring Plan investments and causing the Plan to pay plainly excessive recordkeeping and investment management fees.

Any suggestion that Plaintiffs' Complaint lacks merit because it is "one of dozens" of lawsuits challenging the actively managed Fidelity Freedom target date funds ("TDFs")[2] ("Freedom Funds"), Defs. Mem. at 1, is a red herring and simply unfounded because Plaintiffs

---

[1] Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Class Action Complaint (ECF No. 28) is referred to herein as "Defs. Mem." All references to "CAC" or "Complaint" are to the Class Action Complaint. (ECF No. 1).

[2] A target date fund offers investors an "all-in-one retirement solution" as the portfolio of underlying funds is designed to gradually shift to take more conservative positions as the target retirement year approaches. This "set-it-and-forget-it" investment option which has proved very attractive to unsophisticated investors. CAC at ¶¶ 60, 65.

plead compelling claims for breaches of fiduciary duty and related misconduct against Defendants. This case is not, as Defendants claim, an attempt "to impose categorical rules on fiduciaries" of the Plan. *Id.* In reality, the Complaint is a specific challenge to the imprudent retention of several funds and service arrangements for the Plan. The Fidelity Freedom Funds ("Active Suite") were among the first TDF suites available to investors, and thus benefitted significantly from the subsequent popularity of TDFs. Nevertheless, as the Active Suite's excessive risk, cost, and consistent underperformance has become apparent in the past decade, retirement plans have abandoned and fled from the Active Suite such that its market share has steadily and substantially declined.

Despite Defendants' transparent attempts to mischaracterize the nature of Plaintiffs' claims, they are clear. Plaintiffs simply assert that the retention of the Active Suite as the TDF for the Plan could not have been deemed prudent by any competent fiduciaries fulfilling their duties. Moreover, the Plan's above-market investment management and recordkeeping fees strongly suggest that the Plan has been mismanaged. To meet their fiduciary duties, fiduciaries are "obligated to minimize costs." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc) (citing Unif. Prudent Investor Act §7). Indeed, "[c]ost-conscious management is fundamental to prudence in the investment function." *Id.* at 1197-98 (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)). District courts from the First through Eleventh Circuits have denied similar motions to dismiss analogous claims when pled with the degree of detail and specificity demonstrated in the Complaint.[3] This case is no different and Defendants' arguments for dismissal lack merit.

---

[3] *See, e.g.*, *In re Biogen, Inc. ERISA Litig.*, No. 20-CV-11325-DJC, 2021 WL 3116331, at *3 (D. Mass. July 22, 2021); *Tracey et al. v. MIT*, 2017 WL 4478239, *2 (D. Mass. Oct. 4, 2017) (sustaining excessive fee claim); *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d 252, 255 (D. Mass. 2018); *Falberg v. Goldman Sachs Group, Inc.,* 2020 WL 3893285, at * 11 (S.D.N.Y. July 9, 2020) (same);

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Overview of the Plan

Plaintiffs are former participants in the Plan, a defined contribution retirement plan. CAC at ¶¶ 2, 9-12.  Defined contribution plans have become the primary form of retirement savings in the United States.  *Id.* at ¶ 2.  Accordingly, every penny saved matters.  The Plan is one of the largest 401(k) plans in the United States, with assets totaling more than $1.1 billion by the end of 2020, and 18,580 participants.  *Id.* at ¶ 4.  Plans with such substantial assets and participant counts have significant bargaining power and the ability to demand low-cost administrative and investment management services in the marketplace.  *Id.*  The Children's Hospital Corporation ("Boston Children's") is a fiduciary charged with administering the Plan and appointing, overseeing, and removing members of the Children's Hospital Corporation Retirement Committee (the "Committee").  *Id.* at ¶¶ 112-114.  CHC also appointed Fidelity Management Trust Company to serve as the Plan trustee and recordkeeper.  *Id.* at ¶¶ 24, 51.

### B.    Plaintiffs' Claims and Supporting Facts

#### 1.    The Plan's Imprudent Investment Options

It is a basic principle of investment theory that the risks associated with an investment must be justified by its potential returns for that investment to be rational.  CAC at ¶ 67.  Yet, the Active Suite, which held approximately 53% of the Plan's assets by December 2020 (largely

---

*Pinnell, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, 2020 WL 1531870, at *6 (E.D. Pa. Mar. 31, 2020) (same); *Feinberg v. T. Rowe Price Group, Inc., et al.*, 2018 WL 3970470, at *7 (D. Md. Aug. 20, 2018) (same); *Main v. Amr. Airlines*, 248 F. Supp. 3d 786, 794 (N.D. Tex. Mar. 31, 2017) (same); *Cassell v. Vanderbilt*, 285 F. Supp. 3d 1056, 1061 (M.D. Tenn. 2018) (same); *Bell v. Pension Committee of ATH Holding Company, LLC*, 2017 WL 1091248, at *4 (S.D. Ind. Mar. 23, 2017) (same); *Schultz et al. v. Edward Jones*, 2018 WL 1508906, a *3 (E.D. Mo. Mar. 27, 2018) (same); *Bouvy v. Analog Devices, Inc.*, 2020 WL 3448385 (S.D. Cal. June 24, 2020) (same); *Johnson v. Providence Health & Servs. et al.*, 2018 WL 1427421, at *6 (W.D. Wash. Mar. 22, 2018) (same); *Troudt v. Oracle Corp.*, 2017 WL 1100876, at *3 (D. Col. Mar. 22, 2017) (same); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1349 (N.D. Ga. May 10, 2017) (same).

because of its role as the Plan's Qualified Default Investment Alternative, placing even more importance on prudent monitoring), does not satisfy that basic principle.  *Id.* at ¶¶ 64-65.

The Active Suite, a suite of TDFs the Plan has offered since at least December 2009, is riskier and more expensive than its index fund counterpart, the Fidelity Freedom Index series ("Index Suite"), with which it shares the same investment management company and investment managers, and approximately the same equity glide path (*i.e.*, allocation strategy) -- not to mention name.  CAC at ¶¶ 61-66.  The primary distinction between the two suites is that, while the investment managers select only Fidelity mutual funds that track market indices as components for the Index Suite, the same managers pick actively managed Fidelity mutual funds and riskier assets for the Active Suite.  *Id.* at ¶¶ 63, 66-67.

In 2013 and 2014, the Active Suite underwent a strategy overhaul, authorizing the investment managers to deviate from the glide path allocations by 10%, thereby increasing its exposure to market volatility.  *Id.* at ¶¶ 74-75.  Since the strategy overhaul, and in particular as of the start of the Class Period,  the Active Suite and most of its components have consistently underperformed several of the most popular readily investable alternatives in the TDF marketplace.  *Id.* at ¶¶ 81-82 (embedding charts).  The strategy overhaul and subsequent underperformance did not go unnoticed to the investing public, including other 401(k) plans -- the Active Suite experienced $16 billion in net outflows from 2014 to 2018.  *Id.* at ¶ 79.  Indeed, in March 2018, Reuters, a news organization, published a scathing special report (the "Reuters Report")[4] detailing the Active Suite's issues and commentary from financial analysts.  *Id.* at ¶ 74.

---

[4]"Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelityputs-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

### 2.    The Plan's Significantly-Above-Average Investment Expenses

The Plan's investment menu is also, as a whole, significantly more expensive than those in similarly sized plans. The Plan's excessive investment expense is reflected in its Total Plan Cost ("TPC") of 0.46%-0.49% of total assets. The average total plan expenses for similarly sized plans is 0.29%. As a result, the Plan pays significantly more for investment management fees than other, similarly sized plans. CAC at ¶ 83. Defendants' disregard for expenses is further corroborated by their failure to select the least expensive share class for certain funds that were available to the Plan. *Id.* at ¶ 84.

## III.    <u>ARGUMENT</u>

### A.    Standard of Review

ERISA's duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The standard applies to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828-29 (2015). A breach of the fiduciary duty of prudence may be alleged with circumstantial facts, as Plaintiffs have comprehensively done here.

When considering a motion to dismiss under Rule 12(b)(6), "the standard is plausibility assuming the pleaded facts to be true and read in a plaintiff's favor." *Sepulveda-Villarini v. Dept. of Educ. Of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010). A complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013) (citing FED. R. CIV. P. 8(a)(2)); *see also Morales-Tañon v. Puerto Rico Elec. Power Auth.*, 524 F.3d 15, 18 (1st Cir. 2008). In order

to adequately state a claim in order to survive a motion to dismiss, a plaintiff is not required to set forth "a high degree of factual specificity" and "the complaint must be read as a whole." *García-Catalán*, 734 F.3d at 103 (internal citations omitted).

When assessing a complaint, courts should provide "some latitude" when "a material part of the information needed is likely to be within the defendant's control" and "it cannot reasonably be expected" plaintiffs would have access to such information without discovery. *Id.* at 104 (internal citations omitted). This is especially true in cases like this one concerning breach of fiduciary duty under ERISA where plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 331 (3d Cir. 2019).

To survive a challenge to standing under Rule 12(b)(1), a plaintiff must establish (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief. *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1618, (2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "An injury in fact is defined as 'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'" *In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *3 (citing *Lujan*, 504 U.S. at 560 (footnote omitted) (internal citations and quotation marks omitted)). A plaintiff with Article III standing may proceed under 29 U.S.C. § 1132(a)(2) on behalf of the Plan or other participants. *See, e.g.*, *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 593 (8th Cir. 2009).

**B.      Plaintiffs' Allegations Plausibly State a Claim for Breach of Fiduciary Duties**

     1.      **The Continued Retention of the Active Suite Supports the Inference that Defendants Breached Their Fiduciary Duties**

Defendants' characterization of the allegations in the Complaint regarding their failure to remove the Active Funds reflects either a deep misunderstanding or a deliberate effort to mislead the Court.  Defs. Mem. at 6.  The relevant inquiry is nor whether ERISA requires index funds or that fiduciaries "scour the market to find and offer the cheapest possible fund," but rather whether the Plan's fiduciaries engaged in a prudent process to select and continually monitor cost-effective investment options.[5]  *See Biogen,* 2021 WL 3116331, at *5 (quoting *Falberg v. Goldman Sachs Grp., Inc.*, 2020 WL 3893285, at *8) ("A plaintiff may survive a motion to dismiss, even absent allegations of the defendant's knowledge or inadequate investigation, if the court can infer based on circumstantial factual allegations . . . that the process was flawed."); *Marshall v. Northrop Grumman Corp.*, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019) ("[a] trier of fact could reasonably view the [investment committee's] evaluations and discussions in [] meetings insufficient to disprove a breach of Defendants' fiduciary duties because the Investment Committee failed to adequately weigh the costs and benefits of an active management strategy against a passive management strategy.").

Defendants' position that a suite of TFS comprising passively managed underlying funds may never be a proper comparator to the Active Suite due to differences in fund strategies is similarly infirm.  Contrary to Defendants' superficial examination, the Index Suite is a

---

[5]Accordingly, Plaintiffs' allegations are distinguishable from *Hecker v. Deere & Co.*, 569 F.3d 708, 710-11 (7th Cir. 2009), as they do not suggest that Defendants should have selected only passive funds or the Index Suite, but constitute circumstantial facts which reveal Defendant's deficient monitoring process.

meaningful, if not ideal, benchmark for the Active Suite.  The Active and Index Suites are offered by the same investment management firm, readily available as a Plan investment option, share the same management team (CAC at ¶ 63), and share almost identical glide paths.  *Id.* at ¶ 66.  The crucial distinction between the two is the management team's discretion to select riskier and actively managed assets and to deviate from the glide path for the Active Suite, which is reflected in the substantially higher management fees.  *Id.* at ¶ 74.  In other words, the Index Suite is the control and the Active Suite is the variable -- any outperformance or underperformance by the Active Suite relative to the Index Suite is directly related to the fee differential.

The cases cited by Defendants on this issue are easily distinguishable.  In *Meiners* and *Davis*, the plaintiffs did "not match that benchmark by alleging that cheaper alternative investments with some similarities exist in the marketplace."  *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018); *see Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485-86 (8th Cir. 2020) (challenged fund was a "one-stop shop for those investors who want broad exposure to both domestic and international equities," while proposed comparators had "lower percentage of international stock").  Similarly, in *Anderson v. Intel Corp.*, plaintiffs merely alleged that proposed benchmarks were "common," without any discussion of aims, risks, and rewards of the chosen comparators.  2022 WL 74002, at *10 (N.D. Cal. Jan. 8, 2022).  Here, as discussed above, the Active and Index Suite are both TDFs and share, among other things, the same investment management team and nearly identical glide paths (which are derived from the same investment philosophy), going beyond "some similarities."  Likewise, in those cases, there was no indication that the passive funds offered as comparators had the nearly identical features the Active and Index Suites do here.  Courts in this district and across the country have rejected

Defendants' proposition that the Active and Index Suites are not proper comparators at the motion to dismiss stage. *See Biogen*, 2021 WL 3116331 at *6 ("Disputes over the appropriateness of these benchmarks, however, are inappropriate at the motion to dismiss stage"); *Jones v. Coca-Cola Consol., Inc*., 2021 WL 1226551 (W.D.N.C. Mar. 31, 2021); *In re Omnicom ERISA Litig*., 2021 WL 3292487, at *12 (S.D.N.Y. Aug. 2, 2021); *In re MedStar ERISA Litig*., 2021 WL 391701, at *6 (D. Md. Feb. 4, 2021).

Defendants notably provide no explanation for how the small differences between the Index and Active Suite – *e.g.,* the additional 1.5% exposure to international equities and more exposure to emerging markets and high yield bonds for the Active Suite – nullify their similarities. e.g., the same managers, same fund type, almost identical glide paths, as discussed above. *Cf. Patterson v. Morgan Stanley*, 2019 WL 4934834, at *12 (S.D.N.Y. Oct. 7, 2019) ("[p]laintiffs assert in a conclusory manner that the Vanguard Mid-Cap Growth Fund was 'comparable' to the Mid Cap Fund . . . without ever explaining how or why the funds were comparable").

### 2. Plaintiffs' Comparison of the Active Suite to Other Similar TDFs Supports an Inference of a Fiduciary Breach

Defendants also take issue with Plaintiffs' comparison of the Active Suite to four of the largest non-Fidelity managers in the TDF marketplace. Defs. Mem. at 8. As an initial matter, "[d]isputes over the appropriateness of these benchmarks, however, are inappropriate at the motion to dismiss stage." *Biogen,* 2021 WL 3116331, at *6 (citing *Cunningham v. Cornell Univ*., 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 29, 2017)). However, the infirmity of Defendants' argument does not stop there. Defendants suggest that, even using these benchmarks, Plaintiffs' allegations are insufficient to suggest Defendants acted imprudently, as the test of prudence focuses on process and not results. Defs. Mem. at 8-9 (citing *Barchock v.*

*CVS Health Corp.*, 886 F.3d 43, 44-45 (1st Cir. 2018)).  Plaintiffs do not disagree with the characterization of the focus of the test of prudence, but allege that the Active Suite's continued underperformance at the start of the Class Period relative to its apt comparators (identifiable in real time) should have led Defendant to investigate the continued prudence of retaining the Active Suite.

Plaintiffs selected the non-Fidelity comparators on the basis that those four TDFs represent the primary offerings of the Freedom Funds' top competitors, which collectively manage nearly 60% of all assets invested in TDFs. Defendants claim that courts have rejected comparisons between the Active Suite and the four non-Fidelity comparator TDFs.  Defs. Mem. at 9.  Again, however, "[d]isputes over the appropriateness of these benchmarks, however, are inappropriate at the motion to dismiss stage."  *Biogen* 2021 WL 3116331, at *6.  Defendants also make the strawman argument that there is no requirement under ERISA that fiduciaries select the best performing fund -- an assertion Plaintiffs never make in their Complaint.  Defs. Mem. at 10. Plaintiffs do not allege that failure to select the best-performing fund, or even a better-performing fund, automatically constitutes a fiduciary breach.  Rather, Plaintiffs allege that Defendants, in failing to consider the risk of the Active Suite, its consistent underperformance, and its excessive fees through the Class Period, ignored warning after warning that the vintages comprising the Active Suite were not suitable investment options for Plan participants.  *Biogen*, 2021 WL 3116331, at *6 ("Defendants plausibly knew about the 'pitfalls' of the Active suite, given its publicity, and did not meet the objective prudent person standard by continuing to offer said suite").

Finally, Defendants argue that Plaintiffs' comparison of three-and five-year returns does not plausibly suggest that retaining the Active Suite was imprudent conduct by Defendants.

However, as Plaintiffs state in the Complaint, three- and five-year performance comparisons are proper to assess underperformance for benchmarking purposes because those metrics are widely regarded by investment professionals and the investment policy statements of competently-managed defined contribution retirement plans as the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup.  CAC at ¶ 36 n.20 *Cunningham v. Cornell Univ.* ("*Cunningham II*"), 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (advisor satisfied fiduciary duty where it regularly presented "three and five-year benchmarks" of investment options); *Biogen,* 2021 WL 3116331, at *6 ("Based on the Freedom suite's performance on a trailing three- and five-year annualized basis following the 2013 and 2014 overhaul . . . [d]efendants plausibly knew about the 'pitfalls' of the Active suite, given its publicity, and did not meet the objective prudent person standard by continuing to offer said suite.").  Indeed, in *Ramos v. Banner Health*, the plan's investment policy statement **requires** the evaluation of investment returns using a three- and five-year benchmark.  461 F. Supp. 3d 1067, 1097 (D. Colo. 2020).  Defendants' suggestion that a longer time horizon is required is at odds with industry standards and is a transparent attempt to distract from the clear, objective signs of the Active Suite's unsuitability for the Plan.

### 3.    Defendants' Arguments Regarding the Underperformance of the Active Suites' Underlying Funds Lack Merit

Plaintiffs have provided detailed descriptions of the underperformance and/or insufficient track records of the Active Suite's underlying investments as of the start of the Class Period. CAC at ¶¶ 68-71.  Defendants take issue with the inclusion of these facts, arguing that because they were not offered as stand-alone funds in the Plan, and were not plan assets under ERISA, that there can be no inference of imprudence by Defendants for failure to consider the consistent underperformance of the underlying investments.  This is a truly bizarre proposition, as the

underperformance, or insufficient track record of the underlying investments should have been a clear warning to Defendants of the serious shortcomings of the Active Suite. Indeed, the performance of the Active Suite itself is entirely dependent upon the performance of the underlying funds. Defendants also take issue with the fact that Plaintiffs do not allege that the Index Suite or the non-Fidelity TDFs **only** had underlying funds with a five-year track record that outperformed their benchmarks. As with Defendants' other arguments, this misses the point. Taken together, these allegations amount to a real-time warning that prudent fiduciaries must adjust the Plan's investment offerings. *Biogen,* 2021 WL 3116331, at *6 (citing *In re Quest Diagnostics Inc. ERISA Litig*., 2021 WL 1783274, at *3 n.5 (D.N.J. May 4, 2021)).

### 4.    Outflows from the Freedom Funds Suggest Imprudence

Defendants take issue with Plaintiffs' reliance on negative popular and financial press coverage by Reuters and Morningstar, both of which support the inference that Defendants should have realized that the Active Suite was imprudent as investors and professionals were losing faith in the Freedom Funds between 2014 and 2018. Defs. Mem. at 12; CAC at ¶ 74 n.13; ¶ 79 n.18. Defendants ignore the *$16 billion* in net outflows from 2014 to 2018, and instead point to the fact that the Freedom Fund still held more than $167 billion in assets in 2018, suggesting that the size of the Plan and continued popularity with other investors somehow meant that it was appropriate for Defendants to turn a blind eye to the significant red flags regarding the underperformance of the Active Suite during the Class Period. Defs. Mem. at 12. As the Complaint alleges, however, Fidelity is the second largest TDF provider by total assets and the Active Suite enjoyed a significant incumbency advantage, and therefore it is unsurprising that the Active Suite maintained considerable assets despite significant underperformance. CAC at ¶ 61. This is flatly not the measure of prudence under ERISA. Rather, courts assess a fiduciary's prudence based on the fiduciary's conduct, rather than "the result of performance,"

and viewed from the perspective of the time of the challenged decision. *Barchock,* 886 F.3d at

44 (quoting *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009)).  Defendant's failure to

react to real-time warning signs, including significant net asset outflows, is sufficient to infer

imprudence.  *Biogen*, 2021 WL 3116331, at *6.   "Here, Plaintiffs' allegations support a

plausible claim that a prudent person who knew what Defendants knew would have stopped

utilizing the Active suite in the aftermath of Fidelity's strategy overhaul in 2014.  Plaintiffs assert

that in 2018, the Active suite experienced an estimated $5.4 billion in net outflows with nearly

$16 billion withdrawn from the fund family over the previous four years."  *Id.*

### 5.    Plaintiffs Allege that the Freedom Funds Were Unsuitably High-Risk

Plaintiffs allege that the Active Suite was unsuitable for participants if the Plan because it

chases returns by taking on inordinate risk.  CAC at ¶ 66.  While the vintages of  the Index Suite

invest only in underlying index funds that track segments of the market in order to manage risk,

the Active Suite primarily invests in underlying funds with a manager actively deciding which

securities to buy and sell, in what quantities, and when, in an effort to time the market.  *Id*.

Defendants describe Plaintiffs' allegation regarding the risk of the Active Suite as

conclusory, and once again suggest that the Active and Index Suites are not suitable comparators.

Defs. Mem. at 13.  As discussed in greater detail above, the Active and Index Suites are suitable

comparators.  Further, Plaintiffs' allegations are not conclusory, but rather are consistent with the

typical plan objective to "(1) to maximize retirement savings for participants while (2) avoiding

excessive risk."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 420, 134 S.Ct. 2459, 189

L.Ed.2d 457 (2014).  Unlike the cases cited by Defendants, Plaintiffs do not ground their

fiduciary breach claims solely in the risk levels of the investments selected by the Plan.  *Cf.*

*Barchock*, 886 F.3d at 49-55; *St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv.*

*Mgmt. Inc.,* 712 F.3d at 722 (2d Cir. 2013); *Jacobs v. Verizon Commc'ns, Inc.*, 2017 WL

8809714, at *6 (S.D.N.Y. Sept. 28, 2017). Rather, their claims are rooted in Defendants' continued investment and failure to remove the Active Suite following its underperformance, risk, and cost, after the strategy overhaul in 2013 and 2014 and in light of the unsuitability of the investment for Plan participants.

### C.     Plaintiffs Plausibly Allege Defendants Failed to Monitor Recordkeeping Fees

In addition to Plaintiffs' allegations that Defendants imprudently retained the Active Suite, Plaintiffs also allege that the Plan's recordkeeping costs were excessively high, and that Defendants failed to realize that they caused the Plan to overpay Fidelity for recordkeeping services. CAC at ¶¶ 50-59. Defendants misrepresent the clear allegations in the Complaint, claiming that Plaintiffs' allegations are premised on the Plan's annual recordkeeping fees exceed the fees of seven comparator plans in "a single year, 2020." Defs. Mem. at 14. While the Complaint does cite the Plan's 2020 Form 5500, Plaintiffs allege in no uncertain terms that Defendants' gross misconduct with regard to excessive recordkeeping and administration services occurred throughout the entirety of the Class Period, as defined in the Complaint. *Id.* at ¶¶ 50-59.

Moving from one misrepresentation to the next, Defendants take issue with the fact that, because there are thousands of 401(k) plan, Plaintiffs' inclusion of seven comparator plans that pay lower recordkeeping fees *for the exact same services* as the Plan is somehow insufficient to raise an inference that the Plan's fees were unreasonable. Defs. Mem. at 14. Defendants appear to be under the impression that, just because Plaintiffs identified seven comparators with lower recordkeeping fees than the Plan, the remaining universe of plans are somehow not lower. While this is clearly untrue, Plaintiffs emphasize that the seven plans identified in the Complaint were selected for their similarity to the Plan and services obtained. Additionally, Fidelity has previously stipulated to facts which support Plaintiffs' position. In *Moitoso v. FMR LLC*,

14

Fidelity stipulated that "the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this [p]lan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."  451 F. Supp. 3d 189, 199 (D. Mass. 2020).  Here, the Plan has nearly $1.1 billion in assets, nearly identical to the threshold identified by Fidelity in *Moitoso*.  CAC at ¶ 4.

Finally, Defendants ask this Court to disregard Plaintiffs' allegation that Defendants caused the Plan to improperly pay excessive recordkeeping fees.  Defs. Memo. at 14-16. Defendants' only support for this argument is that Fidelity may have performed additional services for in exchange for the challenged fees, in addition to recordkeeping.  *Id*. at 16 n.17. While it may be the case, albeit unlikely given the totality of allegations demonstrating the improprieties of Defendants, that there were additional services for which the revenue sharing payments were made to Fidelity, it is not Plaintiffs' burden to disprove this assertion at this juncture, and the Court should not draw the inference in Defendants' favor at this stage.  *See Braden*, 588 F.3d at 596 (holding "[i]t is not [Plaintiffs'] responsibility to rebut these possibilities in [their] complaint, however . . . [and] Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct"); *see also Sweda,* 923 F.3d at 332 (citing *Tussey v. ABB, Inc*., 746 F.3d 327, 336 (8th Cir. 2014) ("finding fiduciaries breached their duties by '[failing to] (1) calculate the amount the Plan was paying [the recordkeeper] for recordkeeping through revenue sharing, (2) determine whether [the recordkeeper's] pricing was competitive, [or] (3) adequately leverage the Plan's size to reduce fees,' among other things.").

### D.    Plaintiffs Plausibly Allege Defendants Failed to Monitor Investment Fees

Defendants' feeble attack on Plaintiffs' allegations regarding the Plan's excessively expensive investment menu only further highlights their complete misunderstanding of the Complaint.  From 2015 to 2020, the Plan paid out 0.46%-0.49% of its total assets in investment-

related fees alone, while the average *total plan cost* of comparable plans was 0.29% during the

same period.  CAC at ¶ 83.  Citing to the *Barchock* case, Defendants attempt to escape this

damning fact by arguing that industry studies like the Brightscope/ICI study cited in the

Complaint cannot provide a meaningful basis to provide imprudence.  Defs. Mem. at 16.[6]

Plaintiffs' reliance on the Brightscope/ICI study is readily distinguishable from *Barchock*, as

Plaintiffs draw particularized comparisons between the Plan's investment-related fees and the

TPC of specific comparators.  CAC at ¶¶ 83-85.[7]  Moreover, at least one court in this district has

found this same study to support imprudence claims.  *See Biogen,* 2021 WL 3116331, at *8.

Plaintiffs' allegations regarding TPC are straightforward "circumstantial facts" indicating

a flawed process because of the skew toward expensive funds.  *See Kruger v. Novant Health,*

*Inc.*, 131 F. Supp. 3d 470, 476 (M.D.N.C. 2015) (plan's exclusive use of retail share classes

sufficient to indicate, on motion to dismiss, that cheaper share classes were not considered).

Nonetheless, Defendants challenge these allegations, arguing that mutual funds with higher than

average are not necessarily imprudent, because "in any data set, about half will always be above

the average."  Defs. Mem. at 17.[8]  But Plaintiffs do not argue that a Plan must "always use the

---

[6] Defendants take far too much liberty in characterizing the Barchock decision, as the court there merely found that the specific academic study cited by plaintiffs was not sufficient to infer imprudence with regard to money market funds at issue, as the study merely addressed the composition of stable value funds and made a general retrospective claim regarding the performance of stable value funds relative to money market funds.  886 F.3d 43 at 54.

[7] Defendants also cite to a series of out-of-circuit cases where courts have rejected the use of an ICI study for failure to distinguish between actively and passively managed funds, claiming that these decisions suggest that the comparison of the Active Suite and Index Suite is an "apples-to-oranges" comparison. Defs. Mem. at 16-17; *Perkins v. United Surgical Partners Int'l*, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022); *Parmer v. Land O'Lakes, Inc.,* 518 F. Supp. 3d 1293 (D. Minn. 2021); *Kong v. Trader Joe's Co.*, 2020 WL 5814102, at *4 (C.D. Cal. Sept. 24, 2020); *Rosenkranz v. Altru Health Sys.*, 2021 WL 5868960, at *10-11 (D. N.D. Dec. 10, 2021).  However, in those cases, there was no indication that the passive funds offered as comparators had the nearly identical features the Active or Index Suites do here, or that they were benchmarks selected by the active fund managers.

[8] Defendants point to *Obeslo v. Great-W. Capital Mgmt.*, LLC, 2020 WL 4558982, at *7 n.4 (D. Colo. Aug. 7, 2020), to support their defense of the Plan's higher-than-average fees, despite the fact that *Obleso*

16

institutional share class with the lowest gross expense ratio."[9]  Rather, sound logic dictates the average cost of a plan's investment lineup should gravitate toward the average cost of comparable plans.  The Plan fails these principles.

Defendants argue "there are perfectly legitimate, and prudent, reasons that a fiduciary may choose not to offer the lowest-cost institutional share class of a particular fund," which may include expenses reflecting revenue sharing to pay for recordkeeping.  Defs. Mem. at 17-18.  The Ninth Circuit recently rejected this exact argument in reversing dismissal of similar claims concerning investment management fees.  *See Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *1-2 (9th Cir. 2022).[10]  Again, Plaintiffs do not assert a blanket rule that a fiduciary must select the ***lowest*** cost share class of a fund, and readily concede that there may be prudent reasons for a fiduciary not to do so.  Instead, Plaintiffs assert that, given the information available to ***Defendants***, it was imprudent to fail to monitor and offer lower cost share classes. Accordingly, Plaintiffs' allegations are "sufficient to suggest Defendants breached their fiduciary

---

was limited to damages calculation under the Investment Company Act and is not applicable here. Defendants' citation to *Barchock* is similarly misleading, in that the court rejected a comparison to the industry average cash allocation of stable value funds, whereas here Plaintiffs compare the fees of the Plan to the fees charged by comparable plans.  *Barchock*, 886 F.3d at 52-53.

[9]Defendants' reliance on *White v. Chevron Corp.*, 2017 WL 2352137, (N.D. Cal. May 31, 2017) ("*White II*"), *aff'd,* 752 F.App'x 453 (9th Cir. 2018), and other cases in footnote 20 of their brief spills much ink to refute a point that Plaintiffs do not attempt to make.  Plaintiffs do not argue that it is *per se* imprudent for a fiduciary to select retail rather than institutional share classes, but rather that "'[s]howing that any given Fund had cheaper alternatives or that it had unreasonably excessive fees,' however, 'may allow a trier of fact to 'reasonably infer . . . that the defendants' process was flawed,' though it is not dispositive of the ultimate question regarding the 'methods employed by the ERISA fiduciary' to investigate, select, or monitor investments."  *See Biogen*, 2021 WL 3116331, at *8 (quoting *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 157 (S.D.N.Y. 2017)).

[10]Defendants might attempt to cling to the Ninth Circuit's comment that it agreed the plaintiffs there did not plausibly allege the defendants failed to actively consider passively managed alternatives to actively managed alternatives.  *Davis*, 2022 WL 1055557, at *2 n.1.  Any such attempt would be misguided, as (1) *Davis* only involves a challenge to the plan's fees, not challenges to specific plan investments, as with Plaintiffs' claims here, (2) Plaintiffs do not claim that it is imprudent *per se* to select passively managed funds instead of actively managed funds, and (3) Plaintiffs plead numerous additional indicia of imprudence not present in *Davis*.

duty by failing to satisfactorily monitor and lower cost share classes . . ." *Biogen,* 2021 WL 3116331, at *8; *Velazquez v. Mass. Fin. Sevs. Co.*, 320 F. Supp. 3d 252, 259 (D. Mass. 2018) (noting that "[a] claim of breach is sufficiently made out, however, when a plaintiff plausibly alleges that the higher fees were unjustified or otherwise improper").[11]

### E.    Plaintiffs Have Standing to Bring Each of Their Claims

Defendants' standing argument, Defs. Mem. at 18-19, ignores the fundamental character of ERISA breach of fiduciary duty claims.  Namely, actions under 29 U.S.C. §1132(a)(2) are "brought in a representative capacity on behalf of the plan as a whole," and remedies under §1109 "protect the entire plan."  *Braden v. Wal-Mart, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009). Thus, plaintiffs in an ERISA case may seek recovery on behalf of the entire plan, even if they did not personally invest in every one of the challenged funds.  In *Braden*, 588 F.3d at 593, the court noted "[a]lthough in certain types of matters, courts have found that a plaintiff cannot suffer an injury from an investment that he or she did not purchase, 'courts have declined to apply the above bright-line rule when addressing ERISA claims for breach of fiduciary duties.'") (citation omitted).  *See also Cassell v. Vanderbilt*, 2018 WL 5264640, *2-3 (M.D. Tenn. 2018) (plaintiff has standing to challenge investments in which they did not invest.).

---

[11]Defendants claim that Plaintiffs have not adequately alleged that Defendants breached ERISA's duty of loyalty.  Defs. Mem. at 18 n. 21.  This is clearly false, as Plaintiffs allege Defendants' retention of the Active Suite, use of high-cost share classes, and failure to monitor fees enabled Fidelity to collect its inflated compensation from participants. CAC at ¶¶ 55-59.  These allegations support a strong inference that Defendant's actions, were taken (1) to save itself costs at the expense of Plan participants, and/or (2) to favor its recordkeepers over the Plan participants.   Finally, courts, including in this Circuit, routinely decline to dismiss disloyalty claims where the factual allegations are, as here, tied to the prudence claims because discovery of the shared facts would resolve both claims.  *See, e.g.*, *Kruger*, 131 F. Supp. 3d at 474-80; *Morin v. Essentia Health*, 2017 WL 4876281, at *1 (D. Minn. Oct. 27, 2017) (citing *Tussey*, 746 F.3d at 335; *Braden*, 588 F.3d at 595).  Defendants only challenge to Plaintiffs' monitoring claim is that, because they mistakenly view Plaintiffs' primary causes of action as deficient, so too must be the ancillary claims.  Defs. Mem. at 18 n. 21.  Because Plaintiffs have plausibly alleged that Defendants breached their fiduciary duties directly, Plaintiffs have also plausibly alleged that Defendants have breached their duty to monitor.  *See Biogen*, 2021 WL 3116331, at *10.

Defendants ignore that Plaintiffs have indisputably alleged injuries that were caused by Defendants' fiduciary breaches, including losses related to the funds in which they invested and the payment of excessive recordkeeping and investment management fees. Contrary to Defendants' citation to *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (a case involving a defined benefit plan), these injuries accord Plaintiffs standing to pursue the Plan's losses caused by Defendants' ***same*** conduct concerning funds in which Plaintiffs were not invested. *See, e.g.*, *Hay v. Gucci America, Inc.*, 2018 WL 4815558, at *4 (D.N.J. Oct. 3, 2018) ("Plaintiff here alleges an injury rooted in Defendants' conduct in managing all the funds as a group.") (internal quotation omitted); *see also Sacerdote v. New York Univ.*, 2018 WL 840364, at *7 (S.D.N.Y. Feb. 13, 2018) (finding, where not every class member invested in each challenged fund, "alleged foregone opportunities from funds that were not included and the alleged reduction in choice that resulted is an alleged injury in fact.") (citation omitted); *Urakhchin Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *4 (C.D. Cal. Aug. 5, 2016)).[12]

The vast majority of courts have rejected Defendants' exact standing argument. *See Biogen*, 2021 WL 3116331, at *4 (citing *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 154 (S.D.N.Y. 2017)) ("[T]he Court concludes that the named Plaintiffs have asserted an injury in fact, as they allege that they personally paid excessive fees in connection with their own investments, thereby establishing injury . . . and have asserted a sufficient claim for class

---

[12]Defendants' citations to out-of-district opinions *In re LinkedIn ERISA Litig*., 2021 WL 5331448 (N.D. Cal. Nov. 16, 2021), and *Perkins*, 2022 WL 824839, similarly miss the mark. In *LinkedIn*, the court specifically took issue with plaintiffs' failure to allege their investment in the Freedom Funds Active Suite. 2021 WL 5331448 at *4 ("in fact, there is no information in the complaint about any of the Plaintiffs' investments"). Here, Plaintiffs have alleged that they invested in the Freedom Funds during the relevant period and suffered losses as a result. CAC at ¶¶ 9-12. Similarly, the *Perkins* plaintiffs did not allege facts reflecting their plan investments or payment of fees, and only claimed the fees associated with plan investments were excessive, including because fiduciaries failed to select the lowest-cost share class of certain investments. 2022 WL 824839 at *3. Since the plaintiffs did not allege investment "in any of the more expensive share classes," the plaintiffs could not establish harm from the fees. *Id.*

standing given their joint stakes in the litigation.); *Boley v. Universal Health Servs., Inc.*, 498 F.

Supp. 3d 715, 721-24 (E.D. Pa. 2020) (denying analogous motion to dismiss for lack of

standing); *Falberg v. Goldman Sachs Grp., Inc*, 2020 WL 3893285, at *8 (S.D.N.Y. July 9,

2020) (finding that named plaintiffs, who were participants in a defined contribution plan, had

asserted an injury because "plaintiffs can establish constitutional standing to bring representative

claims by pointing to injuries to Plan assets"); *Leber*, 323 F.R.D. at 156 ("that only some of these

alleged losses manifested themselves in the named plaintiffs' individual accounts does not

deprive plaintiffs of their standing to seek redress on behalf of the Plan for the broader injuries

the Plan incurred").[13] Because "Plaintiffs allege the process utilized by Defendants resulted in

the selection of several imprudent funds, including funds in which Plaintiffs invested, thereby

establishing injury, and have asserted a sufficient claim for class standing given their joint stakes

in the litigation." *Biogen*, 2021 WL 3116331, at *4.[14]

## IV.    CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety.

---

[13]Defendants' reliance on *Thole* is entirely misplaced because Plaintiffs have demonstrated an injury in fact with respect to the Fidelity Freedom target date funds.  As it relates to standing here, *Thole* is inapplicable, as that case involved a defined ***benefit*** plan, unlike the Plan, which is a defined ***contribution*** plan.  In *Thole*, Justice Kavanaugh noted the importance of this distinction, observing that, among other things, "[t]he basic flaw in the plaintiffs' trust-based theory of standing is that the participants in a defined-benefit plan are not similarly situated to the beneficiaries of a private trust or to the participants in a defined-contribution plan."  140 S.Ct. at 1619.

[14]Perplexingly, Defendants cite *Brown v. Medtronic, Inc.*, 628 F.3d 451, 455 (8th Cir. 2018), *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008), and *Fishman Haygood Phelps Walmsley Willis & Swanson, LLP v. State St. Corp.*, 2010 WL 1223777, at *7 (D. Mass. Mar. 25, 2010) for the proposition that there is no article III standing where a plaintiff does not allege an injury-in-fact during the during the Class Period while they held the investment.  Defs. Mem. at 18-19.  This argument completely ignores the fact that the Complaint clearly alleges that Plaintiffs maintained investments through the Plan in the Fidelity Freedom funds during the Class Period (CAC at ¶¶ 9-12), and that they suffered losses as a result of Defendants' conduct.  *Id.* at ¶ 20.

Dated: April 21, 2022               Respectfully submitted,

/s/ *John Roddy*
John Roddy
Elizabeth Ryan
BAILEY & GLASSER LLP
176 Federal Street, 5th Floor
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954
Email: jroddy@baileyglasser.com
       eryan@baileyglasser.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
       lrubinow@millershah.com

James C. Shah
Alec J. Berin
John C. Roberts
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
       ajberin@millershah.com
       jcroberts@millershah.com

Kolin C. Tang
MILLER SHAH LLP
19712 MacArthur Blvd.
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

Mark K. Gyandoh
Gabrielle Kelerchian
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
         gabriellek@capozziadler.com

Donald R. Reavey
CAPOZZI ADLER, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2022 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:    <u>*/s/ John Roddy*</u>
              John Roddy