## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ADILSON MONTEIRO, KAREN GINSBURG, JASON LUTAN, and BRIAN MINSK, Individually and as representatives of a class of similarly situated persons, on behalf of the CHILDREN'S HOSPITAL CORPORATION TAX-DEFERRED ANNUITY PLAN, <br><br> Plaintiffs, <br><br> v. <br><br> THE CHILDREN'S HOSPITAL CORPORATION, THE BOARD OF DIRECTORS OF THE CHILDREN'S HOSPITAL CORPORATION, THE CHILDREN'S HOSPITAL CORPORATION RETIREMENT COMMITTEE; and DOES No. 1-20, Whose Names Are Currently Unknown, <br><br> Defendants. | Case No: 1:22-cv-10069-AK <br><br> **Notice of Supplemental Authority Authorized by Order on 9/1/2022** |

## NOTICE OF SUPPLEMENTAL AUTHORITY IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants the Children's Hospital Corporation, the Board of Directors of the Children's Hospital Corporation, and the Children's Hospital Corporation Retirement Committee (collectively "Defendants") respectfully submit the opinion issued by the Seventh Circuit in *Albert v. Oshkosh Corp.*, No. 21-2789, 2022 WL 3714638, --- F.4th --- (7th Cir. Aug. 29, 2022) (attached hereto) as supplemental authority in support of their Motion to Dismiss the Complaint. *See* ECF Nos. 27-28 (Motion to Dismiss and Memorandum of Law in Support), and 34 (Reply).

Dated:  September 1, 2022

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ *Keri L. Engelman*
Keri L. Engelman (BBO #704360)
Joshua M. Adler (BBO# 706905)
One Federal Street
Boston, MA  02110-1726
Tel:  (617) 341-7828
Fax:  (617) 341-7701
keri.engelman@morganlewis.com
joshua.adler@morganlewis.com

Jeremy P. Blumenfeld (admitted *pro hac vice*)
1701 Market Street
Philadelphia, PA  19103
Tel:  (215) 963-5000
Fax:  (215) 963-5001
jeremy.blumenfeld@morganlewis.com

Stephanie R. Reiss (admitted *pro hac vice*)
One Oxford Centre, 32nd Fl.
Pittsburgh, PA  15219
Tel:  (412) 560-3378
Fax:  (412) 560-3700
stephanie.reiss@morganlewis.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of September, 2022, I electronically filed the foregoing

document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice

of electronic filing to all CM/ECF participants.

/s/ *Keri L. Engelman*
Keri L. Engelman

2

# EXHIBIT 1

2022 WL 3714638
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

Andrew ALBERT, Plaintiff-Appellant,

v.

OSHKOSH CORPORATION,
et al., Defendants-Appellees.

No. 21-2789
|
Argued June 2, 2022
|
Decided August 29, 2022

Appeal from the United States District Court for the Eastern District of Wisconsin. No. 1:20-cv-00901 — **William C. Griesbach**, *Judge.*

**Attorneys and Law Firms**

Paul M. Secunda, Attorney, Walcheske & Luzi, LLC, Brookfield, WI, for Plaintiff-Appellant.

Samuel Block, Deborah Shannon Davidson, Attorneys, Morgan, Lewis & Bockius LLP, Chicago, IL, Jeremy P. Blumenfeld, Attorney, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Mark E. Schmidtke, Attorney, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Valparaiso, IN, Matthew J. Sharbaugh, Michael E. Kenneally, Attorneys, Morgan, Lewis & Bockius LLP, Washington, DC, Bernard Bobber, Kevin J. Kinney, Attorneys, Ogletree Deakins, Milwaukee, WI, for Defendants-Appellees.

Before Easterbrook, St. Eve, and Jackson-Akiwumi, Circuit Judges.

**Opinion**

St. Eve, Circuit Judge.

 **\*1**  Andrew Albert claims that his former employer, a subsidiary of Oshkosh Corporation, violated the Employee Retirement Income Security Act by mismanaging its retirement plan. Albert alleges, among other things, that Defendants breached their fiduciary duties by authorizing the Plan to pay unreasonably high fees for recordkeeping and administration, failing to adequately review the Plan's investment portfolio to ensure that each investment option was prudent, and unreasonably maintaining investment advisors and consultants for the Plan despite the availability of similar service providers with lower costs or better performance histories.

The district court granted Defendants' motion to dismiss the complaint and denied Albert's motion to reconsider. While this appeal was pending, the Supreme Court issued its opinion in *Hughes v. Northwestern University,* —— U.S. ——, 142 S. Ct. 737, 211 L.Ed.2d 558 (2022), vacating our decision in *Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020), and remanding for reevaluation of the operative complaint. The district court cited *Divane* repeatedly in its opinion, albeit not for the proposition that the Supreme Court rejected in *Hughes.* As explained below, we affirm the dismissal of all claims for failure to state a claim.

**I. Background**

**A. Statutory Context**
The Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, provides a variety of remedies to ensure that employees receive benefits they earned through employer-provided benefit plans. *Id.* § 1132. Of relevance here, ERISA provides a private right of action for breach of a fiduciary duty. *Id.* § 1132(a)(2). Plan participants and beneficiaries may seek monetary relief from a plan fiduciary for failing to properly oversee a benefits plan. *Id.* § 1109; *see also id.* § 1002(7), (8), (21). The duty of prudence requires a plan fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use ...." *Id.* § 1104(a)(1)(B). The duty of loyalty requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." *Id.* § 1104(a)(1).

In a defined contribution plan like Albert's, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 523, 525, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015); *see* 29 U.S.C. § 1002(34). [1] Defined contribution plans often pay a variety of fees in exchange for services that third parties perform. [2]

Investment-management fees, for example, compensate a fund, such as a mutual fund or index fund, for designing and maintaining the fund's investment portfolio. Typically, investment-management fees are calculated as a percentage of the money a plan participant invests in a particular fund, which is known as an expense ratio. "Expense ratios tend to be higher for funds that are actively managed according to the funds' investment strategies, and lower for funds that passively track the makeup of a standardized index, such as the S&P 500." *Hughes*, 142 S. Ct. at 740. Recordkeeping fees compensate recordkeepers who "track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants." *Id.* Recordkeeping fees are assessed either as a flat fee per participant or via an expense ratio.

**\*2** Sometimes, a portion of the investment-management fees collected through an expense ratio goes to the recordkeeper. This is known as "revenue sharing." We have explained that "expense ratios and revenue-sharing payments [generally] move in tandem: the higher a given share class's expense ratio, the more the fund pays [the recordkeeper] in revenue sharing." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013). A "share class" refers to groups of investors who invest in the same investment option. A "retail" share class pays the same fees as the general public, while an "institutional" share class pays a discounted rate.

In *Hughes*, the Supreme Court vacated our decision in *Divane*, which dismissed an ERISA complaint alleging mismanagement of a defined contribution plan for failure to state a claim. The plaintiffs alleged, among other things, that the plan sponsor "breached its fiduciary duties by providing investment options that were too numerous, too expensive, or underperforming." *Divane*, 953 F.3d at 991. We held that this claim failed as a matter of law because the inclusion of low-cost investment options in the plan mitigated concerns that other investment options were imprudent. *Id.* ("[The availability of] the types of funds plaintiffs wanted ... eliminat[ed] any claim that plan participants were forced to stomach an unappetizing menu."). The Supreme Court rejected this portion of our analysis because "[s]uch a categorical rule is inconsistent with the context-specific inquiry that ERISA requires and fails to take into account respondents' duty to monitor all plan investments and remove any imprudent ones." *Hughes*, 142 S. Ct. at 740 (citing *Tibble*, 575 U.S. at 530, 135 S.Ct. 1823). In *Tibble*,

the Court similarly explained that "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 530, 135 S.Ct. 1823. That is so even when participants choose their own investments in a defined contribution plan. *Id.* at 529–30, 135 S.Ct. 1823.

These principles meant that the categorical rule we applied in *Divane* was improper. *Hughes*, 142 S. Ct. at 742. The Court therefore vacated and remanded for us to reconsider whether the plaintiffs had plausibly alleged a violation of the duty of prudence in light of *Tibble*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court noted, however, that "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742. The case is still pending before this court on remand.

Several of the questions presented in this appeal concern the ramifications of *Hughes*. According to Defendants, *Hughes* "did not radically reinvent this area of law or upend years of precedent"; it simply reinforced that "ERISA does not allow the soundness of investments A, B, and C to excuse the unsoundness of investments D, E, and F." Plaintiff, meanwhile, contends that *Hughes* renders reliance on any aspect of *Divane* improper.

**B. Facts**

Andrew Albert worked for a subsidiary of Oshkosh Corporation from January 2018 to April 2020. Oshkosh Corporation is a company based in Oshkosh, Wisconsin that manufactures specialty vehicles and trucks. Oshkosh Corporation is the plan sponsor of the Oshkosh Corporation and Affiliates Tax Deferred Investment Plan ("the Plan"). The plan administrator is the Administrative Committee, which oversees the day-to-day administration and operation of the Plan. Oshkosh selected Fidelity Management Trust Company ("Fidelity") as the Plan's recordkeeper and Strategic Advisors, Inc. ("SAI") as the Plan's investment advisor. SAI is a subsidiary of Fidelity, but neither SAI nor Fidelity are defendants here. According to Albert, the Plan has about $1.1 billion in assets and over 12,000 participants.

**\*3** Albert filed this suit individually and as a representative of a putative class of Plan participants and beneficiaries. As a former employee, he participated in the Plan, but the amended complaint does not specify which investment options he holds in his individual account. The main thrust of his complaint is that Oshkosh Corporation, the Oshkosh Board of Directors, the Plan's Administrative Committee, and unknown officers and employees (collectively, "Oshkosh") breached their fiduciary duties under ERISA from June 15, 2014, through the date of judgment. At least twenty-nine of the Plan's investment options charge excessive fees because Oshkosh allegedly failed to engage in a prudent decision-making process.

Albert brings nine counts against Oshkosh, which can be sorted into three buckets: recordkeeping fees (Count I), investment-management fees (Count II), and ancillary claims (Count III to IX). Count III alleges that Oshkosh breached its fiduciary duty by paying too much to SAI in the form of investment-advisor fees. While Counts I to III allege breaches of the duties of prudence *and* loyalty, only Count III is arguably relevant to a breach of the duty of loyalty, as explained below. Counts IV to VI mirror Counts I to III but allege that Oshkosh failed to monitor other fiduciaries with respect to the Plan's fees. Counts VII to IX allege that payment of each category of fees amounted to a prohibited transaction in violation of 29 U.S.C. § 1106(a)(1)(C). Albert also alleges that Oshkosh failed to properly disclose these fees, but this claim is not tied to a specific count.

**C. Procedural History**
On September 2, 2021, the district court granted Oshkosh's motion to dismiss the complaint. At no point did the court rely on the categorical rule the Supreme Court rejected in *Hughes*. First, the district court dismissed Count I (breach of fiduciary duty for excessive recordkeeping fees) because Albert's allegations—that nine purportedly comparable plans paid less for recordkeeping—did not plausibly "suggest[ ] that the fee charged by Fidelity [was] excessive in relation to the services provided." *Albert v. Oshkosh Corp.*, No. 20-C-901, 2021 WL 3932029, at \*5 (E.D. Wis. Sept. 2, 2021). The district court dismissed Count II (breach of fiduciary duty for excessive investment-management fees), which it divided into two categories: share-class allegations and high-cost fund allegations. As to the first category, "Plaintiff's preference for different share classes of certain investments is not enough to state a plausible claim for breach of fiduciary duty." *Id.* at \*6. The district court noted that the Seventh Circuit "has not addressed imprudence based on a net investment expense

to retirement plans theory," but this lack of guidance was "primarily because it is a novel concept created by Plaintiff." *Id.* As to the second category, "[t]he fact that the Plan offered certain actively managed options does not establish that Defendants acted imprudently." *Id.* at \*7. Count III (breach of fiduciary duty for excessive investment-advisor fees) failed to state a claim because Albert "does not allege that a lower-cost alternative would provide comparable services." *Id.* at \*7.

Counts I to III also failed to state duty of loyalty claims because plaintiffs "must do more than recast allegations of purported breaches of fiduciary duty as disloyal acts." *Id.* at \*7. Counts IV to VI (breach of the duty to monitor) failed because they were derivative of Albert's fiduciary duty claims. *Id.* Counts VII to IX (prohibited transactions) failed because they were based on circular reasoning—that "an entity which becomes a party in interest by providing services to the Plan[ ] has engaged in a prohibited transaction simply because the Plan[ ] [has] paid for those services." *Id.* at \*8 (quoting 🚩 *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284, 2017 WL 3701482, at \*13 (S.D.N.Y. Aug. 25, 2017)). Finally, Albert failed to state a claim for failure to disclose because fiduciaries need not disclose detailed information about revenue sharing. *Id.* at \*7 (citing 🚩 *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)).

**\*4** On July 2, 2021, before the entry of final judgment, the Supreme Court granted certiorari in *Hughes*. On September 30, 2021, Albert filed a Rule 59(e) motion to vacate the judgment and stay proceedings pending a decision in *Hughes*. The district court denied the motion, in large part because Albert did not seek a stay until after the entry of final judgment. Albert timely appealed.

## II. Discussion

This court reviews de novo the district court's dismissal of the amended complaint for failure to state a claim. 🚩 *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 910 (7th Cir. 2013). In putative ERISA class actions, Rule 12(b)(6) motions are an "important mechanism for weeding out meritless claims." 🚩 *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014) (citing 🚩 *Iqbal*, 556 U.S. at 677–680, 129 S.Ct. 1937; 🚩 *Twombly*, 550 U.S. at 554–563, 127 S.Ct. 1955). Courts apply a "careful, context-sensitive scrutiny of a complaint's allegations" to "divide the

plausible sheep from the meritless goats." *Dudenhoeffer, 573 U.S. at 425, 134 S.Ct. 2459*. Because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, [ ] courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742. We may "affirm on any ground that the record supports and that appellee has not waived." *Larson, 723 F.3d at 917*.

### A. Standing

Before turning to the merits, we have "an independent obligation to assure that standing exists." *Pavlock v. Holcomb, 35 F.4th 581, 588 (7th Cir. 2022)* (quoting *Summers v. Earth Island Inst., 555 U.S. 488, 499, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)*). Article III limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. The "irreducible constitutional minimum" of standing requires that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)*. In *TransUnion LLC v. Ramirez*, —— U.S. ——, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021), the Supreme Court reiterated that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 2208.

Oshkosh argues that Albert lacks standing to bring ERISA claims challenging investment options he never held in his own investment account. In doing so, Oshkosh raises a factual challenge to standing. *Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 444 (7th Cir. 2009)*. ("[A] factual challenge lies where the complaint is formally sufficient but the contention is that there is in fact no subject matter jurisdiction.") (internal quotation marks omitted). When considering a factual challenge to jurisdiction, courts "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (internal quotation marks omitted).

There is no serious dispute that Albert has standing with respect to the following claims, which seemingly affect all participants in the Plan: excessive recordkeeping fees, excessive investment-advisor fees, breach of the duty of loyalty, failure to monitor, prohibited transactions, and breach of the duty to disclose. *See Boley v. Universal Health Servs., Inc., 36 F.4th 124, 131–33 (3d Cir. 2022)* (holding that plaintiffs had standing for recordkeeping, investment-selection, and failure-to-monitor claims because a common course of conduct affected all plan participants).[3] Instead, Oshkosh objects to Albert's standing with respect to funds not in his own investment account. We agree that Albert's claim for excessive investment-management fees is more complicated because each investment option charges a different expense ratio. If Albert did not personally invest in a fund with an imprudent expense ratio, then it is difficult to see how he suffered an injury in fact. Similarly, if Albert invested solely in passively managed index funds, then excessive fees for the Plan's actively managed funds would not harm him.[4]

**\*5** The amended complaint does not specify which investment options Albert actually holds, but an uncontested declaration from an Oshkosh benefits analyst makes clear that he invested in at least some actively managed funds.[5] That is sufficient at this juncture to conclude Albert has standing for his investment-management fee claims. *See Boley*, 36 F.4th at 133 (recognizing that defendants' "concerns regarding the representation of absent class members might implicate class certification or damages but are distinct from the requirements of Article III"). To be sure, the existence of standing at the pleading stage does not absolve ERISA plaintiffs of their continuing obligation to "maintain their personal interest in the dispute at all stages of litigation." *TransUnion, 141 S. Ct. at 2208*. Information revealed during discovery could very well change the standing analysis. Furthermore, "there may be some situations where typicality for an ERISA class would not be satisfied unless the class representative invested in each of the challenged funds." *Boley*, 36 F.4th at 136.

### B. Duty of Prudence Claims

29 U.S.C. § 1104(a)(1)(B) requires plan fiduciaries to act prudently when managing an employee benefit plan. That being said, "ERISA does not require fiduciaries of an [individual account plan] to act as personal investment advisers to plan participants." *White v. Marshall & Ilsley Corp., 714 F.3d 980, 994 (7th Cir. 2013)*, *abrogated on other grounds by Dudenhoeffer, 573 U.S. 409, 134 S.Ct. 2459*. And "the ultimate outcome of an investment is not proof of imprudence." *Divane, 953 F.3d at 992*, *vacated and*

*remanded on other grounds sub nom. Hughes*, 142 S. Ct. 737 (quoting 🚩 *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)).

To state a breach of the duty of prudence under ERISA, a plaintiff must plead "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." 🚩 *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016). Oshkosh does not dispute that the named Defendants are plan fiduciaries under 🚩 29 U.S.C. § 1002(21) or that higher fees may have harmed plan participants in some sense. Instead, Oshkosh argues that there was no breach because the allegations, taken as true, do not show that it acted imprudently.

### 1. Recordkeeping Fees (Count I)

Albert's first duty of prudence claim is that the Plan paid Fidelity excessive recordkeeping fees by "fail[ing] to regularly solicit quotes and/or competitive bids." For support, Albert compares publicly available data for the Plan with nine other plans that are supposedly prudent when it comes to recordkeeping fees. (ERISA and the Internal Revenue Code require the annual submission of Form 5500s for employee benefit plans.) These comparator plans have similar numbers of participants (between around 10,000 and 16,000) and total assets (between $355 million and $2.1 billion) as the Plan. Between 2014 and 2018, the comparator plans paid an average annual recordkeeping fee of $32 to $45 per plan participant. By contrast, during the same period, the Oshkosh Plan paid an average annual recordkeeping fee of $87 per participant. Based on this data, Albert argues that "a prudent Plan Fiduciary would have paid on average an effective annual [recordkeeping] fee of around $40 per participant, if not lower."

Oshkosh responds that the amended complaint is devoid of allegations as to the quality or type of recordkeeping services the comparator plans provided. This court has repeatedly emphasized that the cheapest investment option is not necessarily the one a prudent fiduciary would select. *See* 🚩 *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011) (noting that "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)") (quoting 🚩 *Hecker*, 556 F.3d at 586). Defendants argue the

same logic applies to recordkeeping fees, meaning that Albert cannot proceed to discovery solely on the basis that the Plan paid higher recordkeeping fees than a potentially random assortment of nine other plans from around the country.

**\*6** In 🚩 *Divane*, we rejected the notion that a failure to regularly solicit quotes or competitive bids from service providers breaches the duty of prudence. *See* 🚩 *Divane*, 953 F.3d at 990–91 (holding that defendant "was not required to search for a recordkeeper willing to take $35 per year per participant as plaintiffs would have liked" (citing 🚩 *Hecker*, 556 F.3d at 586)), *vacated on other grounds by Hughes*, 142 S. Ct. 737. The parties dispute whether the line of cases we relied upon in 🚩 *Divane*—namely, 🚩 *Hecker* and 🚩 *Loomis*—are also under a cloud of suspicion post-*Hughes*.

Albert overstates the significance of *Hughes* on this point. *Hughes* did not hold that fiduciaries are required to regularly solicit bids from service providers. Nor did it suggest that the reasoning in 🚩 *Hecker* and 🚩 *Loomis* no longer stands.[6] *Hughes* merely rejected this court's assumption that the availability of a mix of high-cost and low-cost investment options in a plan insulated fiduciaries from liability. *Hughes*, 142 S. Ct. at 742 ("The Seventh Circuit erred in relying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions by respondents."); *see also Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, ––– F.4th ––––, –––– n.4, No. 21-1872, 2022 WL 3355075, at \*7 n.4 (7th Cir. Aug. 15, 2022). Although *Hughes* is still pending on remand in this court, the Sixth Circuit recently held that an ERISA plaintiff failed to state a duty of prudence claim where the complaint "failed to allege that the [recordkeeping] fees were excessive relative to the services rendered." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (internal quotation marks omitted). The *Smith* court did not consider *Hughes* to have any bearing on the analysis of such claims, and neither do we. *See also Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th Cir. 2022) (concluding plaintiffs failed to state a claim as to "overall plan fees" where "the employees never alleged that these fees were high in relation to the services that the plan provided").

Although the district court repeatedly cited 🚩 *Divane* in its discussion of Albert's recordkeeping claim, we affirm the dismissal of Count I. That claim fails under our precedent that *Hughes* left untouched. In so holding, we emphasize that recordkeeping claims in a future case could survive

Case 1:22-cv-10069-JEK    Document 42    Filed 09/01/22    Page 9 of 15

the "context-sensitive scrutiny of a complaint's allegations" courts perform on a motion to dismiss. 🚩*Dudenhoeffer, 573 U.S. at 425, 134 S.Ct. 2459*. Albert's complaint simply does not provide "the kind of context that could move this claim from possibility to plausibility" under 🚩*Twombly* and 🚩*Iqbal. Smith*, 37 F.4th at 1169.

### 2. Investment-Management Fees (Count II)

Next, Albert alleges that Oshkosh breached its duty of prudence by paying unreasonably high fees to Fidelity for investment management. Recall that the Plan selected Fidelity as both its recordkeeper and its investment-management provider. As the Plan's recordkeeper, Fidelity received direct and indirect compensation. Indirect compensation refers to revenue-sharing arrangements in which some of the money raised via expense ratios for investment-management fees is shared with the recordkeeper. If the recordkeeper does not use all of the fees it collects through expense ratios, some of that money can be returned to participants' individual investment accounts.

**\*7**  As with his recordkeeping claims, Albert compares the investment-management fees that the Plan paid to the fees that nine allegedly comparable and prudent plans paid. Albert claims that the key indication of whether investment fees are prudent is the "Net Investment Expense to Retirement Plans." Albert defines this concept as "the share class that gives plan participants access to portfolio managers at the lowest net fee for the services of the portfolio manager." Under this theory, "[w]hen two identical service options are readily available ... a prudent Plan Fiduciary ensures that the least expensive of those options is selected." Albert further alleges that if Oshkosh had chosen investment options that Albert believes are prudent alternatives, "the Plan's Participants would have [ ] received virtually identical portfolio management services at a lower cost."

The problem is that the Form 5500 on which Albert relies does not require plans to disclose precisely where money from revenue sharing goes. Some revenue sharing proceeds go to the recordkeeper in the form of profits, and some go back to the investor, but there is not necessarily a one-to-one correlation such that revenue sharing always redounds to investors' benefit. Albert's "net investment expense to retirement plans theory" assumes that there is such a correlation; if that assumption is wrong, then simply subtracting revenue sharing from the investment-

management expense ratio does not equal the net fee that plan participants actually pay for investment management.

Complicating matters further, Count II encompasses two different duty of prudence theories. First, Albert claims that the Plan should have offered higher-cost share classes of certain mutual funds because the "net expense" of those funds would be lower in light of revenue sharing. This is the inverse of what ERISA plaintiffs typically argue—that a plan should have offered cheaper institutional share classes instead of more expensive retail share classes. Second, Albert claims that the Plan should not offer certain actively managed funds because those funds are more expensive than passively managed funds.

#### a. Net-Expense Theory

We agree with Oshkosh that the amended complaint does not allege sufficient facts to make this novel theory plausible. We have not found, and Albert does not cite, any court decisions crediting this theory. While a prudent fiduciary might consider such a metric, no court has said that ERISA *requires* a fiduciary to choose investment options on this basis. *Cf.* 🚩*Loomis*, 658 F.3d at 670 ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).") (quoting 🚩*Hecker*, 556 F.3d at 586). We see no reason to impose such a requirement here. *See Hughes*, 142 S. Ct. at 742 ("[T]he circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.").

#### b. Actively Managed Funds Theory

Albert's second theory is more common: that some of the Plan's actively managed funds were too expensive. The fact that actively managed funds charge higher fees than passively managed funds is ordinarily not enough to state a claim because such funds may also provide higher returns. *See Smith*, 37 F.4th at 1165 ("We know of no case that says a plan fiduciary violates its duty of prudence by offering actively managed funds to its employees as opposed to offering only passively managed funds."); 🚩*Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020) ("[A] complaint cannot simply make a bare allegation that costs are too high,

or returns are too low. ... Rather, it 'must provide a sound basis for comparison—a meaningful benchmark.' ") (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).

**\*8** Once again, the Sixth Circuit's decision in *Smith* reinforces that *Hughes* does not require a radically different approach to claims alleging excessive investment-management fees. The *Smith* court held that an ERISA plaintiff failed to state a duty of prudence claim where the plan merely "offer[ed] actively managed funds in its mix of investment options." *Smith*, 37 F.4th at 1165. In fact, "denying employees the option of actively managed funds, especially for those eager to undertake more or less risk, [could] itself be imprudent." *Id.* Albert's allegations are similarly threadbare: that "Defendants failed to consider materially similar and less expensive alternatives to the Plan's investment options." In the absence of more detailed allegations providing a "sound basis for comparison," *Meiners*, 898 F.3d at 822, we affirm the dismissal of Count II under this theory as well.

### 3. Investment-Advisor Fees (Count III)

Albert alleges that the fees the Plan paid to SAI (alternately called "service provider fees" or "investment-advisor fees") were excessive and therefore imprudent. According to Albert, "the fee rate paid to SAI was over 50 basis points for services that add no additional value compared to other alternative services available to plan participants." SAI's services "provided virtually no value to some Participants and a negative value to other Participants compared to other similar services and options available in the Plan, e.g., the Fidelity Freedom Funds." Other than this brief reference to Fidelity Freedom Funds, Albert does not explain why the fees SAI charged were excessive and unreasonable in comparison to other service providers. Instead, he alleges upon information and belief that the Plan's fiduciaries "did not solicit competitive bids from other service providers similar to SAI or evaluate whether other service providers could provide the same or superior benefits and services ostensibly provided by SAI, at a lower cost to Plan Participants."

This claim is particularly thin because Albert does not provide any basis for comparison between the fees paid to SAI and fees paid to other service providers. *See Davis*, 960 F.3d at 484 ("[A] complaint ... 'must provide a sound basis for comparison—a meaningful benchmark.' ") (quoting *Meiners*, 898 F.3d at 822); *Smith*, 37 F.4th at 1169

(complaint failed to state a claim in the absence of allegations that "fees were excessive relative to the services rendered"). Without more, Albert has failed to state a duty of prudence claim as to the fees the Plan paid to SAI.

### C. Duty of Loyalty Claims

Counts I, II, and III also purport to encompass breaches of the duty of loyalty. To recap, the duty of loyalty requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," with "the exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Albert argues that the facts supporting his duty of prudence claims are technically not identical to his duty of loyalty claims; the latter hinge on allegations relating to the Plan's use of SAI, a subsidiary of Fidelity, as the Plan's investment advisor. Nonetheless, because only Count III involves SAI, Albert's duty of loyalty claim is more accurately limited to that count.

Albert alleges upon information and belief that "Fidelity urged Defendants to select SAI" as the Plan's investment advisor, thereby enabling "Fidelity to obtain additional revenue from SAI services delivered with a very high profit margin." Albert again contends that SAI's services provided little to no value (or even a negative value), and he faults Defendants for failing to solicit bids from other service providers. We agree with Oshkosh that these allegations are insufficient to state a claim for breach of the duty of loyalty.

**\*9** *First*, it is hard to see why *Oshkosh* violated its duty of loyalty when Fidelity encouraged the Plan to use SAI as its investment advisor. Albert does not allege, for example, that Fidelity gave Oshkosh kickbacks in exchange for selecting SAI. *Cf. Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 590 (8th Cir. 2009) (complaint survived motion to dismiss where plaintiff alleged that "revenue sharing payments were not reasonable compensation for services rendered by Merrill Lynch, but rather were kickbacks paid by the mutual fund companies in exchange for inclusion of their funds in the Plan"). In other words, there are no allegations that Oshkosh engaged in self-dealing at the expense of the Plan. *See Forman*, 40 F.4th at 450 (plaintiffs failed to state duty of loyalty claim where no allegations suggested "the fiduciary's operative motive was to further its own interests").

*Second*, to the extent that there is anything untoward about a company encouraging a customer to use its subsidiary's

services, Fidelity is neither a named defendant nor a fiduciary. [7] What matters is whether Oshkosh discharged its duties "solely in the interest of the [Plan's] participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A); *see also* *Loomis*, 658 F.3d at 671 ("Plaintiffs do not contend that the funds that Exelon [the plan administrator] selected had any control over it, or it over them; there is no reason to think that Exelon chose these funds to enrich itself at participants' expense."); *Hecker*, 556 F.3d at 586 ("As for the allegation that [the plan administrator] improperly limited the investment options to Fidelity mutual funds, we find no statute or regulation prohibiting a fiduciary from selecting funds from one management company.").

*Third*, Albert has not identified any comparator investment advisors. Without allegations suggesting that the fees SAI charged are unreasonable in light of available alternatives, Albert has failed to state a claim for breach of the duty of loyalty. [8]

**D. Duty to Monitor Claims**

Counts IV, V, and VI allege that Oshkosh breached its duty to monitor other fiduciaries with respect to record-keeping fees, investment-management fees, and service-provider fees, respectively. Albert concedes that his duty to monitor claims rise or fall with his duty of prudence and duty of loyalty claims. *See, e.g.,* *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) (noting that "several [district] courts have held that a failure to monitor claim is derivative in nature and must be premised [on] an underlying breach of fiduciary duty"). Because we affirm the dismissal of Albert's fiduciary duty claims, these claims fail as well.

**E. Prohibited Transaction Claims**

Counts VII, VIII, and IX allege that Oshkosh engaged in prohibited transactions with Fidelity and SAI by paying excessive fees for Plan services. ERISA expressly prohibits certain kinds of transactions between a plan and a "party in interest." 29 U.S.C. § 1106(a)(1). This provision "supplements the fiduciary's general duty of loyalty ... by categorically barring certain transactions deemed likely to injure the pension plan." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (internal quotation marks omitted). The statute provides:

**\*10** A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) *furnishing of goods, services, or facilities between the plan and a party in interest*;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a)(1) (emphasis added). In turn, ERISA defines a "party in interest" of an employee benefit plan as:

(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;

(B) *a person providing services to such plan*; [or]

(C) an employer any of whose employees are covered by such plan;

...

29 U.S.C. § 1002(14) (emphasis added).

Under a literal reading of §§ 1002(14)(B) and 1106(a)(1)(C), ERISA would prohibit payments by a plan to an entity providing services for the plan, such as Fidelity and SAI. Several courts have declined to read ERISA that way because it would prohibit fiduciaries from paying third parties to perform essential services in support of a plan. *See* *Sweda v. Univ. of Pa.*, 923 F.3d 320, 337 (3d Cir. 2019) ("Reading § 1106(a)(1) as a per se rule barring all transactions between a plan and party in interest would miss the balance that Congress struck in ERISA, because it would expose fiduciaries to liability for every transaction whereby services are rendered to the plan."); *Sellers v. Anthem Life Ins. Co.*, 316 F. Supp. 3d 25, 34 (D.D.C. 2018) ("Subsections (A) through (D) [of § 1106(a)(1)] cannot be read to categorically prohibit

Albert v. Oshkosh Corporation, --- F.4th ---- (2022)
2022 WL 3714638

the very transactions that cause a person to obtain the status of a party in interest."); 🚩*Sacerdote*, 2017 WL 3701482, at *13 ("[I]t is circular to suggest that an entity which becomes a party in interest by providing services to the Plans has engaged in a prohibited transaction simply because the Plans have paid for those services."), *vacated on other grounds by* 9 F.4th 95 (2d Cir. 2021).

Albert's interpretation is also inconsistent with the purpose of the statute as a whole. *See, e.g.*, 🚩29 U.S.C. § 1001(a) ("[T]he continued well-being and security of millions of employees and their dependents are directly affected by these plans," and "it is therefore desirable in the interests of employees and their beneficiaries ... that minimum standards be provided assuring the equitable character of such plans and their financial soundness."). As the Supreme Court recognized in 🚩*Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), § 1106(a)(1) prohibits transactions that "generally involve uses of plan assets that are potentially harmful to the plan." 🚩*Id.* at 893, 116 S.Ct. 1783. It would be nonsensical to read § 1106(a)(1) to prohibit transactions for services that are essential for defined contribution plans, such as recordkeeping and administrative services. *See* 🚩*id.* at 895, 116 S.Ct. 1783 ("When [§ 1106(a)(1)(D)] is read in the context of the other prohibited transaction provisions, it becomes clear that the payment of benefits in exchange for the performance of some condition by the employee is not a 'transaction' within the meaning of [§ 1106(a)(1)(D)].").

 **\*11**  Albert insists that payments by the Plan to Fidelity and SAI were nonetheless "prohibited transactions." For support, Albert points to language in this court's decision in 🚩*Allen v. GreatBanc Trust Co.*, 835 F.3d 670 (7th Cir. 2016). In 🚩*Allen*, participants in an employee stock ownership plan alleged that the plan's trustee engaged in prohibited transactions by purchasing stock from the employer (and plan sponsor) and issuing a loan to the plan to fund the stock purchase. The employer's stock price later plummeted, and plan participants perversely had to pay interest on the loan to their own employer. 🚩*Id.* at 673–74. The court concluded that both transactions "are indisputably prohibited transactions within the meaning of [§ 1106]."[9] 🚩*Id.* at 675. The court's more important holding, however, was that the exemptions for prohibited-transaction claims outlined in

§ 1108 are affirmative defenses that a plaintiff need not anticipate in a complaint. 🚩*Id.* at 676.

Albert points to 🚩*Allen* for the broad proposition that a plaintiff can state a prohibited-transaction claim merely by identifying a "party in interest" under 🚩§ 1002(14) and alleging that the party in interest engaged in one of the transactions listed in § 1106(a)(1). The Third Circuit seems to have read 🚩*Allen* this way and expressly declined to follow it. *See* 🚩*Sweda*, 923 F.3d at 326–27. By contrast, Oshkosh suggests that the 🚩*Allen* court simply did not confront the circularity problem discussed above because the transactions at issue did not transform the defendants into parties in interest. We agree that the transactions in 🚩*Allen* looked like self-dealing, unlike routine payments for plan services. *See* 🚩*Sweda*, 923 F.3d at 336 ("[T]he transactions the Seventh Circuit scrutinized in 🚩*Allen* were a far cry from the ordinary service arrangements at issue here.").

Albert's argument that he need not anticipate affirmative defenses at the pleading stage is a red herring. While it is true that "an ERISA plaintiff need not plead the absence of exemptions to prohibited transactions," 🚩*Allen*, 835 F.3d at 676, Oshkosh is not asserting an affirmative defense under § 1108.[10] Instead, Oshkosh is arguing that a literal reading of 🚩§§ 1002(14)(B) and 1106(a)(1)(C) would lead to absurd results that are inconsistent with ERISA's statutory purpose. If routine payments by plan fiduciaries to third parties in exchange for plan services are prohibited, that would seem to put plan participants and beneficiaries in a worse position: Employee benefit plans would no longer be able to outsource tasks like recordkeeping, investment management, or investment advising, which in all likelihood would result in lower returns for employees and higher costs for plan administration.

In short, the district court properly dismissed Albert's prohibited transactions claims for failure to state a claim.

### F. Duty to Disclose Claim
Finally, Albert alleges that Oshkosh failed to disclose fees that are charged to participants and specifically the method of calculating revenue-sharing fees. Albert relies primarily on a Department of Labor regulation, which states in relevant part:

When the documents and instruments governing an individual account plan ... provide for the allocation of investment responsibilities to participants or beneficiaries, the plan administrator ... must take steps to ensure, consistent with [the fiduciary duties of loyalty and prudence], that such participants and beneficiaries, on a regular and periodic basis, are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and *are provided sufficient information regarding the plan, including fees and expenses*, and regarding designated investment alternatives, including fees and expenses attendant thereto, *to make informed decisions with regard to the management of their individual accounts.*

**\*12** 29 C.F.R. § 2550.404a-5(a) (emphases added).

As an initial matter, the Department of Labor regulation does not clearly require the kinds of disclosures Albert claims Oshkosh should have made. Albert's argument is also hard to square with this court's decision in ⚑*Hecker*. There, we held that plaintiffs had failed to state a breach of fiduciary duty claim on the basis of either a revenue-sharing agreement or the failure to disclose information about that agreement. ⚑*Hecker*, 556 F.3d at 585. The court explained that the plan administrator acted appropriately by disclosing the total fees for funds offered in the plan and directing participants to fund prospectuses for more information. "The total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment." ⚑*Id.* at 586. Because information about how fees are distributed internally was "not material" to a participant's decision-making process, the failure to disclose such information was "not a breach of [ ] fiduciary duty." ⚑*Id.*

Albert argues that ⚑*Hecker* is no longer good law in light of the Supreme Court's decision in *Hughes*. We agree with Oshkosh that this reading of *Hughes* is untenable; that decision had nothing to do with the duty to disclose. Moreover, the amended complaint does not identify any additional breaches of the duty to disclose beyond revenue sharing. [11] The district court properly dismissed Albert's duty to disclose claim.

## III. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.

**All Citations**

--- F.4th ----, 2022 WL 3714638

## Footnotes

1    By contrast, in a defined benefit plan, "retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." ⚑*Thole v. U. S. Bank N.A*, ⸺ U.S. ⸺, 140 S. Ct. 1615, 1618, 207 L.Ed.2d 85 (2020); *see* ⚑29 U.S.C. § 1002(35).

2    Our sister circuit has observed, "just as compounding can dramatically increase the value of a mutual-fund investment over time, so the costs of that investment can dramatically eat into that investment over time." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1163 (6th Cir. 2022).

3　In *Boley*, plan participants alleged three breaches of fiduciary duty, two of which echo Albert's complaint: (1) failing to monitor and reduce excessive recordkeeping fees; and (2) failing to use a "prudent investment evaluation process," resulting in a needlessly expensive menu of investment options. *Id.* at 131. The plaintiffs' third theory, offering a needlessly expensive suite of funds (the Fidelity Freedom Funds), does not align closely with Albert's complaint.

4　The Supreme Court's decision in *Thole* does not shed much light on standing for participants in defined contribution plans. *Thole* held that participants in a defined benefit plan lacked standing to pursue claims for breach of fiduciary duty because retirees enrolled in such plans receive a fixed amount of money per month, no matter how the plan itself is managed. 140 S. Ct. at 1619. The Court explained that the difference between defined contribution plans and defined benefit plans was of "decisive importance" to the Article III analysis. *Id.* at 1618; *see also Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 629 n.9 (5th Cir. 2021) (declining to extend *Thole* to defined contribution plans).

5　According to the declaration, Albert invested in thirteen of the Plan's investment options. Twelve of those thirteen investment options appear in the amended complaint. Based on the expense ratios alleged in the complaint, eleven of those funds are actively managed.

6　The Sixth Circuit distinguished *Hecker* and *Loomis* with respect to a claim Albert does not raise here: that plan fiduciaries should have offered institutional share classes instead of retail share classes of certain investment options. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 452 (6th Cir. 2022) (noting that *Hughes* "rejected a bright line rule, derived from *Hecker* and *Loomis*, that a broad menu of funds could itself defeat an imprudence claim premised on one particular offering that performed poorly or had high fees").

7　As explained below, Fidelity and SAI may be "parties in interest" within the meaning of 29 U.S.C. § 1002(14), but that does not mean they owe fiduciary duties to plan participants and beneficiaries.

8　Albert relies on an out-of-circuit district court decision allowing similar allegations to survive a motion to dismiss. *See Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1356 (N.D. Ga. 2017) ("Whether the Plans' fiduciaries intended to benefit TIAA, Fidelity, and Vanguard is an issue that can be better determined at the motion for summary judgment stage."). But that language comes from the court's discussion of the plaintiff's prohibited-transaction claims. The court's discussion of the duty of loyalty is cursory (only two sentences) and unpersuasive. *See id.* at 1357.

9　The court seems to have reasoned that the employer, as a plan sponsor, was a party in interest under § 1002(14)(C). When the trustee, acting as a fiduciary, directed the plan to purchase the employer's stock, that was a "prohibited transaction" under § 1106(a)(1)(A). Similarly, when the employer (via its shareholders) lent money to the plan to purchase its own stock, that was a "prohibited transaction" under § 1106(a)(1)(B).

10　Albert suggests that Oshkosh would invoke § 1108(b)(2)(A) ("Contracting or making reasonable arrangements with a party in interest for ... services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.").

11　Albert's reliance on *Baird v. BlackRock Institutional Trust Co.* is unpersuasive because that case is nonprecedential, out of circuit, and did not discuss revenue sharing at all. 403 F. Supp. 3d 765, 781–82 (N.D. Cal. 2019).

**Albert v. Oshkosh Corporation, --- F.4th ---- (2022)**

2022 WL 3714638

---

**End of Document**                                               © 2022 Thomson Reuters. No claim to original U.S. Government Works.