# EXHIBIT A

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| ADILSON MONTEIRO, KAREN GINSBURG, JASON LUTAN, and BRIAN MINSK, Individually and as representatives of a class of similarly situated persons, on behalf of the CHILDREN'S HOSPITAL CORPORATION TAX-DEFERRED ANNUITY PLAN, | Case No: 1:22-cv-10069-AK |
| | **Fourth Notice of Supplemental Authority Authorized by Order on _____** |
| Plaintiffs, | |
| v. | |
| THE CHILDREN'S HOSPITAL CORPORATION, THE BOARD OF DIRECTORS OF THE CHILDREN'S HOSPITAL CORPORATION, THE CHILDREN'S HOSPITAL CORPORATION RETIREMENT COMMITTEE; and DOES No. 1-20, Whose Names Are Currently Unknown, | |
| Defendants. | |

---

**NOTICE OF SUPPLEMENTAL AUTHORITIES IN FURTHER**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants the Children's Hospital Corporation, the Board of Directors of the Children's Hospital Corporation, and the Children's Hospital Corporation Retirement Committee (collectively "Defendants") respectfully submit the transcript of the bench decision issued by the U.S. District Court for the Eastern District of Virginia for both *Tullgren v. Booz Allen Hamilton Inc.*, No. 1:22-cv-856 (E.D. Va. Dec. 1, 2022) (Dkt. 37) and *Hall v. Capital One Fin. Corp.*, No. 1:22-cv-857 (E.D. Va. Dec. 1, 2022) (Dkt. 49) (attached hereto as Exhibit A.1), the decision issued by the U.S. District Court for the District of Colorado in *Jones v. DISH Network Corp.*, 1:22-cv-167 (D. Colo. Jan. 31, 2023) (Dkt. 72) (attached hereto as Exhibit A.2), and the decision issued by

the U.S. District Court for the Western District of Washington in *Beldock v. Microsoft Corp.*, 2023 WL 1798171 (W.D. Wash. Feb. 7, 2023) (attached hereto as Exhibit A.3), as supplemental authorities in support of their Motion to Dismiss the Complaint.  *See* ECF Nos. 27-28 (Motion to Dismiss and Memorandum of Law in Support), and 34 (Reply).

Dated:  February __, 2023                    Respectfully submitted,

                                             MORGAN, LEWIS & BOCKIUS LLP

                                             By: /s/ *Keri L. Engelman*
                                             Keri L. Engelman (BBO #704360)
                                             One Federal Street
                                             Boston, MA  02110-1726
                                             Tel:  (617) 341-7828
                                             Fax:  (617) 341-7701
                                             keri.engelman@morganlewis.com

                                             Jeremy P. Blumenfeld (admitted *pro hac vice*)
                                             1701 Market Street
                                             Philadelphia, PA  19103
                                             Tel:  (215) 963-5000
                                             Fax:  (215) 963-5001
                                             jeremy.blumenfeld@morganlewis.com

                                             Stephanie R. Reiss (admitted *pro hac vice*)
                                             One Oxford Centre, 32nd Fl.
                                             Pittsburgh, PA  15219
                                             Tel:  (412) 560-3378
                                             Fax:  (412) 560-3700
                                             stephanie.reiss@morganlewis.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the __ day of February, 2023, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

*/s/ Keri L. Engelman*
Keri L. Engelman

# EXHIBIT A.1

```
1                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION


3

     MICHAEL TULLGREN,                    :
4                                         :
                    Plaintiff,            :  Civil Action
5                                         :  No. 1:22-cv-00856-MSN-IDD
          v.                              :
6                                         :
     BOOZ ALLEN HAMILTON INC., et         :  December 1, 2022
7    al.,                                 :  9:54 a.m.
                                          :
8                   Defendants.           :
                                          :
9    ............................... :

10   ANDRE HALL, et al.,                  :
                                          :
11                   Plaintiffs,          :  Civil Action
                                          :  No. 1:22-cv-00857-MSN-IDD
12        v.                              :
                                          :
13   CAPITAL ONE FINANCIAL                :  December 1, 2022
     CORPORATION, et al.,                 :  9:54 a.m.
14                                        :
                    Defendants.           :
15                                        :
     ............................... :

16

17               TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE MICHAEL S. NACHMANOFF,
18              UNITED STATES DISTRICT COURT JUDGE


19
     APPEARANCES:
20
      For the Plaintiffs:          MILLER SHAH LLP
21                                 James C. Shah, Esq.
                                   John Claude Roberts, Esq.
22                                 1845 Walnut Street, Suite 806
                                   Philadelphia, PA 19103
23


24

25                          (Continued)
```

```
 1     (Continued)

 2     For the Plaintiffs:        TYCKO & ZAVAREEI LLP
                                  Glenn Edward Chappell, Esq.
 3                                2000 Pennsylvania Avenue NW
                                  Suite 1010
 4                                Washington, D.C. 20036

 5     For the Defendants:        MORGAN LEWIS & BOCKIUS LLP
                                  Matthew James Sharbaugh, Esq.
 6                                Frank H. Williams, III
                                  1111 Pennsylvania Avenue NW
 7                                Washington, D.C. 20004

 8                                Jeremy P. Blumenfeld, Esq.
                                  Jared R. Killeen, Esq.
 9                                1701 Market Street
                                  Philadelphia, PA 19103
10
       Court Reporter:            Diane Salters, B.S., CSR, RPR, RCR
11                                Official Court Reporter
                                  United States District Court
12                                401 Courthouse Square
                                  Alexandria, VA 22314
13                                Email: Dianesalters.edva@gmail.com
                                  Telephone:  (301) 338-8033
14

15

16

17

18

19

20

21

22

23

24
       Proceedings reported by machine shorthand.  Transcript produced
25     by computer-aided transcription.
```

*Proceedings*

1          THE DEPUTY CLERK:  *Michael Tullgren v. Booz Allen*

2   *Hamilton, et al.*, Case Number 22-cv-856, and *Hall, et al. v.*

3   *Capital One Financial Corporation, et al.*, Case Number 22-cv-857.

4   Will the parties please note their appearances for the record.

5          MR. SHAH:  Good morning, Your Honor.  James Shah on

6   behalf of Miller Shah.

7          THE COURT:  Good morning.

8          MR. ROBERTS:  Good morning, Your Honor.  John Roberts,

9   on behalf of plaintiffs in both cases, from Miller Shah.

10          THE COURT:  Good morning.

11          MR. CHAPPELL:  Good morning, Your Honor.  Glenn

12   Chappell from Tycko & Zavareei on behalf of plaintiffs in both

13   cases.

14          THE COURT:  Good morning.

15          MR. BLUMENFELD:  Good morning, Your Honor.  Jeremy

16   Blumenfeld from Morgan Lewis on behalf of defendants.

17          THE COURT:  Good morning, Mr. Blumenfeld.

18          MR. SHARBAUGH:  Good morning, Judge.  Matthew Sharbaugh

19   from Morgan Lewis on behalf of defendants.

20          THE COURT:  Good morning.

21          MR. KILLEEN:  Good morning, Your Honor.  Jared Killeen

22   from Morgan Lewis on behalf of the defendants.

23          THE COURT:  Good morning.

24          MR. WILLIAMS:  Good morning, Your Honor.  Frank

25   Williams, III, on behalf of the defendants.

*Proceedings*

1          THE COURT:  Good morning.  Very good.  Well, good

2     morning to you-all, and I'm delighted to be starting court early.

3     It's a long tradition here in the Eastern District of Virginia,

4     and I'm pleased you were here before ten o'clock.

5          This matter comes before the Court on motions to

6     dismiss in both of the cases which were called, *Tullgren v. Booz*

7     and *Hall v. Capital One*.  I saw, as I reviewed the pleadings and

8     realized that we have the same lawyers on both cases, that for

9     purposes of efficiency, we could call the cases together.  I

10    don't think that I need to or it would be appropriate to

11    consolidate the cases formally, but I want to make sure that both

12    sides agree that it's appropriate to simply have one argument

13    addressing the fundamental issues and that the Court will make a

14    decision that applies in both cases, although I would issue

15    orders appropriately in both cases.

16         Does anyone have any objection to that?  Mr. Shah?

17         MR. SHAH:  Plaintiffs have no objection, Your Honor.

18         MR. BLUMENFELD:  That's fine with us, Your Honor.

19    Thank you.

20         THE COURT:  Likewise, let me, just in terms of

21    housekeeping before we turn to the substance of the motion,

22    address the motions for leave to file the amicus briefs.  I know

23    that there were amicus briefs filed in both cases.  They weren't

24    the identical parties, but they were substantially similar, the

25    Chamber of Commerce and the various other groups.  I've reviewed

*Proceedings*

1   those motions and the oppositions.  I am going to deny those

2   motions.  I will not grant leave to file those amicus briefs.

3   Although I appreciate the effort and work that was put into this,

4   I do find that the defendants are ably represented by competent

5   counsel and the matters have been fully briefed and that I can

6   certainly understand the public interest and the industry's

7   interest in this issue, but this isn't the Supreme Court, it's

8   not the Fourth Circuit.  This is a motion to dismiss under

9   12(b)(6).  I'm looking at the complaint, the facts that are

10  alleged.  I will apply the law.  I don't need to address the

11  arguments that are in those amicus briefs, and so that motion is

12  denied.

13          So that leaves us with the motions to dismiss filed by

14  the defense in both cases.  I've received those motions,

15  memoranda.  I've reviewed the oppositions filed by plaintiffs in

16  those cases and the reply briefs.  And so the matter is fully

17  briefed before the Court.  I am mindful of the fact, as I've

18  reviewed many of the other cases from around the country, that

19  the law firm on the plaintiffs' side has been on many of those

20  cases, and Mr. Blumenfeld, yourself and your law firm has been on

21  the other side of those cases, so you're used to these arguments

22  and we don't need to repeat them all from the beginning.  So you

23  can assume I'm familiar with your arguments, but I'll hear

24  whatever you have to say.

25          MR. BLUMENFELD:  Thank you very much, Your Honor.

*Proceedings*

1          THE COURT:  Thank you.

2          MR. BLUMENFELD:  May it please the Court, my name is

3     Jeremy Blumenfeld, and I represent defendants in both cases.

4          As the Court's aware, plaintiffs allege breach of

5     fiduciary duty claims regarding the plan's offering of BlackRock

6     target-date funds as investment options when four other

7     target-date funds allegedly performed better.  These allegations

8     don't state a claim as a matter of law.

9          A few principles, and then I'll dive into the argument,

10    Your Honor.  First, plan fiduciaries don't need to pick the best

11    performing funds, and the corollary to that, Your Honor, is that

12    there is no cause of action for not picking the best performing

13    funds.  The Supreme Court, this past January, held that the

14    plausibility of allegations of a fiduciary breach must account

15    for the range of reasonable judgments that fiduciaries may make.

16    And since the Supreme Court's decision in *Hughes*, the courts of

17    appeals have universally rejected investment challenges by

18    alleging underperformance, comparing funds that have some

19    similarities and some differences.  We talk about these cases in

20    our brief, but just to name them:  *Albert v. Oshkosh* out of the

21    Seventh Circuit, *Smith v. CommonSpirit* out of the Sixth,

22    *Matousek v. MidAmerican* out of the Eighth, and *Davis v.*

23    *Salesforce* out of the Ninth.  Notably, Your Honor, *Smith v.*

24    *CommonSpirit* and *Davis v. Salesforce* also involved target-date

25    fund allegations, that is, comparisons of one target-date fund to

*Proceedings*

1    one or another target-date fund.

2              Even before the Supreme Court's decision in *Hughes*, the

3    Eighth Circuit, in *Meiners v. Wells Fargo*, rejected another

4    challenge to Wells Fargo target-date funds on the basis that they

5    were underperforming as compared to Vanguard target-date funds,

6    the same Vanguard target-date funds that plaintiffs point to as

7    comparators here.  The grounds for dismissal in those cases apply

8    equally here.  There are really three reasons for it, Your Honor,

9    as we set forth in our papers:  One, the lack of a meaningful

10   benchmark; two, plaintiffs are just cherry-picking a few

11   target-date funds out of a universe of 28 -- or, really, more

12   than that -- target-date funds that exist in the marketplace;

13   and, three, the performance differences are small.  I'm going to

14   focus my remarks, Your Honor, on the meaningful benchmark aspect,

15   and then I'll have a few remarks on the other two towards the

16   end.

17             There are several reasons that comparator funds here

18   don't provide a meaningful benchmark as a matter of law.  First,

19   the comparator funds are active funds, at least two of them, as

20   compared to the BlackRock funds, which are passively managed

21   target-date funds.  This difference matters.  It's not just a

22   naming convention.  It's what the Sixth Circuit looked at in

23   *Smith v. CommonSpirit;* it's what the Eighth Circuit looked at in

24   *Davis v. Washington University in St. Louis;* and it was the basis

25   for the Ninth Circuit's decision in *Davis v. Salesforce*.  It's

1    also, on the face of the complaint here, reflected in the fact

2    that these investments have different risks and have different

3    investment strategies.  Paragraph 27 of the Capital One complaint

4    and paragraph 25 of the Booz Allen complaint admit that active

5    funds are not designed to address different risks and have

6    different strategies.

7            The second difference, Your Honor, is the glide path,

8    that is, "through retirement" versus "to retirement."  The

9    BlackRock funds are to-retirement funds.  All the comparator

10   funds that plaintiffs point to are through retirement.  Again,

11   that's not just a nomenclature issue; it means they are designed

12   to address different risks.  It's not that one is better than

13   another or worse than another; they're just not meaningful

14   benchmarks for each other because they are designed to accomplish

15   different things.  That's reflected in the DOL guidance, which is

16   attached as Exhibit 2 to our motion to dismiss.  It's also,

17   again, on the face of the complaint.  Here, it's paragraph 26 of

18   the Capital One complaint and paragraph 24 of the Booz Allen

19   complaint.

20           The third difference, another meaningful one, is the

21   equity holdings of the BlackRock target-date funds are different

22   than the comparator funds, and there are really two subcomponents

23   of that:  First, on the face of the complaint -- paragraph 39 of

24   Capital One, paragraph 37 of Booz Allen -- the complaint admits

25   that the equity holdings vary from among the BlackRock

*Proceedings*

1    target-date funds to the others.  Sometimes those differences are

2    a little smaller; sometimes they're as much as ten percent or

3    more, that is, a ten percent more difference in equity holdings.

4    That's a meaningful difference in terms of the comparatorness and

5    renders them inept comparators.  Again, the Eighth Circuit, in

6    the *Meiners* case, affirmed Rule 12 dismissal on precisely those

7    grounds, that is, the holdings of the target-date funds in the

8    Vanguard target-date funds were a little bit different, about ten

9    percent or so, from the holdings in the Wells Fargo target-date

10   funds that were being challenged in that case; and as a result,

11   the Eighth Circuit said it wasn't a meaningful benchmark and

12   affirmed Rule 12 dismissal of those allegations.

13            THE COURT:  Do you think that argument, maybe, proves

14   too much in the sense that you could potentially never have a

15   comparator if you had to identify exactly the same allocation?

16            MR. BLUMENFELD:  So you could often have a comparator;

17   and what the courts talk about in that context is where they are

18   identical, that's sufficient.  Typically, this comes up in the

19   context of different share classes of an investment option where

20   everything about the investments are identical, and what you're

21   left with is one happens to be cheaper, at least at first blush,

22   than another.  And there are lots of reasons why somebody might

23   pick one or the other of those, but at least courts have looked

24   at that and said that provides a meaningful benchmark.

25            To use an analogy, Your Honor, to say that Person A

1    finished a race in 45 seconds and Person B finished a race in

2    55 seconds doesn't allow you to draw any inference about who is

3    faster or slower unless you know they were running the exact same

4    race, unless you know they were both running.  If one of them had

5    hurdles, you can't say one is better than the other.  They're not

6    meaningful comparators.  If one of them was a little bit longer

7    than the other, they're not meaning comparators; you can't

8    compare them.  The same is true here.  And, frankly, Your Honor,

9    that's what the Sixth Circuit did in *Smith v. CommonSpirit*, the

10    Seventh Circuit in the *Albert v. Oshkosh*, and the *Meiners* case

11    from the Eighth Circuit, and *Davis v. Salesforce.*  All were

12    dealing with those issues and precisely those kinds of things.

13          I would say further, Your Honor, plaintiffs' argument

14    assumes that all equities are the same, but we know that's not

15    true.  There are domestic equities and there are foreign

16    equities.  There are large-cap equities and small-cap equities,

17    and there are growth-oriented equities versus value-oriented

18    equities, and the complaint here says nothing about any of those

19    holdings.  And that's meaningful, Your Honor, because the

20    allegation is that some of these funds hold 90-plus percent of

21    their holdings in equities.  But if one of them has 90 percent of

22    their holdings in large-cap domestic equities and the other has

23    90 percent of its holdings in small-cap foreign holdings, they're

24    not meaningful comparators for each other.

25          Likewise, with respect to bonds, Your Honor, the

*Proceedings*

1    complaint actually doesn't say anything at all about the bond

2    holdings of the comparator funds or the BlackRock target-date

3    funds.  It assumes that anything that's not in equity would be a

4    bond, and that assumption isn't right.  But even taking that

5    assumption as true, the same problems arise.  First, you have a

6    situation where the bonds vary by as much as 10 to 12 percent

7    between the BlackRock funds and the comparator funds.  That's not

8    to say that one allocation to bonds is better or worse than the

9    other; it is to say they are different.  They're expected to have

10   different returns and carry with them, also, different risks.

11           And the second part of that is, again, it says nothing

12   about what those bonds are invested in.  You could have two bond

13   funds that are 100 percent invested in bonds, but if one of them

14   is in government agency bonds and the other is in corporate

15   bonds, those aren't comparable.  They're going to carry with them

16   different risks and different returns.  And what we know here is

17   two things:  Nothing about the American funds or T. Rowe Price

18   fund bond holdings as compared to the BlackRock funds.  There's

19   no allegations about it and no information about it.  And with

20   respect to the others, there is information comparing the

21   BlackRock bonds to the Vanguard bonds and the Fidelity Freedom

22   bonds.  And what we know from that, Your Honor, is that they

23   invest -- putting aside the percentages, they invest in different

24   kinds of bonds.  Again, it's not to say that one is better than

25   the other or worse than the other.  They're just different, and

*Proceedings*

1    they carry with them different risks and, therefore, expected

2    different returns.  They are not meaningful benchmarks for each

3    other.

4              Plaintiffs' response, essentially, Your Honor, is to

5    say that all of these issues are fact issues and that the Court

6    can never decide whether something is a meaningful benchmark or

7    not.  With respect, Your Honor, that's just not the law.  The

8    Sixth Circuit, the Seventh Circuit, the Eighth Circuit, the Ninth

9    Circuit all considered these issues in the context of Rule 12

10   motions, and all found that the claims failed as a matter of law

11   for lack of a meaningful benchmark.  And the reason is you can't

12   infer imprudence based on investments that are not comparable

13   having different performance.  If you could, then a plaintiff

14   could sue over a bond fund saying that an equity fund performed

15   better and just say, Well, whether it's a meaningful benchmark or

16   not is a fact issue.  This is really no different.

17             You also could compare a target-date fund to not

18   another target-date fund.  Why not just the S&P 500 Index and say

19   that the S&P 500 performed better than all of the target-date

20   funds we're talking about and, therefore, they are all imprudent

21   investment options?  They're not meaningful benchmarks for each

22   other, and you can't do that, and it is certainly appropriate to

23   consider in the context of a Rule 12 motion.  That's clear from

24   the Supreme Court's decision in *Hughes* and all of the appellate

25   decisions after it.

*Proceedings*

1          So what are we left with, Your Honor?  What are the

2    other allegations of imprudence in the complaint here?  There are

3    none.  There are no red flags about other investors abandoning

4    the BlackRock funds.  There are no allegations of press reports

5    that are critical of the BlackRock funds.  There are no

6    allegations that the manager, BlackRock, was a new manager or

7    inexperienced or that the funds had an insufficient track record,

8    and there are no allegations of self-dealing or excessive costs

9    or anything along those lines.

10          And just look at the cases that they looked to in

11   support -- and I know we talk about some of those in our reply

12   brief -- there's one in particular that I'd like to mention that

13   I don't believe was in our reply brief, but looking back at

14   the briefing, I thought it would be worth addressing, and that's

15   the *Williams v. Centerra Group* case.  It's cited in their brief

16   at pages 10 to 11.  A couple of observations about that case:

17   First, it predates the Supreme Court's decision in *Hughes*.  It

18   predates *Oshkosh* and *CommonSpirit* and *Davis v. Salesforce* and all

19   the other cases I've been talking about.  But even putting that

20   to one side, listen to what the allegations were in that case and

21   what that case was about.  Aon was hired as an investment manager

22   to manage the Centerra 401(k) plan, and the allegations were

23   shortly after being hired, Aon came in and replaced all of the

24   401(k) plan investment options in the Centerra plan with Aon

25   investment options.  This is a quote from the court's opinion

*Proceedings*

1    denying the motion to dismiss, a part that plaintiffs don't talk

2    about in their papers, where the court is talking about the

3    allegations that the plaintiffs made that made the claim

4    plausible:  Plaintiffs contend the following allegations support

5    a plausible inference of imprudence:  One, AHIC -- that's Aon

6    Hewitt Investment Consulting -- benefited directly and indirectly

7    when it chose to invest the plan in its affiliated Aon trusts,

8    creating a significant conflict of interest; two, despite

9    the conflict of interest, AHIC failed to undertake an

10   independent investigation of investment options available in the

11   market before deciding to use its own products; and, three, AHIC

12   hired an inexperienced manager without a meaningful track record,

13   and the Aon trusts were newly created with insufficient

14   performance history.  Of course, Your Honor, none of those facts

15   exist here.  No allegations of self-dealing or financial conflict

16   of interest, no allegations that BlackRock was an inexperienced

17   manager or that the BlackRock funds had an insufficient

18   performance history.  Instead, what we know from plaintiffs'

19   brief and the documents that are incorporated into the complaint,

20   BlackRock was a gold-rated investment manager highly rated for

21   its people, process, and parent organization.

22            Your Honor, putting aside the meaningful benchmark

23   point, I told you there were those two other arguments.  I just

24   want to touch on those briefly.  And, in particular, without

25   rehashing the arguments that were in our papers, I'd like to

*Proceedings*

1  direct the Court to Exhibit 1 to our motion to dismiss, which was

2  the Morningstar Report.  It's Docket 22-1 at page ID number 145.

3  And, in particular, that shows the performance history of the

4  BlackRock target-date funds in percentile rankings.  It shows

5  that the BlackRock LifePath Index funds, the funds that are being

6  challenged here, over the prior three years were at the

7  33rd percentile, that is, they were in the top third

8  of target-date funds --

9       THE COURT:  I'm sorry to interrupt, but do I really

10  need to consider that?  Is that not outside the pleadings?

11       MR. BLUMENFELD:  So, no, it is not outside the

12  pleadings because they cite to it in, I think it's footnote 4 of

13  the complaints in this case, and plaintiffs haven't objected to

14  it being attached.  The Court doesn't need to consider it, no,

15  because the complaint is silent on the subject, but I think it

16  sort of proves the point as to why plaintiffs' allegations are

17  insufficient.  And what it shows, Your Honor, is that the

18  BlackRock funds were in the 33rd percentile over three years, the

19  29th percentile over five years, and the 37th percentile over ten

20  years.  That certainly is not outside the range of reasonable

21  judgments that fiduciaries make.  It's in the top third over the

22  last three and five years and just shy of that over the last ten

23  years.  What that shows is that plaintiffs' allegations that the

24  fund performance of the BlackRock funds was deplorable is only

25  from their suggestion that you can compare it to just four funds

*Proceedings*

1      and ignore all of the other target-date funds in the marketplace.

2              THE COURT:  Well, I'm going to give plaintiffs' counsel

3      a chance to address this, but you note in your pleadings -- and I

4      believe looking back on it, maybe all these same lawyers were

5      involved in the case in *Wehner v. Genentech* -- that the

6      plaintiffs pointed to BlackRock TDF as a benchmark for a fund

7      that was performing well as compared to an underperforming fund.

8              MR. BLUMENFELD:  Correct.  Also true, Your Honor.  And

9      if you look at the performance of the other comparator funds they

10     talk about in that Morningstar Report that they cite to and that

11     is incorporated into the complaint, you see the BlackRock funds

12     are, you know, like I said, they're in the top third and just shy

13     of the top third.  The Vanguard funds that they point to as a

14     comparator, over the last ten years, they were in the

15     31st percentile.  And if you think about that, Your Honor, that's

16     plaintiff saying you were unreasonable and imprudent because you

17     offered a fund that performed at the 37th percentile and,

18     instead, you should have offered a fund that performed six

19     percentile better, that is, in the 31st percentile.  And the

20     Fidelity Freedom Index Funds -- and I point that out, Your Honor,

21     only because the chart that is in the Morningstar Report lists

22     the Freedom Index funds and also the Freedom funds -- plaintiffs

23     have elsewhere said in the complaint the Freedom funds were not a

24     prudent choice either.  So I just want to make that distinction.

25     The Fidelity Freedom Index Funds actually performed worse in

*Proceedings*

1    their percentile rankings than the BlackRock funds over the last

2    three years, the last five years, and the last ten years.

3        Unless the Court has any questions, I don't have

4    anything further.

5        THE COURT:  Would you like to address, briefly, the

6    issue of Mr. Hall's status as plaintiff here?  I'm not sure it's

7    the primary issue, but it was raised by the defense.

8        MR. BLUMENFELD:  Sure.  So I think the release is

9    clear.  He has released the claims that are the subject of his

10   lawsuit and also agreed, to the extent that he has some claim

11   that is not released, that he was agreeing not to participate in

12   any way, shape, or form in any sort of class action.  The case

13   law, the contract, the terms of that are clear and prohibit him

14   from participating in this action.  His claims are released, to

15   start with, but even if they weren't, they would be barred

16   because he's not allowed to participate in any sort of action.

17       THE COURT:  And how do you respond to the argument that

18   the release doesn't apply to his standing in the shoes of the

19   plan?

20       MR. BLUMENFELD:  So I think the case law is to the

21   contrary, because the plan doesn't need to release the claims.

22   He is the one who needs to release the claims.  The cases that we

23   cite in our brief, I think, make that point, including the, I

24   believe it's the *George Washington University* case out of the

25   D.C. Circuit which affirmed dismissal of the *Howell v. Motorola*

1  case, which affirmed summary judgment on a release even though

2  those claims were also brought on behalf of the plan in both of

3  those contexts.  And he's also agreeing not to participate in a

4  lawsuit, which, again, means to the extent the claim is not

5  released, he personally is agreeing not to participate in a

6  lawsuit and shouldn't have filed this action in court.

7           THE COURT:  Thank you.

8           MR. BLUMENFELD:  There is one other thing that I just

9  wanted to address briefly, Your Honor.  I apologize for

10  having forgotten about it.  There's a footnote in plaintiffs'

11  brief where they say, We should be allowed to amend.  My answer

12  to that, Your Honor, is that's not a motion for leave to amend.

13  Plaintiffs' counsel know that that's not a motion for leave to

14  amend.  It's the same thing they tried in the *Smith v.*

15  *CommonSpirit* case, and the Sixth Circuit rejected, and I would

16  ask that you do the same thing.  Them dropping a footnote saying

17  they should be allowed to amend is like me saying, You should

18  allow them to amend and then you should dismiss the amended

19  complaint for reasons that I haven't told you about yet and that

20  aren't the subject of a motion and for a complaint that doesn't

21  exist yet.  If they're going to be allowed to amend, they should

22  be forced to go through that process.  And in the meantime, I

23  would say Your Honor can rule on the current complaint, the

24  current motion to dismiss, and I would ask you to dismiss the

25  complaint and then enter judgment based on it.

*Proceedings*

1          THE COURT:  Thank you.

2          MR. BLUMENFELD:  Thank you, Your Honor.

3          THE COURT:  Mr. Shah?

4          MR. SHAH:  Good morning, Your Honor.  May it please the

5     Court, James Shah on behalf of plaintiffs in both cases.

6          I would like to start with the standard.  There was a

7     fair amount of discussion in the briefing about what the

8     appropriate standard is and the suggestion that somehow

9     the *Dudenhoeffer* case from the Supreme Court and the *Hughes* case

10    placed some kind of heightened pleading standard in ERISA actions

11    on plaintiffs.  And I would just like to note that in

12    *Dudenhoeffer*, the Court actually reversed the dismissal of ERISA

13    claims and specifically said that it declined -- the Supreme

14    Court declined to impose a presumption of prudence.  And so I

15    think that any suggestion in the briefing that *Dudenhoeffer*

16    somehow heightened the pleading standard cannot be found in the

17    actual text of the opinion itself.  And, in fact, *Hughes*, which

18    was recently decided, as counsel noted, specifically when it came

19    to the standard and the burden in ERISA pleading, says, Given the

20    Seventh Circuit's repeated reliance on this reasoning, we vacate

21    the judgment below so that the court may reevaluate the

22    allegations as a whole.  On remand, the Seventh Circuit should

23    consider whether petitioners have plausibly alleged a violation

24    of the duty of prudence as articulated in *Tibble*, applying

25    the pleading standard discussed in *Iqbal* and *Twombly*.

20

*Proceedings*

1          So even the most recent Supreme Court case, in *Hughes*

2   *v. Northwestern,* has made clear that this is a Rule 8 pleading

3   analysis and that there is no heightened standard.  And I think

4   that's important, because in reference to *Tibble*, in *Tibble*, the

5   Supreme Court made very clear that fiduciaries, in the context of

6   401(k) plans, have an ongoing duty to monitor and remove funds

7   that are imprudent.  And so what plaintiffs' complaints in both

8   actions do here is plausibly allege that the plan fiduciaries in

9   the respective actions did not monitor the BlackRock TDF

10  investment in an appropriate way.  And, again, we're talking

11  about a plausibility standard, not some heightened standard, and

12  the fiduciaries here, as per the Supreme Court's guidance in

13  *Dudenhoeffer* and in *Hughes*, are not afforded a presumption of

14  prudence.  So let's look at -- and *Dudenhoeffer* talks about

15  looking at pleadings in context when it comes to fiduciary

16  violations.  *Sweda* out of the Third Circuit talks about taking

17  a holistic look.

18          And Mr. Blumenfeld spoke at length about benchmarking,

19  and I think what is important is how the allegations frame the

20  TDF marketplace.  As we note in both complaints, Your Honor, the

21  six largest target-date funds make up 75 percent of the

22  target-date market.  And we have, as counsel noted, excluded the

23  Fidelity Freedom funds from the comparators, and so the four

24  other comparators make up 59 percent, nearly 60 percent of the

25  entire target-date fund.  So is it plausible that in a relatively

*Proceedings*

1  niche area of target-date funds where six funds make up

2  75 percent, billions of dollars of the marketplace, that four of

3  those six could be apt comparators to the one that we allege was

4  underperforming?  I think the answer is, most assuredly, yes.

5  And to Your Honor's question to Mr. Blumenfeld, if they're not,

6  is there not an apt comparator?  So are fiduciaries really

7  investing billions of dollars in an investment where there's no

8  comparator that they can look to to determine whether or not the

9  decision to invest in that fund is actually prudent?

10       And I want to kind of take the flip side of that

11  because the suggestion was that we as plaintiffs' counsel are

12  arguing that the Court doesn't need to do any analysis at a

13  motion to dismiss stage as to whether or not a comparator is apt.

14  And I think in the briefing, they even suggested if all the

15  comparators start with C, then that's not a determination for the

16  Court at a motion to dismiss stage.  That's not what we're

17  saying.  Of course, as alleged, the comparator has to plausibly

18  be an apt comparator, an appropriate comparator.  And,

19  contextually, here, given the nature of the TDF marketplace, it

20  is our position that the comparators are, in fact, apt.  I think,

21  notably, when cases like *CommonSpirit* out of the Sixth Circuit

22  are mentioned and the other cases, those are circumstances where

23  you had one passive being compared to one active, all right, and

24  there are other variations in those cases.  For example, in

25  *CommonSpirit*, the District of Maryland, in the *Moler v.*

*Proceedings*

1   *University of Maryland* case that recently came down, specifically

2   distinguished *CommonSpirit* in allowing underperformance claims to

3   go forward, and the Court said -- the Sixth Circuit affirmed

4   the district court's dismissal of plaintiff's complaint where the

5   plaintiff had not plausibly pleaded that this ERISA plan acted

6   imprudently merely by offering actively managed funds in the mix

7   of investment options.

8            So what we have alleged here with the comparators are

9   two passive comparators in the TDF marketplace of the big six --

10   I guess accounting used to be, like, the Big 5, but, you know --

11   and two active.  So the defendants take issue with a

12   passive-active comparison, but they really don't have any

13   argument for how two of the largest six comparators that are also

14   passive are somehow problematic.  That fact alone takes us

15   completely out of the realm of the other cases that were

16   mentioned.  In fact, the *Salesforce* case out of the Ninth

17   Circuit, also markedly different, the plaintiffs' claims there,

18   it truly was just a passive is better than active; they should

19   take these nine active funds and they should have all been

20   passive.  That's not what we're saying here.  We're not saying

21   that BlackRock should have been some other type of fund.  So

22   completely different --

23            THE COURT:  Help me understand what you are saying.

24   Help me understand what the allegations in the complaint are,

25   which the Court has to --

*Proceedings*

1      MR. SHAH:  Sure.

2      THE COURT:  -- and will accept as true under 12(b)(6).

3  What are the allegations that demonstrate the breach of the

4  fiduciary duty?

5      MR. SHAH:  Right.  So to that point, what the complaint

6  details numerically over a decade period, when you look at the --

7  when one looks at the BlackRock TDFs from a performance

8  standpoint and compares them to the four apt comparators as pled,

9  that there was significant underperformance for that entire time,

10  I think what the complaint --

11      THE COURT:  So how could you argue in 2021 in *Wehner v.*

12  *Genentech* that BlackRock TDF was a comparator for demonstrating

13  underperformance by another fund?

14      MR. SHAH:  So in *Genentech*, I think it's important to

15  note there that what was alleged in *Genentech*, which were custom

16  TDF funds -- so *Genentech* had custom funds; they weren't

17  BlackRock or Vanguard; it was simply a comparison that those

18  funds even underperformed the BlackRock funds -- so there's

19  no allegation that the BlackRock TDFs were the gold standard or

20  were prudent or were appropriate.  So I understand why they make

21  that argument, but that in no way detracts from the allegations

22  here regarding the performance -- the elongated poor performance.

23  And I would like to point out that -- and I know that we get

24  accused in every brief, in these briefs in particular, of

25  engaging in some type of hindsight analysis -- that is absolutely

*Proceedings*

1    not the case.  And courts in this district -- and we cite them --

2    and elsewhere have noted where a complaint provides real-time

3    data, that is, information that was or should have been known to

4    the fiduciaries at the time, that that is not a hindsight

5    analysis.  So the allegations in the complaint here -- for

6    example, if you look at second quarter 2017, all right, that data

7    on the three- and five-year basis, annualized basis, that data

8    was all available to the fiduciaries at the time, so --

9         THE COURT:  Fiduciaries are constantly looking at data

10   in which some funds are doing better and some funds are doing

11   worse, and at one moment of time, you can compare one fund to

12   another and say, relatively speaking, this one is doing poorly.

13   But these are funds that have a life of 30, 40, 50 years; they're

14   designed to allocate risk and grow over time.  So how is -- and I

15   understand; I've looked at -- there are a lot of charts in there

16   and, you know, some of them show a modest difference, some of

17   them show a larger difference, some of them show BlackRock doing

18   a little bit better than the comparator funds in certain

19   quarters -- how is it that that by itself could form the basis

20   for concluding that the plan administrators were breaching their

21   fiduciary duties or not adequately monitoring simply because

22   there were quarters, or even years, in which the BlackRock TDF

23   fund was not getting the same returns as Vanguard or Fidelity?

24        MR. SHAH:  And I think that's an important distinction.

25   Again, it's not a hindsight analysis.  The fiduciaries for each

*Proceedings*

1    of those quarters that we include the data for, at that time,

2    they had information that would have shown them on a three- and

3    five-year period just how significantly, from a performance

4    standpoint, they were trailing the other four TDFs in the

5    marketplace.  The hindsight analysis --

6         THE COURT:  But isn't that argument that they should

7    have made the decision at that point to pull out and take away

8    that option and then the participants would have no idea 10 or 15

9    or 20 years later whether that had been a good idea or a bad

10   idea; isn't that exactly what fiduciaries of ERISA plans aren't

11   supposed to be doing?

12        MR. SHAH:  No.  In fact, I disagree with that, Your

13   Honor.  In fact, we address this in the complaint, that we say

14   that the industry standard is to look at three- and five-year

15   time horizons for fiduciaries and make determinations about the

16   prudence of investments that are offered in the menu.  And the

17   complaints also further allege that if -- the notion you have to

18   wait 25 years to see if a TDF was appropriate or prudent, if

19   you're looking over that period of time, you have many of the

20   vintages that are out of their life span, are no longer even in

21   play.  And we also allege in the complaints that the average

22   person in this day and age, which is much different from when I

23   started my career, is in the same job for just slightly over four

24   years.  So there is a lot of movement in and out that also has to

25   be considered from a demographic standpoint.

*Proceedings*

```
 1              And, again, from having -- on the standard under Iqbal

 2    and Twombly and taking the allegations in the light most

 3    favorable to the plaintiffs, we have addressed these issues as to

 4    why a three- and five-year time horizon is correct, why we are

 5    not engaged in a hindsight analysis, but we provide real-time

 6    data that would have been and should have been made available to

 7    the fiduciaries at the time, and we demonstrate significant

 8    underperformance.  To try to demonstrate that somehow our

 9    pleadings don't demonstrate significant underperformance, in

10    defendant's briefing, they pick one vintage, the 2050 vintage,

11    and they say, Oh, look, for this three- and five-year period --

12    now, again, one vintage in one cherry-picked period -- they say,

13    Look, it's about a one percent difference.  What does that mean?

14    But the data that we have in there is annualized.  So even taking

15    their cherry-picked one, when you look at it over the three- and

16    five-year period, compounded, it's a 3.36 percent difference over

17    three years and an 8.3 -- almost 8.4 percent underperformance

18    over five years.  And if you take that same vintage and do a

19    different three- and five-year period -- again, this is the one

20    they are pointing to, saying it wasn't underperformance -- if you

21    look at it from Quarter 1, 2018, over a three-year period, it's

22    6.57 percent underperformance; in five years, it's 18.56 percent

23    underperformance.  That is substantial.

24              And I think another important point -- Your Honor asked

25    me, you know, what do we plead here -- these are the QDIAs, all
```

*Proceedings*

1  right, so these are the default investments, the TDFs.  So these

2  are the core assets.  As we allege in the case of Booz Allen as

3  of, I think a year and a half ago, 29 percent of the $6 billion

4  fund was in this TDF, 35 percent for Capital One.  So these are

5  the core assets.  These are the assets where if people who -- as

6  we also allege, most 401(k) participants are not particularly

7  savvy when it comes to investing -- if they don't make an

8  election as to where to put their money, it defaults into these

9  funds.  I'm not saying that gives it a heightened burden, but,

10  contextually, holistically, it's another consideration when you

11  have specific allegations of a decade of underperformance.  And

12  the only hindsight analysis being done in this case is when

13  defendant says, Oh, look, over the last year, they've improved a

14  little bit.  But the case law -- we cite this -- is *Legion*, that

15  when it comes to a fiduciary's conduct, the court looks to what

16  it offered at a point in time, right, not what transpired after.

17  At a point in time, was there a breach or was there not a breach?

18  Whether what occurred after inures to the benefit or detriment is

19  not the issue.  The breach occurs at the time when something was

20  presented.

21      I would also just note on the benchmarking that even

22  courts in this district -- in *In Re MedStar*, in the *IQVIA* case --

23  have determined that where you have one passive comparator in a

24  TDF world and an active -- when you have a -- sorry -- when you

25  have an active TDF and a passive comparator, that at a motion to

*Proceedings*

1  dismiss stage, that is sufficient and that it's not for the Court

2  to determine whether or not that that's plausibly apt, and that

3  there's no further analysis that needs to be done.  Again, we're

4  well beyond that here because we have the two passive and the two

5  active comparators.

6       I think that largely addresses the benchmark arguments

7  that my colleague made.  I would --

8       THE COURT:  Well, how do you respond to the other

9  arguments that are made, setting aside the passive and the

10  active, that you have the "to retirement" and you have "through

11  retirement," and, obviously, the risk allocation and the way in

12  which those funds are invested is going to vary if you have a

13  time horizon that is ending at the time of retirement or

14  continuing through it?

15       MR. SHAH:  Sure.  We certainly would acknowledge and do

16  not allege that these investments are 100 percent identical,

17  right?  But as the case law says, there is no perfect comparator.

18  And I think what's notable is that in the complaint, we're not

19  silent about glide path in "to" and "through."  Allegations 37

20  through 40 -- paragraphs 37 through 40 in the Booz Allen

21  complaint -- 38 through 40, we acknowledge that there are

22  differences, but we also plead why those differences are not

23  material when it comes to a holistic analysis of the TDF.  Again,

24  particularly when you're looking at there are six TDFs -- and I

25  can't emphasize this enough -- that make up three-quarters of the

*Proceedings*

1    market, right?

2         So, again, going back to *Twombly* and *Iqbal* in the

3    pleading standard, alleging that four of those are apt

4    comparators, it's hard to see how that isn't plausible,

5    particularly in light of all the other allegations.  So I

6    think -- and some courts have addressed this, and we cite these

7    in the brief -- but several courts specifically have even looked

8    at the fact that there are different investment strategies and

9    different equity allocations and said that in and of itself,

10   particularly the motion to dismiss, doesn't lend itself to a

11   finding at this procedural stage; that the comparators are not

12   apt; that that is still left for after discovery and down the

13   road.

14        And I would also point out, this isn't a particularly

15   surprising notion, because we're not trying to compare a small

16   cap to a high-risk international tech investment, right?  Even

17   when you do comparators, benchmarking, whether it's a small cap

18   or a large cap, you're still going to have -- those large-cap

19   investments, small-cap investments all have sub-assets.  They're

20   never going to be identical, right?  So the notion that,

21   particularly at this stage, that distinctions or some

22   differences, five percent here, two percent here, that that is so

23   meaningful that it can't plausibly be an apt comparator doesn't

24   make sense, because that would translate to the entire

25   marketplace in terms of, you know, what could a fiduciary look

*Proceedings*

1    to.  Well, basically, it is just an attempt to insulate and

2    inoculate fiduciaries making decisions pertaining to the

3    target-date marketplace from any potential scrutiny, and that is

4    impossible to square with the case law that says the duties taken

5    on by ERISA fiduciaries are the highest known to law.

6         When you combine the applicable pleadings standard with

7    the very specific and significant allegations of long-term

8    significant underperformance of these TDFs as compared to four of

9    the five other TDFs that make up the vast majority of the

10   marketplace, we think that we have more than satisfied our burden

11   here.

12        Let me just say one additional thing:  My colleague

13   mentioned, Well, they don't talk about, you know, the 48th

14   largest TDF, right?  But, again, these are two companies that

15   have hundreds of millions -- billions of dollars invested in the

16   TDFs.  If we had come in and said an apt comparator was XYZ TDF

17   that has a total asset class -- a total asset base of

18   $100 million, they would have said, Mr. Shah is making an

19   incredulous statement, that Booz Allen should have put its $1.5

20   billion into XYZ fund that's not even managing 10 percent of

21   that.  So, again, plausible?  Are these plausible benchmark

22   comparators?  Absolutely, in this marketplace.

23        THE COURT:  Thank you.

24        MR. SHAH:  Appreciate the Court's time.

25        MR. BLUMENFELD:  May I have a few minutes for rebuttal?

*Proceedings*

1          THE COURT:  You may.

2          MR. BLUMENFELD:  Thank you.

3          I would like to address a legal question and then drill

4     down a little into some of the facts that counsel was talking

5     about.

6          First, we haven't said that this is a heightened

7     pleading standard case, but the Supreme Court, in *Hughes* -- this

8     isn't me talking; this is the courts of appeals since used --

9     have made clear that you need to identify a meaningful benchmark.

10    *Hughes* came out of the Seventh Circuit, and the first court in

11    the Seventh Circuit to have addressed the impact of *Hughes* was

12    the *Albert v. Oshkosh* case.  The Seventh Circuit there held

13    *Hughes* didn't change the law, and affirmed Rule 12 dismissal of

14    similar kinds of claims.

15         Getting back to *Twombly*, sort of the start of it all.

16    I went back to look at what was going on in the *Twombly* case that

17    led the Supreme Court to reach the ruling that it did.  They

18    didn't have charts and graphs.  They had a map, and the map

19    showed all of the places around the country where the different

20    defendants, apparently, were located right next to each other but

21    weren't competing, and the plaintiffs alleged that, and they also

22    alleged there was an agreement by them not to compete.  And that

23    was the sort of thing that the Supreme Court said was not

24    sufficient to state a claim.  Applying that same kind of analysis

25    to the charts and graphs that are in the complaint here is fully

*Proceedings*

1    consistent with *Twombly*, fully consistent with *Hughes* and all of

2    the courts of appeals to have reached these issues.

3        Plaintiffs talked about the active versus passive and

4    basically said, We don't have an answer as to the Fidelity and

5    Vanguard target-date funds.  That's not true.  The *Meiners v.*

6    *Wells Fargo* case out of the Eighth Circuit specifically addressed

7    it.  It wasn't about active versus passive.  Plaintiffs said that

8    in their briefs, but it doesn't mention active versus passive at

9    all.  Instead, they said that the Vanguard target-date funds, the

10    same one these plaintiffs are pointing to, were not comparable to

11    the Wells Fargo target-date funds because they had different

12    allocations to bonds, the same differences that I'm talking about

13    here.  And while plaintiffs may say some of those allocation

14    differences are small, those small differences in allocations

15    reflect different risks that different plan fiduciaries are

16    allowed to take.  And the question is not can plaintiffs identify

17    a better performing target-date fund; the question is whether the

18    target-date fund that's in the plan was outside the range of

19    reasonable judgments that other fiduciaries make, and it's not.

20        And the contrary, you know, you heard Mr. Shah talk

21    about the fact that three- and five-year performance history is

22    their benchmark.  But if that's true, in the time period that the

23    BlackRock target-date funds were last, according to the

24    allegations in the complaint, one of the other target-date funds,

25    one of the other four was fourth.  That target-date fund also

*Proceedings*

1    would be imprudent, because on a three- and five-year basis,

2    there are three other better target-date funds in the marketplace

3    that did better, and one of them was third, and that means there

4    are two other target-date funds that did better.  And what you're

5    left with is their allegations really boil down to they found a

6    better target-date fund in the marketplace.  That's not relevant.

7    What's relevant is whether the target-date fund that's in the

8    plan fell outside the range of reasonable judgments that

9    fiduciaries make, and they have no answer to that, Your Honor.

10            And I would say further -- you know, you pointed out

11   the *Genentech* argument, and we think you're right to focus on

12   that issue -- I would say further, plaintiffs' own argument would

13   mean that the Fidelity target-date funds that they point to as

14   appropriate comparators and the Vanguard funds that they point to

15   as appropriate comparators also would not be prudent investment

16   options over the last two years because they were last or second

17   to last during that time period.  That's why you can't do what

18   you are asking plaintiffs' counsel about, right?  You can't be

19   jumping in and out of an investment option just because at a

20   point in time, its three-year performance or five-year

21   performance happens to be lower than something else.  That's why

22   the Supreme Court talked about the range of reasonable judgments

23   that fiduciaries make and why the courts -- *CommonSpirit*, *Davis

24   v. Salesforce*, *Meiners*, *Albert v. Oshkosh* -- are rejecting these

25   sorts of claims, because plaintiffs' arguments that they're not

*Proceedings*

1    engaged in hindsight is to say, Well, as of Q2 2017 -- I think

2    was the time period he talked about -- the BlackRock funds

3    performed lower than the others.  But that performance number as

4    of that point in time says nothing about what the performance is

5    going to be subsequent to that date or what the risks are of the

6    fund at that point in time or subsequent to that date.  That's

7    where the hindsight comes in.  It only works if, in hindsight,

8    the BlackRock target-date funds ended up performing worse; and,

9    here, we know they didn't.

10           I don't think I have anything further unless the Court

11   has any questions.

12           THE COURT:  I do not.  Thank you.

13           MR. BLUMENFELD:  Thank you, Your Honor.

14           THE COURT:  Do you wish to be heard?

15           MR. SHAH:  Do you wish me to be heard?

16           THE COURT:  This is your chance if you want to take it.

17           MR. SHAH:  I will be very brief.  Famous last words, I

18   know.

19           In terms of the *Meiners* case, the Eighth Circuit case,

20   the Eighth Circuit specifically said that the plaintiffs there

21   failed to plead underperformance of any kind.  They just pointed

22   to one, in that case, the Vanguard that had outperformed the

23   Wells Fargo fund.  They did in -- I think it's footnote 2 -- they

24   did note that the district court had noted that there were some

25   differences in the investment strategy between the two funds.

*Proceedings*

1   But to say that that was fundamental to the holding, I think,

2   ignores the fact that the Eighth Circuit noted that the

3   plaintiffs had, at base, failed to plead an underperforming

4   investment.

5           Outside the range of reasonableness, if, essentially,

6   last over a decade's worth of data in a QDIA isn't plausibly

7   outside the range of reasonableness of the four apt benchmarks,

8   then where does that leave a plan participant?

9           And, lastly, with respect to Mr. Hall, the *Lerner* case

10  from the Southern District of New York that we cite in our

11  briefing says that the vast majority of cases that have addressed

12  the issue say that a plan participant cannot release the claims

13  of a plan, and have allowed individuals who have signed such

14  agreements to move forward with their claims on behalf of the

15  plaintiffs.

16          Thank you very much for your time here, Your Honor.

17  Appreciate it.

18          THE COURT:  Thank you.

19          Well, this matter comes before the Court on the motions

20  to dismiss in both cases, and I've listened carefully to the

21  arguments of counsel and spent a lot of time looking at the cases

22  and reading the complaint.  And having considered the standard

23  under 12(b)(6), applying *Iqbal* and *Twombly*, I find that it is

24  appropriate, and the Court will grant the motions to dismiss in

25  this case.

*Proceedings*

1           Count 1 alleges that the defendants breached a

2    fiduciary duty of prudence by continuing to offer the BlackRock

3    TDFs in both of these plans when it should have been known to a

4    prudent fiduciary that they were underperforming in comparison to

5    other TDFs offered in the market.  And in Count 2, plaintiffs

6    allege that Capital One failed to adequately monitor

7    the committee and prevent the alleged breach.  And then Count 3

8    is pled in the alternative, alleging liability for defendants'

9    knowing breach of trust.

10           With respect to Count 1, the Court finds that the

11   plaintiffs have failed to set out circumstantial factual

12   allegations from which the Court may reasonably infer that the

13   decision to retain BlackRock was the product of a flawed

14   decisionmaking process.  Plaintiffs fail to allege facts

15   that demonstrate BlackRock TDFs severely underperformed the

16   comparable TDFs or that, in fact, the comparable TDFs were

17   appropriate, meaningful benchmark comparators.  The complaint

18   lacks facts showing that the TDFs shared the same investment

19   strategy, investment style, risk profile, or asset allocation.

20   The Court accepts that the differences that have been identified

21   between actively managed and passively managed, the time horizons

22   of "to retirement" versus "through retirement," and the different

23   allocations of bond and equity mixes is fatally defective in

24   plausibly stating a claim, and I find that Counts 2 and 3 are

25   derivative of Count 1 and, therefore, must be dismissed.

*Proceedings*

1          I do find that Mr. Hall, with respect to the *Capital*

2   *One* case, is barred from bringing these claims in his individual

3   capacity because of the severance agreement he entered, although

4   it is a, I think, troubling circumstance that the weight of the

5   case law does reflect that he cannot release the claims of the

6   plan.  So I'm going to dismiss this case without prejudice.

7          I understand the argument made with regard to what goes

8   on from here.  I'm going to give the plaintiffs an opportunity to

9   file an amended complaint if there's a good-faith basis for doing

10  so, and I'll give you 14 days to make that decision, but I would

11  caution that plaintiffs should think carefully about whether or

12  not there's a way to move forward and whether that makes sense.

13  And I realize there are other cases around the country and I may

14  not be the only judge to be weighing in on this, but based and

15  all the information that I've seen, the weight of the case law, I

16  do find that dismissal is appropriate, and both cases are

17  dismissed at this time without prejudice.

18          Is there anything else I need to address this morning

19  on behalf of the plaintiffs?

20          MR. SHAH:  Nothing from the plaintiffs, Your Honor.

21          THE COURT:  Thank you.  On behalf of the defense?

22          MR. BLUMENFELD:  No, Your Honor.  Thank you.

23          THE COURT:  Thank you.  I want to thank counsel on both

24  sides.  As you've both noted, you're used to these battles, and

25  I'm sure there will be more of them.  It was well argued and well

1    briefed, and I appreciate the efforts on the part of all parties.

2            Thank you.  Court will be in recess.

3                    *       *       *       *       *

4

5                    CERTIFICATE OF REPORTER

6            I, Diane Salters, hereby certify that the foregoing

7    transcript is a true and accurate record of the stenographic

8    proceedings in this matter.

9

10                                   /s/ Diane Salters

11                            _____

                             Diane Salters, CSR, RCR, RPR
12                            Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT A.2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00167-CMA-STV

LAQUITA JONES,
LATEESHA PROCTOR,
PATRICK SMITH, and
BEN MCCOLLUM,

      Plaintiffs,

v.

DISH NETWORK CORPORATION,
THE BOARD OF DIRECTORS OF DISH NETWORK CORPORATION,
THE RETIREMENT PLAN COMMITTEE OF DISH NETWORK CORPORATION, and
DOES 1-20

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on a Motion to Dismiss filed by Defendants

DISH Network Corporation, Retirement Plan Committee of DISH Network Corporation,

and the Board of Directors of DISH Network Corporation (the "Motion"). [#30]  The Motion

has been referred to this Court.  [#33]  This Court has carefully considered the Motion

and related briefing, the entire case file and the applicable case law, and has heard oral

argument on the Motion [#63]. For the following reasons, the Court respectfully

**RECOMMENDS** that the Motion be **GRANTED**.

I.    **BACKGROUND**[1]

This putative class action, brought under the Employment Retirement Income Security Act of 1974 ("ERISA"), alleges that Defendants breached their fiduciary duties of prudence and loyalty related to administration of the DISH Network Corporation 401(k) Plan (the "Plan"). [#1]  Plaintiffs are former DISH employees and former Plan participants. [*Id.* at ¶¶ 9-12]  Plaintiffs seek to certify a class for a period beginning six years before the filing of this action (*i.e.* January 20, 2016) and extending until the date of judgment. [*Id.* at ¶ 1]  Defendants are Plan fiduciaries, charged with administering and controlling the Plan. [*Id.* at ¶¶ 13-16]

The Plan is a participant-directed 401(k) plan. [*Id.* at ¶ 21]  This means that participants direct their contributions into various investment options offered by the Plan, with DISH making contributions as well. [*Id.*]  Plan expenses are paid for by Plan assets. [*Id.*]  Thus, the value of a participant's account is determined by the participant's contributions, their employer's contributions, and the market performance of their selected investments—minus any expenses charged to the participant's account. [*Id.*]  This form of retirement plan is referred to as a "defined contribution plan" because of the employer's defined contributions into a participant's account (in contrast to a "defined benefit plan," under which an employer guarantees a certain level of benefits upon retirement). [*Id.* at ¶¶ 2-4]  By the end of 2020, the Plan had 18,808 participants with account balances and

---

[1] The facts are drawn from the well-pleaded allegations in the Plaintiffs' Complaint (the "Complaint"). [#1]  The Court accepts these allegations as true at this stage of the proceedings. *See Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)).

assets totaling about $841 million—placing it in the top 0.2% of all 401(k) plans by plan size.  [*Id.* at ¶ 4]

### A.      Recordkeeping and Administrative Fees

A common industry practice for fiduciaries of large defined contribution plans is to hire a third party to provide various recordkeeping and administrative services.  [*Id.* at ¶ 28]  The provider receives compensation for these services from the plan, which is then passed on to participants—either as direct deductions from participant accounts or as indirect "revenue sharing" arrangements with third-party investment providers.  [*Id.* at ¶¶ 30-32]  Here, all Plan assets were held in a trust by Fidelity Management Trust Company ("Fidelity"), which provided these recordkeeping and administrative services for the Plan.  [*Id.* at ¶¶ 24, 51]  According to the Complaint, the Plan paid "grossly excessive fees" when compared against the fees paid by comparable plans for comparable services. [*Id.* at ¶¶ 50-59]  The Complaint attributes this excess to Defendants' failure to compare or benchmark the fees paid by the Plan against those paid by comparable plans.  [*Id.* at ¶¶ 58-59]

### B.      Fidelity Freedom Funds

Among other investment options available to participants, the Plan offers certain "target date funds" ("TDFs").  [*Id.* at ¶ 60]  A TDF is made up of a portfolio of underlying investment vehicles that gradually shifts to become more conservative as a target retirement year approaches.[2]  [*Id.*]  The Plan offers participants the "Fidelity Freedom Fund" target date suite—not to be confused with the "Fidelity Freedom *Index* Fund" target

---

[2] The planned shift in the underlying investment allocation is referred to as the TDF's "glide path."  [*Id.* at ¶ 60]

date suite.  [*Id.* at ¶ 61]  Although these fund families share similar names and glidepaths, there is a significant difference in their underlying investments.  [*Id.* at ¶ 66]  The Freedom Funds (the "Active Suite") primarily invest in actively managed Fidelity mutual funds.  [*Id.* at ¶ 63]  A key feature of an active fund is a management team that actively decides which securities to invest in, with the goal of beating benchmark market indices.  [*Id.* at ¶¶ 66-67]   In contrast, the Freedom Index Funds (the "Index Suite") place no investments under active management and instead invest in funds that simply track market indices.  [*Id.* at ¶ 63]  Plaintiffs each maintained an investment in a TDF within the Active Suite during the Class Period.  [*Id.* at ¶¶ 9-12]

The Complaint identifies several features of the Active Suite that should have alerted Defendants that the Active Suite was not a suitable investment option for the Plan. [*Id.* at ¶¶ 66-81]  First, the funds which underlie the Active Suite are high risk, and about half of the actively managed Fidelity mutual funds underlying the Active Suite trail their respective benchmarks over those underlying funds' lifetime.  [*Id.* at ¶¶ 66-69]  This underperformance includes two of the Active Suite's top three domestic equity positions. [*Id.* at ¶ 68]  In addition, over half of the underlying active funds did not have a basic five-year performance track record at the beginning of the Class Period, meaning that no meaningful analysis could possibly be performed on them.  [*Id.* at ¶ 70]  And while the Active Suite and the Index Suite share virtually identical glide paths, the investments underlying the Active Suite are higher risk than those underlying the Index Suite.  [*Id.* at ¶¶ 72-73]  Moreover, Active Suite managers have discretion to deviate from a fund's glide path by ten points in either direction, introducing more unnecessary risk to the Active Suite.  [*Id.* at ¶ 74]   These risk-increasing features of the Active Suite, and active

management in general, have been criticized by industry experts, particularly in light of most participants' desire to avoid risk in allocating their retirement investments. [*Id.* at ¶¶ 74-75]

The Active Suite has also consistently underperformed other widely utilized TDF offerings. [*Id.* at ¶ 79] When compared to the primary TDFs offered by four of the five largest non-Fidelity managers, representative TDFs from the Active Suite saw the lowest three-year and five-year annualized returns as of 2015. [*Id.* at ¶¶ 79-81]

In addition to this underperformance, TDFs in the Active Suite charge higher fees than the more hands-off TDFs in the Index Suite. [*Id.* at ¶¶ 67, 76-77] These higher fees are passed on to participants in the form of high expense ratios.[3] [*Id.* at ¶ 76] Thus, whereas certain TDFs within the Index Suite charge a mere .08% expense ratio, the expense ratios for TDFs within the Active Suite range from .42% to .65%. [*Id.*]

Many investors have lost faith in the Active Suite. [*Id.* at ¶ 78] As a result, the Active Suite has seen substantial investment outflows, as opposed to the inflows experienced by the Index Suite. [*Id.*] In 2018, the Active Suite experienced about $5.4 billion in net outflows, compared to the estimated $4.9 billion inflows experienced by the Index Suite that same year. [*Id.*] Based on these indicators, Plaintiffs allege that "Defendants' decision to add the Active [S]uite over another prudent TDF suite, and their failure to replace the Active [S]uite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties." [*Id.* at ¶ 63]

---

[3] The expense ratio is the total annual cost to an investor to invest in a TDF, expressed as a percentage of assets. [#1, ¶ 76]

### C.     The Royce Total Return Fund

The Complaint alleges that the Plan contains another imprudent investment option—the Royce Total Return Fund Institutional Class (the "Royce Fund").  [*Id.* at ¶ 83]  The Complaint does not allege that any Plaintiff maintained an investment in the Royce Fund during the Class Period.  [*See id.* at ¶¶ 9-12]  The Royce Fund's benchmark is the Russell 2000 Index.  [*Id.* at ¶ 83]  The Royce Fund has consistently underperformed its benchmark on a rolling five- and ten-year annualized basis.  [*Id.*]  This underperformance compared to the Royce Fund's benchmark, which began before the Class Period and has continued through it, has ranged from -.08% to -3.21%.  [*Id.*]  The Royce Fund has an expense ratio of 1.15%.  [*Id.* at ¶ 84]  Defendants have retained the Royce Fund despite the availability of lower cost and better performing funds.  [*Id.*]  For example, the Vanguard Russell 2000 Index Fund simply tracks the Russell 2000 Index, and has an expense ratio of .08%.  [*Id.*]

### D.     This Lawsuit

Plaintiffs filed this lawsuit, alleging that Defendants breached their fiduciary duties to the Plan by allowing the Plan to be charged excessive recordkeeping and administrative fees and by offering inappropriate investment options to participants.  [#1]  The Complaint alleges three causes of action:  (1) breach of fiduciary duty under ERISA Sections 404(a)(1)(A), (B), and (D) (codified at 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D)); (2) failure to monitor fiduciaries and co-fiduciary breach; and (3) in the alternative, knowing breach of trust.  [*Id.* at ¶¶ 104-20]  Defendants filed this Motion to Dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), along with a

restricted memorandum of law in support.  [##30; 31]  Plaintiffs filed a response [#43][4] and Defendants filed a reply in support of the Motion [#50].  Plaintiffs filed a sur-reply [#55], and Defendants filed multiple notices of supplemental authority  [##51; 65; 69; 71]. The Court heard oral argument on the Motion on August 25, 2022.  [##63; 66]

## II.   LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss for lack of standing is considered under Federal Rule of Civil Procedure 12(b)(1).  Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Standing is a question of subject matter jurisdiction, and thus a basis for Rule 12(b)(1) dismissal.  A plaintiff has constitutional standing when: (1) she has suffered an injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)).  Although the plaintiff bears the burden of establishing standing, when the challenge is facial, the court must

---

[4] Plaintiffs subsequently filed a corrected Response, with the only amendment being to the Table of Contents.  [#44-1]  This Court cites to Plaintiffs' originally filed Response [#43], as the correction to the Table of Contents does not impact the Court's analysis.

accept as true all well-pleaded facts and construe all reasonable allegations in the light most favorable to the plaintiff. *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996) (citations omitted). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).

### B. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) empowers a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Generally, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v.*

*Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

"As a general rule, the only facts [a court] consider[s] in assessing the sufficiency of a complaint are those alleged in the complaint itself." *Emps.' Ret. Sys. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). However, a court "may consider 'documents that the complaint incorporates by reference,' 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and 'matters of which a court may take judicial notice.'" *Id.* (quoting *Gee*, 627 F.3d at 1186).

## III.   ANALYSIS

Defendants move to dismiss this case on two grounds. First, Defendants argue that Plaintiffs lack standing to challenge any TDFs in the Active Suite in which Plaintiffs did not invest, or any fees charged to the Plan while Plaintiffs were active DISH employees. [#31, 11-12, 28 n.28] Second, Defendants argue that Plaintiffs fail to state a claim under Rule 12(b)(6) for which relief can be granted. [#31, 12-30] The Court addresses each ground for dismissal in turn.

## A.    Standing

"To bring a suit under ERISA, a plaintiff must show both constitutional standing and a cause of action (statutory standing) under the ERISA statute."  *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1192 (D. Colo. 2021) (citing *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)); *see also Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1622 (2020) ("There is no ERISA exception to Article III.").  To establish constitutional standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560-61).  "[S]tanding is not dispensed in gross," meaning that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).

Once an ERISA plaintiff establishes the "irreducible constitutional minimum" of Article III standing, *Lujan*, 504 U.S. at 560, Article III does not prevent that plaintiff from "assert[ing] the rights of parties not before the court" when the plaintiff alleges "a single practice by the defendant that injures both the plaintiff and a third party, although in different ways."  *Barrett v. Pioneer Nat. Res. USA, Inc.*, No. 17-CV-1579-WJM-NYW, 2018 WL 3209108, at *4 (D. Colo. June 29, 2018) (citing 13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.9.2 (3d ed., Apr. 2018 update)); *see also Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132 (3d Cir. 2022) ("Article III does not prevent the Named Plaintiffs from representing parties who invested in funds that were allegedly

imprudent due to the same decisions or courses of conduct.*"); Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) (noting that as long as the named plaintiffs in an ERISA action have alleged individualized injuries with respect to all of their claims, they "may proceed under § 1132(a)(2) on behalf of the plan or other participants" even if relief "sweeps beyond [their] own injur[ies]").

To summarize, a named plaintiff bringing an ERISA class action must satisfy Article III standing requirements on a claim-by-claim basis, the same as any plaintiff in federal court. *See Thole*, 140 S. Ct. at 1622 ("Courts sometimes make standing law more complicated than it needs to be. There is no ERISA exception to Article III.").[5]  If the named plaintiff has Article III standing to bring a claim, then that named plaintiff is constitutionally permitted to represent other parties who were also injured by the same alleged breach, even when those injuries go beyond what the named plaintiff experienced.[6]

Courts in this District have confirmed this approach.  In *Barrett v. Pioneer Natural Resources*, the court found that a plaintiff lacked standing to assert a claim as to a Money Market Fund that the plaintiff never invested in.  2018 WL 3209108 at *2-4.  This was

---

[5] The Court agrees with Defendants that this cited reasoning from *Thole* applies to both defined-benefit plans and defined-contribution plans.  [*See* ##31, 12; 50, 18-19 & n.12] However, this reasoning has a different application in each instance.  In *Thole*, the plaintiffs lacked standing to challenge a defined-benefit plan's investments because their "benefits are fixed and will not change, regardless of how well or poorly the plan is managed," meaning that mismanagement would not injure the plaintiffs.  140 S. Ct. at 1620.  The United States Supreme Court distinguished this type of arrangement from a defined-contribution plan, under which a participant's account may very well be directly impacted by the plan's management.  *Id.* at 1619.  Accordingly, *Thole* confirms the requirement that ERISA plaintiffs must "have a concrete stake in [their] suit," but does not otherwise impact the standing analysis for defined-contribution plans.  *Id.* at 1620.

[6] Whether a plaintiff with Article III standing may represent the interests of others injured by the same breach is a question of class certification.  *Kurtz*, 511 F. Supp. 3d at 1193.

because the plaintiff "d[id] not allege that all investment choices or some sensibly grouped subset were offered imprudently," but "only that the Money Market Fund was an imprudent offering." *Id.* at *3. Because the plaintiff failed to adequately "allege a single practice as to the Money Market Fund that injured both him and Monkey Market Fund investors," the plaintiff lacked standing to sue for classwide relief related to the Money Market Fund. *Id.* at *3-4.

Applying the same approach, the court in *Kurtz v. Vail Corporation* found that a plaintiff did have standing to challenge fifteen investment options offered by a plan, when the plaintiff herself only invested in five of those options. 511 F. Supp. 3d at 1192. There, the plaintiff adequately alleged that the defendant's breach impacted "the [p]lan overall[,] or[,] at least, a large subset of offered funds, not a single fund." *Id.* at 1194; *see also id.* at 1193 ("[P]laintiff alleges mismanagement of the entire [p]lan and all its funds through the options it provided, not breach related to an individual fund or funds."). Because the alleged mismanagement "purportedly reduced retirement funds available through the [p]lan to [the] plaintiff," the plaintiff had adequately pleaded an actual injury to her own account caused by the allegedly imprudent actions of the defendant sufficient to confer Article III standing. *Id.* at 1195. Whether that plaintiff could adequately represent the interests of class members with different injuries based on different specific funds was an issue of class certification, not standing. *Id.* at 1193.

Courts across the country apply this approach as well. *See, e.g.*, *Albert v. Oshkosh Corp.*, 47 F.4th 570, 578 (7th Cir. 2022) (holding that a plaintiff had standing to challenge the inclusion of actively managed funds because "he invested in at least some actively managed funds"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009)

(holding that a plaintiff had standing to seek relief for the period before his participation in the plan because the same alleged breaches nevertheless caused injury to his personal account); *In re Omnicom ERISA Litig.*, No. 20-CV-4141, 2021 WL 3292487, at *6-10 (S.D.N.Y. Aug. 2, 2021) (finding that the named plaintiffs had standing to challenge a suite of funds despite not investing in every fund within that suite, but lacked standing to challenge "the alleged mismanagement of the [p]lan by virtue of its inclusion of [two specific funds]" because the named plaintiffs did not invest in those specific funds and were not injured by the defendant's decision to offer them).

The Third Circuit's opinion in *Boley v. Universal Health Services* provides the clearest recent example of this standing analysis in an ERISA class action. There, the Third Circuit began by breaking the allegations down into "three specific breaches of fiduciary duty." *Boley*, 36 F.4th at 131. The court first determined that the named plaintiffs had standing to challenge the allegedly excessive recordkeeping and administrative fees, because the "allegedly excessive annual fee would represent a concrete and personal injury to a plaintiff regardless of the funds in which he or she invested." *Id*. Next, the court held that the named plaintiffs had standing to challenge a suite of funds (incidentally, the same Fidelity Freedom Funds suite at issue here) even though the named plaintiffs had not invested in all funds within the challenged suite. *Id*. This was because each named plaintiff "invested in at least one of the Fidelity Freedom Funds," and, "[i]mportantly," plaintiffs alleged that "all of the funds in the suite were imprudent for the same reasons." *Id*. Thus, "[t]he decision to offer the [challenged suite] was, in effect, one decision that led to thirteen allegedly imprudent funds being included in the [p]lan." *Id.* at 132. The named plaintiffs had therefore established standing to challenge all of the funds

13

within that suite, because "class representatives need only show a constitutionally adequate injury flowing from [the allegedly imprudent] decisions or failures." *Id.* Finally, the court held the named plaintiffs had standing to bring a claim alleging a lack of a prudent investment evaluation process leading to an excessively expensive investment menu. *Id.* at 131-32. Each named plaintiff "invested in at least one fund with allegedly excessive fees," and therefore "adequately alleged that they suffered injury from [defendant's] imprudent investment evaluation process." *Id.*

Applying this analysis here, the Court begins by defining the claims in the Complaint. Plaintiffs claim that Defendants breached their fiduciary duties to the Plan in the following three ways:  (1) paying excessive recordkeeping and administrative fees [#1, ¶¶ 50-59]; (2) retaining the Active Suite of Fidelity Freedom Funds [*id.* at ¶¶ 60-81]; and (3) retaining the Royce Fund [*id.* at ¶¶ 82-84].

To begin, the Court finds that Plaintiffs have standing to challenge the Plan's recordkeeping and administrative fees throughout the Class Period.  In a footnote, Defendants assert a factual attack on Plaintiff's standing to challenge the recordkeeping fees assessed to the Plan "during the portions of the proposed class period in which [Plaintiffs] were active employee Plan participants." [#31 at 28 n.28]  Defendants say that active employee Plan participants actually paid no recordkeeping fees.  [*Id.*]  Even assuming that Defendants are factually correct, the Court nevertheless finds that Plaintiffs have standing to challenge the recordkeeping fees collected throughout the Class Period. As the Eighth Circuit has explained when confronted with a similar argument:

> [The plaintiff] has satisfied the requirements of Article III because he has alleged actual injury to his own Plan account. That injury is fairly traceable to appellees' conduct because he has alleged a causal connection between their actions—even those taken before his participation in the Plan—and

14

his injury.   Finally, the injury is likely to be redressed by a favorable judgment.  *See Lujan*, 504 U.S. at 560, 112 S. Ct. 2130.  [The plaintiff] has thus "made out a 'case or controversy' between himself and [the defendants] within the meaning of Art. III."  *Warth*, 422 U.S. at 498, 95 S. Ct. 2197.  The question whether recovery might be had for the period before [Plaintiff] personally suffered injury is not one of constitutional standing.

*Braden*, 588 F.3d at 592-93 (footnote omitted).  The same analysis applies here.  The Complaint alleges, and Defendants do not factually contest, that Plaintiffs were all subject to the recordkeeping fee at some point during the Class Period.  [##1, ¶¶ 9-12; 31, 27]  If, as alleged, this fee was excessive as a result of Defendants' imprudent failure to secure lower fees, then Plaintiffs have suffered an injury in fact traceable to Defendants' imprudence and redressable by a favorable judgment—thereby conferring Article III standing.  Plaintiffs have therefore cleared the constitutional hurdle to bring this claim. Whether Plaintiffs may also represent the interests of those injured by the same imprudent failure to secure reasonable fees (even though those injuries may extend beyond the precise injuries experienced by Plaintiffs) is not a question of constitutional standing.  *See Braden*, 588 F.3d at 593 ("The question whether recovery might be had for the period before [the plaintiff] personally suffered injury is not one of constitutional standing, but turns instead on whether the 'statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *Kurtz*, 511 F. Supp. 3d at 1193 (finding that "plaintiff's non-investment in certain funds is a class certification question, not a standing one").

Next, the Court finds that Plaintiffs have standing to pursue their claim challenging the retention of the Active Suite.  Defendants argue that Plaintiffs could not have been injured by any funds in which they did not personally invest, and therefore suffered no

injury in fact as to the funds that they did not invest in.  [#31 at 11-12]  This defines
Plaintiffs' claim too narrowly.  Plaintiffs do not bring individual claims for the retention of
each individual Freedom Fund—the claim instead flows out of one basic decision made
by Defendants to select and retain the Freedom Fund Suite.  As explained by the Third
Circuit when faced with this argument:  "The decision to offer the suite of Fidelity Freedom
Funds was, in effect, one decision that led to thirteen allegedly imprudent funds being
included in the [p]lan . . . .  To establish standing, class representatives need only show a
constitutionally adequate injury flowing from [this] decision[]."  *Boley*, 36 F.4th at 132; *see
also Albert v. Oshkosh Corp.*, 47 F.4th 570, 578 (7th Cir. 2022) (relying on *Boley* to hold
that a plaintiff who "invested in at least some actively managed funds" had standing to
challenge the fees associated with all of the allegedly imprudent funds).

The two in-District cases cited by the parties support this approach.  In *Kurtz*, the
court found that the plaintiff had standing to challenge all funds impacted by the same
course of mismanagement, even though the plaintiff only invested in five of the fifteen
challenged funds.  511 F. Supp. 3d at 1192-95.  And in *Barrett*, relied upon heavily by
Defendants [##31, 11-12; 50, 19], the court was confronted with an allegation of
imprudence as to one single fund in which plaintiffs had not invested.  2018 WL 3209108,
at *2.  The court distinguished this allegation from those that challenged "all investment
choices *or some sensibly grouped subset that were offered imprudently*."  *Id.* at *3
(emphasis added).  The court went on to acknowledge that plaintiffs may assert the rights
of parties not before the court when, as here, plaintiffs allege "a single practice by the
defendant that injures both the plaintiff and a third party, although in different ways."  *Id.*

at *4 (citing 13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.9.2 (3d ed., Apr. 2018 update)).[7]

Here, Plaintiffs challenge a "sensibly grouped subset of funds"—the Active Suite—by alleging that Defendants' decision to offer and retain the Active Suite as a whole (not fund-by-fund) constituted a breach of Defendants' fiduciary duty. [#1, ¶¶ 60-81] Plaintiffs each invested in certain Active Suite funds and allege a constitutionally adequate injury to their accounts as a result of Defendants' retention of these funds. [*Id.* at ¶¶ 9-12] Accordingly, Plaintiffs have Article III standing to challenge Defendants' course of action with regard to the Active Suite. Again, whether Plaintiffs adequately represent the interests of other parties with different injuries arising from the same course of action is not a question of constitutional standing. *See Braden*, 588 F.3d at 593; *Kurtz*, 511 F. Supp. 3d at 1193.

Finally, the Court finds that, based on the allegations in the Complaint, Plaintiffs lack standing to challenge the retention of the Royce Fund in the Plan.[8] The Complaint

---

[7] Defendants cite to out-of-District caselaw that appears to take a contrary view on how broadly to define a claim. *See Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, at *6 (S.D.N.Y. Oct. 7, 2019) ("Viewed at a high level, Plaintiffs' challenges to the Selected Funds and Non-Selected Funds raise similar questions—for example, whether the fees paid to Morgan Stanley were inappropriately high [and] whether the funds were improperly retained . . . . But the evidence that Plaintiffs will have to put forward to establish liability will vary from fund to fund, and Plaintiffs' ability to establish liability as to decisions made in connection with one fund will do little to advance their case for liability as to other funds."). But, as discussed, courts in this District and the Circuit courts to have considered the matter have taken a broader approach, treating a claim challenging a single practice amongst a plan or subset of funds as conferring standing to challenge that practice, even if it impacts more than just the funds that the plaintiff invested in.

[8] Defendants do not explicitly challenge Plaintiffs' standing with respect to the Royce Fund. However, Defendants do argue generally that Plaintiffs lack standing to challenge any fund in which they did not invest. [##31, 11-12; 50, 18-19] Moreover, because federal courts are courts of limited jurisdiction, even "[i]f the parties do not raise the question of

attempts to cast this claim as broadly challenging the Plan's management overall.  [#1, ¶ 82]   However, with the exception of a conclusory statement that "Defendants have saddled participants with additional objectively imprudent investment options" and a general investment theory with no specific application to any other fund, the entirety of the claim revolves around the allegedly imprudent retention of a single fund—the Royce Fund.  [*Id.* at ¶¶ 82-84]; *see also Sweda v. Univ. of Penn.*, 923 F.3d 320, 330 (3d Cir. 2019) (disregarding conclusory allegations such as "a prudent process would have produced a different outcome").   Plaintiffs have failed to adequately allege that Defendants' allegedly imprudent course of action with regard to the Royce Fund impacted any other fund within the Plan.   Thus, the Court finds that the claim relates solely to Defendants' retention of the Royce Fund, and not the Plan as a whole or a subset of funds within the Plan.

In contrast to Claims One and Two, Plaintiffs did not suffer a cognizable injury arising from Defendants' course of conduct with respect to the Royce Fund.   The Complaint does not allege that any Plaintiff invested in the Royce Fund.  [*See id.* at ¶¶ 9-12]   And, again, the Complaint fails to adequately allege that any imprudence related to the Royce Fund extended to the Plan as a whole or a sensibly grouped subset of Plan funds, including those in which Plaintiffs invested.   Accordingly, Plaintiffs cannot claim a cognizable injury to their personal accounts arising out of Defendants' allegedly imprudent course of conduct, and therefore lack Article III standing to challenge Defendants' retention of the Royce Fund.

---

lack of jurisdiction, it is the duty of the federal court to determine the matter sua sponte." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

### B.      Fiduciary Duty

Next, the Court turns to Defendants' arguments that Plaintiffs have failed to state a claim for breach of fiduciary duty under Rule 12(b)(6).  Section 404 of ERISA imposes a duty of prudence and a duty of loyalty upon plan fiduciaries.  *See* 29 U.S.C. § 1104(a).  "To properly assert an ERISA claim for breach of fiduciary duty under [Section 404], a plaintiff must allege facts that plausibly demonstrate that:  (1) the defendant was a plan fiduciary,[9] (2) the defendant breached its fiduciary duty, and (3) that the breach resulted in harm to the plaintiff."  *Kurtz*, 511 F. Supp. 3d at 1196 (quoting *Troudt v. Oracle Corp.*, No. 16-cv-00175-REB-CBS, 2017 WL 663060, at *4 (D. Colo. Feb. 16, 2017)).  As discussed above, Plaintiffs have standing to pursue their claims as they relate to the recordkeeping fees and the retention of the Active Suite.

As an initial matter, Defendants' Motion and briefing refers to numerous documents outside the four corners of the Complaint.  "As a general rule, the only facts [a court] consider[s] in assessing the sufficiency of a complaint [under Rule 12(b)(6)] are those alleged in the complaint itself."  *Emps.' Ret. Sys.*, 889 F.3d at 1158 (citing *Gee*, 627 F.3d at 1186 (10th Cir. 2010)).  There are, however, exceptions.  *Id.*  To the extent that this Court relies on a document outside of the Complaint in this Recommendation, the Court will note when it does so and its basis for doing so.

### 1.   Recordkeeping and Administrative Fees

Plaintiffs allege that Defendants imprudently caused the Plan to be charged excessive recordkeeping and administrative fees.  [#1, ¶¶ 50-59]  Defendants argue that

---

[9] For the purposes of this Motion, Defendants do not contest that they are plan fiduciaries under ERISA.  [#31, 12 n.14]

Plaintiffs fail to state a claim for two reasons: (1) Plaintiffs misunderstand and miscalculate the fees that the Plan paid; and (2) Plaintiffs fail to adequately compare the fees paid by the Plan to fees charged to other plans. [##31, 25-30; 50, 14-17]

Accepting Plaintiff's fee calculations for the purposes of this Motion to Dismiss,[10] the Court nevertheless finds that Plaintiffs have failed to state a claim as to the recordkeeping and administrative fees charged by the Plan. Plaintiffs claim that the amounts charged to the Plan were too high. [*See* #1, ¶ 53 ("[T]he Plan should unquestionably have been able to obtain reasonable rates for [recordkeeping] services that were significantly lower than the effective per-participant [recordkeeping] rates [charged].")] "In the absence of 'significant allegations of wrongdoing,' the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) (quoting *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) and citing *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579-80 (7th Cir. 2022)). That is, "the key to stating a plausible excessive-fees claim is to make a like-for-like comparison." *Id.* (citing *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020)).

---

[10] Defendants fault Plaintiffs' "attempt to reverse-engineer [the Plan's recordkeeping] fees using the Plan's Form 5500s," and contend that Plaintiffs should have subtracted additional amounts in order to calculate the per-participant fee. [#31, 25-28] The Court does not find that it is appropriate to consider Defendants' factual attack on Plaintiffs' method of fee calculation under a Rule 12(b)(6) analysis, under which the Court accepts Plaintiffs' factual allegations regarding the fees as true. In addition, Defendants rely on various invoices and account statements to establish that plan participants paid no recordkeeping fees while they were active DISH employees. [*Id.* at 27-28] While the Court may consider such matters in a factual attack on the Court's jurisdiction under Rule 12(b)(1), the Court see no basis for considering these documents under a Rule 12(b)(6) analysis. The invoices and account statements are not referred to or otherwise relied on in the Compliant, nor have Defendants established that they are proper for judicial notice.

Plaintiffs rely on comparisons to the recordkeeping fees paid by eleven other large plans in order to support the claim that Defendants acted imprudently with respect to the Plan's recordkeeping fees.  [#1, ¶¶ 54-58]  The provided comparison, however, is utterly inapt.  Plaintiffs compare the *average* fee paid by the Plan over a five-year span to the fees paid by the comparator plans for just *one* selected year.  [*Id.* at ¶¶ 52, 55-56 & n.6] This is not the "apples-to-apples" comparison that Plaintiffs allege it is, and that suffices for a Court to infer that a fee is excessive.  [*Id.* at ¶ 57 ("In other words, the fees in the table above are apples-to-apples comparisons.")]; *see also Matousek*, 51 F.4th at 279 (requiring a "like-for-like comparison" in order to state a plausible excessive-fees claim in the absence of allegations of wrongdoing).  Put differently, "because the math Plaintiffs used to calculate the [Plan's] annual per-participant recordkeeping fee differs so fundamentally from the math Plaintiffs used to calculate these other plans' . . . per-participant recordkeeping fees, these other plans' fees are not plausible comparators and say nothing helpful about whether the [Plan's] recordkeeping fees are too high."  *Fritton v. Taylor Corp.*, No. 22-cv-00415, 2022 WL 17584416, at *7 (D. Minn. Dec. 12, 2022).

In fact, for most comparator plans, Plaintiffs provide the fees paid by those plans for the year 2020.[11]  [#1, ¶ 56 n.6]  But the Plan's single-year fee for the year 2020, as calculated by Plaintiffs ($33 per participant) [*id.* at ¶ 52], was on par with the fees paid by the comparator plans for the given year (ranging from $23 per participant to $34 per participant) [*id.* at ¶ 55].  Indeed, the Plan's 2020 fee was actually *lower* than the fees

---

[11] Plaintiffs note that in some instances they relied on "the most recently filed Form 5500 [for the comparator plan] if [the] 2020 [Form 5500] is not available."  [#1, ¶ 56 n.6] Plaintiffs do not indicate which comparator plans did not have an available 2020 Form 5500, or which alternative year was used instead for those plans.

paid by two of Plaintiff's selected comparator plans.  [*Id.* at ¶¶ 52, 55]  Far from "nudg[ing] their claim [that Defendants acted imprudently with respect to the Plan's recordkeeping fees] across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, such a comparison (which, on its face, places the Plan's 2020 fees within the provided range of reasonable fees paid by similar plans that year) instead nudges Plaintiffs' claim in the opposition direction.

Stripped of the comparison to fees paid by other plans, Plaintiffs simply allege that the Plan paid higher fees than Plaintiffs believe it should have.  [*See* #1, ¶ 53]  This does not suffice to create a plausible inference that Defendants' decision-making process was flawed.  *Matousek*, 51 F.4th at 280.  Accordingly, the Court RECOMMENDS that Plaintiffs' imprudence claim relating to the Plan's recordkeeping fees be DISMISSED.

### 2.  Fidelity Freedom Funds

Plaintiffs next allege that Defendants breached their fiduciary duties by imprudently selecting and retaining the Active Suite.  [#1, ¶¶ 60-65]  Since the Active Suite has been offered by the Plan "since at least December 31, 2009" [*id.* at ¶ 61]—well before the beginning of the Class Period—the Court construes Plaintiffs' claim as alleging that Defendants employ a deficient process for monitoring the investments that the Plan offers.  [# 66, 22:21-22 ("[T]his is not a claim about the original selection of the Freedom Fund.")]

"Under ERISA a 'prudent' fiduciary must act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'"  *Kurtz*, 511 F. Supp. 3d at 1196 (quoting 29 U.S.C. §

1104(a)(1)(B).  Plan fiduciaries are "under a continuing duty to conduct a regular review of their investment decisions and remove investments which have become improper to retain."  *Birse v. CenturyLink, Inc.*, No. 17-CV-02872-CMA-NYW, 2019 WL 1292861, at *4 (D. Colo. Mar. 20, 2019) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 528-30 (2015)). Nonetheless, "the prudence test . . . is one of conduct, and not a test of the result of performance of the investment."  *Kurtz*, 511 F. Supp. 3d at 1196 (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)).  As a result, "[i]t is not sufficient [for a plaintiff] to simply allege that an investment did poorly, and, therefore, a plaintiff was harmed."  *Birse*, 2019 WL 1292861, at *4.

Courts have recognized that "ERISA plaintiffs generally lack the inside information necessary to make out their [process-oriented] claims in detail unless and until discovery commences."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden*, 588 F.3d at 598); *see also Kurtz*, 511 F. Supp. 3d at 1197 ("[P]laintiffs may face challenges in gathering information about a fiduciary's procedure before discovery.").  As a result, "even when the alleged facts do not specifically address the process by which a Plan is managed, a fiduciary breach claim may still survive a motion to dismiss if the court can reasonably infer from circumstantial factual allegations that the process was flawed." *Kurtz*, 511 F. Supp. 3d. at 1197.  On the other hand, ERISA plaintiffs generally *do* have extensive information regarding the selected funds based on ERISA's disclosure requirements.  *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (citing *Braden*, 588 F.3d at 720); *see also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168 (6th Cir. 2022) ("ERISA's extensive disclosure requirements ease the [pleading] burdens

[confronted by ERISA plaintiffs].").  Thus, "the challenge for ERISA plaintiffs is to use the data about the selected funds and some circumstantial allegations about methods to show that 'a prudent fiduciary in like circumstances would have acted differently.'" *Meiners*, 898 F.3d at 822.  Put differently, "to plausibly establish a claim for a breach of duty to monitor, a plaintiff must allege facts plausibly establishing that no reasonable fiduciary would have maintained the investment."  *Birse*, 2019 WL 1292861, at *4.

Plaintiffs make no direct factual allegations regarding Defendants' process for monitoring the Active Suite.[12]  [*See generally* #1]  They instead allege that the Active Suite cost too much, underperformed, and had an undesirable risk allocation.  [*Id.* at  ¶¶ 60-81]  Plaintiffs' specific allegations regarding the Active Suite may be reduced to the following:  (1) most of the actively-manage funds underlying the TDFs within the Active Suite either had an insufficient track record or missed their respective benchmarks at the start of the Class Period [*id.* at ¶¶ 68-71]; (2) the Active Suite makes "riskier" investments than the Index Suite, and its managers have discretion to deviate from the glide path by up to 10 percentage points in either direction [*id.* at ¶¶ 72-75]; (3) the Active Suite's expense ratio exceeds that of the Index Suite by up to 0.57% [*id.* at ¶¶ 76-77]; (4) the Active Suite has experienced significant outflows in recent years and received negative analyst reviews, in contrast to the significant inflow experienced by the Index Suite [*id.* at ¶¶ 74, 78]; and (5) the Active Suite has underperformed the primary TDF offerings of four of the five largest non-Fidelity managers in the marketplace [*id.* at ¶¶ 79-81].

---

[12] To the extent that Defendants argue that Plaintiffs' claim should be dismissed due to Plaintiffs' failure to provide such direct factual allegations relating to Defendants' process [*see* #31, 15], the Court disagrees.  As discussed above, ERISA Plaintiffs may survive a motion to dismiss based on sufficient circumstantial allegations.

The Court begins with Plaintiff's allegations relating to the Index Suite.  To make a plausible allegation that a prudent fiduciary would have taken a different course "based on the cost or performance of the selected fund[s], a plaintiff must provide a sound basis for comparison—a meaningful benchmark."  *Meiners*, 898 F.3d at 822.  The parties dispute whether the Index Suite may serve as a meaningful benchmark for the Active Suite, and whether such a determination is appropriate at the motion to dismiss stage. [##31, 15-16; 43, 21-22; 50, 6-7]  Courts across the country have split on this question, often in cases involving these exact Suites.  *Compare Smith*, 37 F.4th at 1167 (holding on a motion to dismiss that the Active Suite and Index Suite are "inapt comparators" due to their "distinct goals and distinct strategies"); *Davis*, 960 F.3d at 484-85 (holding on a motion to dismiss that comparing actively managed funds to passively managed funds is "comparing apples and oranges" due to their "different aims, different risks, and different potential rewards"); *Meiners*, 898 F.3d at 823 (holding on a motion to dismiss that a fund with "a different investment strategy" is "not a meaningful benchmark" to a challenged fund); *with In re Biogen, Inc. ERISA Litig.*, No. 20-CV-11325-DJC, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021) ("Disputes over the appropriateness of [comparing the Active Suite with the Index Suite], however, are inappropriate at the motion to dismiss stage."); *In re Omnicom ERISA Litig.*, No. 20-CV-4141 (CM), 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021) (finding "the question of whether two funds are proper comparators" should be deferred "until after discovery").

This issue need not be decided based on the pleadings in this case.  Importantly, Plaintiffs never actually allege that the Index Suite outperformed the Active Suite.  *Cf. In re Biogen*, 2021 WL 3116331, at *6 (permitting a claim to proceed when "[t]he crux of

Plaintiffs' allegation is that the Active suite has 'substantially underperformed the Index Suite'"); *In re Omnicron*, 2021 WL 3292487, at *11 (permitting a claim to proceed when "[t]he complaint alleges that the Active Suite consistently underperformed the benchmark Index Suite"); *In re: Prime Healthcare ERISA Litig.*, No. 20-cv-01529, 2021 WL 3076649, at *5 (C.D. Cal. July 16, 2021) (permitting a claim to proceed when the complaint included "data [which] is sufficient to support an inference that the Active suite was consistently underperforming the Index suite during the relevant time period"). Instead, Plaintiffs compare the Active Suite's expense ratio, "level of risk" incurred (i.e. investment strategy), and amount of investment inflow/outflow with that of the Index Suite. [*See* #1, ¶¶ 66-67, 72-73, 76-78] As detailed below, these comparisons fail to "plausibly establish[] that no reasonable fiduciary would have maintained" the Active Suite in the face of the Index Suite. *Birse*, 2019 WL 1292861, at *4.

Plaintiffs point out that TDFs in the Active Suite charged higher expense ratios than those in the Index Suite, costing Plan participants over $2 million in higher fees in 2020 alone. [#1, ¶¶ 76-77] But, as Plaintiffs further explain, more actively managed TDFs generally incur higher expense ratios. [*Id.* at ¶ 67] This is because of the additional management resources needed to manage the underlying funds. [*See id.*]; *see also Smith*, 37 F.4th at 1169 ("The actively managed funds need to charge higher fees, because they must hire management teams to actively select investments to buy and sell, whereas index funds require less management and less upkeep."). Plaintiffs appear to concede that offering actively managed TDFs is not imprudent *per se* [#43, 26], and no court has held that plans must avoid actively managed funds. *See Smith*, 37 F.4th at 1165 ("We know of no case that says a plan fiduciary violates its duty of prudence by offering

actively managed funds to its employees as opposed to offering only passively managed funds. Several cases in truth suggest the opposite." (citing *Washington Univ. in St. Louis*, 960 F.3d at 485 and *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022)); *Kurtz*, 511 F. Supp. 3d at 1200 (holding that it "cannot be true" that "actively managed funds can *never* be a prudent choice").  It follows that, without more, pointing out the additional expense inherently associated with actively managed funds as compared to passive funds does not suffice to state a claim of imprudence. Indeed, "[a] fiduciary is not required to 'scour the market to find and offer the cheapest possible fund,' as there are other factors for which a fiduciary—and a participant—might want to optimize besides cost."  *Kurtz*, 511 F. Supp. 3d at 1198 (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)).  Such factors may very well include a team of investment managers working to maximize a participant's investment.

Plaintiffs next find fault with the "level of risk" incurred by the Active Suite as compared to the Index Suite, and the ability of Active Suite managers to alter a fund's glidepath.  [#1, ¶¶ 72-75]  This comparison fails for a similar reason as the expense ratio. In Plaintiffs' words, "[t]he goal of an active manager is to beat a benchmark . . . by taking on additional risk."  [#1, ¶ 67]  To permit a claim of imprudence because the Active Suite pursued its goal by taking on risk would seemingly imperil every actively managed fund in every plan.  But, "[i]t's possible, indeed likely, that the absence of any actively managed funds suited for risk-tolerant investors would be imprudent."  *Smith*, 37 F.4th at 1167.  To many investors, the additional risk undertaken in order to—as Plaintiffs allege—"boost [participant] returns" and the ability for trained investment managers to—as Plaintiffs allege—"time market shifts in order to locate underpriced securities" is a feature, not a

bug.  [#1, ¶¶ 73-74]  For this reason, plan fiduciaries are tasked with undertaking a "whole-portfolio[] investment strategy that properly balances risk and reward, as well as short-term and long-term performance."  *Birse*, 2019 WL 1292861, at *3.  The inclusion of actively managed funds is an appropriate tool for plan fiduciaries to utilize in pursuing this strategy.  Thus, the fact that "the Active [S]uite subjects its assets to significantly more risk than the Index [S]uite," or has a "higher exposure" to "riskier" equities and classes than the Index Suite does not suffice to state a claim of imprudence.  [#1, ¶¶ 66, 73]  This is especially true when, as here, the Plan offered both the higher-risk Active Suite as well as the more passively managed index options to its participants throughout the Class Period.  [*See* ##30-2, 40; 30-11, 43; 30-12, 19; 30-13, 19; 30-14, 19  (the Plan's Form 5500s from 2016-2020, listing the Plan's schedule of assets held at the end of each year)];[13] s*ee Smith*, 37 F.4th at 1165 ("Keep in mind that [the plaintiff] could still choose an index fund investment for her 401(k), as [the plan] offered many such options. Offering actively managed funds in addition to passively managed funds was merely a reasonable response to customer behavior."); *Birse*, 2019 WL 1292861 at *5 ("[C]ourts must consider all relevant circumstances and the entire portfolio.").

---

[13] Plaintiffs do not contest the authenticity of these documents.  The Court may consider the Plan's Form 5500s on this Motion because "they are documents referred to in the [C]omplaint and central to [Plaintiffs'] claims."  *Kurtz*, 511 F. Supp. 3d at 1191-92 (citing *Gee*, 627 F.3d at 1186 and *Cnty. of Santa Fe v. Pub. Serv. Co.*, 311 F.3d 1031, 1035 (10th Cir. 2002)); [*see* #1, ¶ 61 ("According to the Plan's Form 5500s, since at least December 31, 2009, the Plan has offered the Fidelity Freedom fund target date suite.")]. These forms are also "government-mandated filings and publicly available," and therefore proper for judicial notice. *Kurtz*, 511 F. Supp. 3d at 1191-92 (citing *Troudt v. Oracle Corp.*, No. 116CV00175-REB-CBS, 2017 WL 663060, at *4 (D. Colo. Feb. 16, 2017), *report and recommendation adopted*, No. 116CV00175-REB-CBS, 2017 WL 1100876 (D. Colo. Mar. 22, 2017)).

Plaintiffs next allege that both analysts and investors lost faith in the Active Suite, particularly in comparison to the Index Suite. [#1, ¶¶ 74, 78]  Plaintiffs cite a 2019 report from Morningstar (the "Morningstar Report") noting $5.4 billion in net outflows from the Active Suite in 2018, as compared to $4.9 billion in net inflows to the Index Suite that same year.  [#1, ¶ 78]  They also cite a 2018 Reuters report noting that nearly $16 billion had been withdrawn from the Active Suite over the prior four years.  [*Id.*]  This certainly indicates an apparent shift in investor preference from the Active Suite to the Index Suite. But again, the question is whether this investor preference, taken as true, "plausibly establish[es] that no reasonable fiduciary would have retained [the challenged] set of investments had the fiduciary engaged in proper monitoring." *Kurtz*, 511 F. Supp. 3d at 1196.  It does not, as made clear by looking at the entirety of the Morningstar Report relied on by Plaintiffs.[14]  As the Morningstar Report illustrates, the $5.4 billion in outflow from the Active Suite represents about 3% of the Active Suite's assets.  [#30-9, 8] Moreover, the Morningstar Report notes the respective inflow and outflow of the Index and Active Suites as an illustration of the trend for investors to prefer the cheapest TDF available.  [#30-9 at 7]  The Morningstar Report continues, noting that "[d]espite an average fee advantage of 50 basis points, the [Index Suite] lagged the [Active Suite] by roughly 38 basis points annually, on average, since the [Index Suite's] 2009 inception

---

[14] The Court may consider the entirety of the Morningstar Report.  Plaintiffs do not contest the authenticity of the copy attached as an exhibit by Defendants. [#30-9]  The Morningstar Report is "referred to in the [C]omplaint and central to [Plaintiffs'] claims." *Kurtz*, 511 F. Supp. 3d at 1191-92 (citing *Gee*, 627 F.3d at 1186 and *Cnty. of Santa Fe*, 311 F.3d at 1035); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

through 2018." [#30-9, 40]  It goes on to rank the Active Suite *higher* than the Index Suite. [*Id.* at 53]

Plan fiduciaries must balance many competing factors when crafting a plan. *See Birse*, 2019 WL 1292861, at *5 (noting some of these factors that must be weighed, including "the opportunity costs of a switch, the comparative risk of the funds, the comparative short-term and long-term returns of the funds, and the balance of the overall portfolio"). Reports of a roughly 3% annual outflow over a handful of years does not support an actionable inference that Defendants imprudently failed to engage in this balancing with respect to the Active Suite, especially when the report relied on by Plaintiffs highlights the Active Suite's positive performance and ranks it higher than Plaintiffs' proposed comparator Index Suite. Plaintiffs' cited criticisms of the Active Suite, or active management in general,[15] fail for similar reasons. Plaintiff notes that various experts took issue with Fidelity's active management strategy. [#1, ¶ 74]  But a handful of skeptical reports does not create a duty to drop an investment, particularly when the expert consensus was clearly mixed. Put differently, "[n]othing in [the reports cited] suggests that the Freedom Funds' reputation was bad enough when viewed in the market as a whole that a prudent plan administrator . . . should have precipitously dumped them. We would need significantly more serious signs of distress to allow an imprudence claim to proceed." *Smith*, 37 F.4th at 1168 (citing *Griffin v. Flagstar Bancorp, Inc.*, 492 F. App'x 598, 604-05 (6th Cir. 2012)).

---

[15] For example, Plaintiffs allege that Morningstar has "repeatedly concluded that in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons." [#1, ¶ 67 (quotation omitted)]  This criticism of active funds generally says nothing about the Active Suite specifically.

Thus, none of Plaintiffs' comparisons between the Active Suite and the Index Suite permit a court to infer that no reasonable fiduciary would have retained the Active Suite. Again, Plaintiffs never allege that the Active Suite outperformed the Index Suite. To be sure, a showing of imprudence does not "come down to simply pointing to a fund with better performance." *Smith*, 37 F.4th at 1167; *see also Birse*, 2019 WL 1292861, at *5 (holding that "relative underperformance is insufficient to state a breach of fiduciary duty claim"). However, such an allegation "will often be necessary," *Smith*, 37 F.4th at 1167, and the Court finds this omission largely negates Plaintiffs' proffered comparisons between the Suites. Investors would be wise to pay a high expense ratio if the added services provide long-term value to their accounts. And to select a fund based solely on the expense ratio with no eye to fund performance or strategy would be a disservice to plan investors. Similarly, plan fiduciaries have no duty to only offer the lowest-risk investments to plan participants; indeed, doing so would likely be imprudent. *Id.* at 1165.

Next, Plaintiffs attempt to establish a comparison to a meaningful benchmark by comparing the Active Suite's performance against that of "the primary offerings of four of the five largest non-Fidelity managers in the TDF marketplace" at the beginning of the Class Period. [#1, ¶¶ 80-81] Plaintiffs provide the three- and five-year annualized returns as of the Fourth Quarter of 2015 of "several representative vintages of the Active [S]uite" against the returns of these "appropriate peers." [*Id.*] While Plaintiffs cite the existence of "other important performance metrics" when comparing investments, Plaintiffs make no further allegations regarding these "readily available alternatives." [*Id.*]

Assuming that these alternative funds may serve as meaningful benchmarks, the Court nevertheless finds that Plaintiffs' comparison to these peer funds fails to plausibly

allege that Defendants engaged in an imprudent monitoring process by failing to replace the Active Suite with one of these alternatives.  The *only* deficiency identified by Plaintiffs in comparison to the peer funds is underperformance at the beginning of the Class Period. But, again, a showing of imprudence does not "come down to simply pointing to a fund with better performance."  *Smith*, 37 F.4th at 1167; *see also Birse*, 2019 WL 1292861, at *5 (holding that "relative underperformance is insufficient to state a breach of fiduciary duty claim").  As explained by a court in the Southern District of New York:

> Put simply, the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers. If that were the case, Plan sponsors would be duty-bound to merely follow the industry rankings for the past year's results, even though past performance is no guarantee of future success. Clearly, no court has ever suggested the existence of such a duty.

*Patterson v. Morgan Stanley*, No. 16-CV-6568, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019); *see also Smith*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty. Precipitously selling a well-constructed portfolio in response to disappointing short-term losses, as it happens, is one of the surest ways to frustrate the long-term growth of a retirement plan.").  To the contrary, "a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016).

This is especially true when, as here, the relative underperformance compared to the allegedly "suitable alternative" funds was slight going into the Class Period—often less than 1%, and never greater than 3.5%.  [#1, ¶ 80]; *see Birse*, 2019 WL 1292861 at

*5 n.2 (distinguishing the plaintiffs' allegations of 2-3% underperformance, which did not state a claim, from cases involving allegations of at least 10% underperformance, which some courts have found could state a claim).  Again, prudent plan fiduciaries weigh many factors in determining a plan's offerings—including "the opportunity costs of a[n] [investment] switch" as well as both "short-term and long-term returns of the funds."  *Birse*, 2019 WL 1292861, at *5.  Plaintiffs have not made any allegations regarding these factors as compared to the allegedly suitable alternative funds.  An allegation that the Active Suite was modestly trailing TDFs offered by competitors going into the Class Period does not suffice to state a claim of imprudence.

Finally, Plaintiffs make allegations regarding the actively managed mutual funds that underlie the TDFs within the Active Suite.  [#1, ¶ 68-71]  Specifically, Plaintiffs allege that 22 of the 32 underlying investment vehicles in the Active Suite were deficient at the beginning of the Class Period—about half because they lacked a five-year track record, and about half because they had failed to outperform their respective benchmarks over the previous three- and five-year periods leading up to the Class Period.  [*Id.* at ¶¶ 68, 70-71]  The Court finds that these allegations regarding a subset of the Active Suite's underlying investments fail to create an inference that no reasonable fiduciary would have retained the Active Suite under these circumstances.

As an initial matter, other courts have found that an investment is not imprudent simply because it is untested.  *See Patterson*, 2019 WL 4934834, at *14 ("That the 2025 Trust was untested is also insufficient to establish imprudence in the selection and retention of the fund."); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 705 (W.D. Mo. 2019) ("Plaintiffs[] cite no authority holding that the implementation of a fund

without a long performance history is per se imprudent.").  And, as discussed above, the mere underperformance of a fund at a given time does not make that fund imprudent to retain.

More fundamentally, an allegation regarding a subset of a TDF's underlying investment vehicles ultimately says very little about the prudence of retaining the TDF at issue.  TDFs consist of a portfolio of investments.  [#1, ¶ 60]  Any ground lost by certain underlying investments could easily be made up by the remainder.  Under Plaintiffs' approach, a fiduciary could be forced to jettison an overall well-performing TDF simply because some of the TDF's underlying funds are performing poorly.  This does not comport with the duty of prudence imposed by ERISA.  *Cf. Birse*, 2019 WL 1292861 at *3 ("In order to establish a claim that a fiduciary has violated its duties under ERISA, the plaintiff must allege facts establishing that the fiduciary's investment decisions . . . are such that a reasonably prudent fiduciary would not have made that decision as part of a prudent, *whole-portfolio*, investment strategy . . . . Even if a claim is narrowly focused on one investment, the proper inquiry considers the *entire portfolio*."  (emphases added) (citation removed)).

Thus, considering the totality of Plaintiffs' allegations, the Court finds that Plaintiffs have failed to state an imprudence claim.  Plaintiffs make no direct allegations regarding Defendants' process for selecting and retaining Plan options.  Plaintiffs have further failed to adequately compare the Active Suite to a meaningful benchmark or otherwise allow a court to reasonably infer that the retention of the Active Suite was the result of an imprudent monitoring process. Accordingly, the Court RECOMMENDS that Plaintiffs' imprudence claim regarding the Active Suite be DISMISSED.

### 3. Duty of Loyalty

Plaintiffs have also failed to state a claim for breach of the duty of loyalty.  Under ERISA, fiduciaries must act "for the exclusive purpose of providing benefits to participants and their beneficiaries."  29 U.S.C. § 1104(a)(1)(A)(i).  "A breach of the duty of loyalty requires factual allegations that a defendant's actions were for the purpose of providing benefits to himself or someone else—having that effect incidentally is not enough." *Kurtz*, 511 F. Supp. 3d at 1202.  "Furthermore, 'a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts.'" *Id.* (quoting *Sacerdote v. New York Univ.*, No. 16-cv-6284, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017)).

Plaintiffs argue that they adequately allege that "Defendants' retention of the Active Suite and failure to monitor fees directly enabled Fidelity to collect inflated compensation from participants."  [#43, 31]   But, as pled, these are—at most—allegations that Defendants' actions had the incidental effect of providing benefits to Fidelity.  [#1, ¶ 77 (alleging that excess fees "go[] straight into Fidelity's pockets," but making no factual allegations that Defendants acted for the purpose of benefitting Fidelity)]  That is, Plaintiffs put forward no factual allegations that Defendants' actions were for the *purpose* of benefitting themselves or Fidelity—only allegations that Fidelity incidentally benefitted from Defendants' allegedly imprudent process.[16]  Thus, Plaintiffs "failed to plead facts suggesting 'the fiduciary's operative motive was to further its own interests,' as required

---

[16] Plaintiffs argue in their briefing that their allegations "support a strong inference that Defendants' actions were taken:  (i) to save itself costs at the expense of Plan participants; or (ii) to favor its recordkeepers over the Plan participants."  [#43, 31]  These allegations do not appear in the Complaint, as, again, the Complaint only alleges an incidental benefit to Fidelity.  The Court also struggles to see how Defendants, as Plan fiduciaries, would save any costs by allowing Fidelity to overcharge the Plan.

to show a breach of the fiduciary duty of loyalty." *Smith*, 37 F.4th at 1170 (quoting *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018)).

Accordingly, the Court RECOMMENDS that Plaintiffs' claims for breach of loyalty be DISMISSED.

## C.      Derivative Claims

Plaintiffs also bring claims of failure to monitor fiduciaries, co-fiduciary liability, and knowing breach of trust.  [#1, ¶¶ 109-20]  These claims are derivative of Plaintiffs' claims for breach of fiduciary duty.  *See, e.g.*, 29 U.S.C. § 1105(a) (stating that a fiduciary may be liable for the breach of a co-fiduciary under certain circumstances); *Smith v. CommonSpirit Health*, No. CV 20-95-DLB-EBA, 2021 WL 4097052, at *13 (E.D. Ky. Sept. 8, 2021) ("[A] a monitoring claim must be dismissed where, as here, the underlying breach by the appointed fiduciary is not sufficiently pled. . . . Likewise, an invalid breach-of-fiduciary-duty claim forecloses a claim for breach of trust." (citations omitted)), *aff'd*, 37 F.4th 1160 (6th Cir. 2022).  Plaintiffs make no argument to the contrary.  [*See* #43, 32]

Accordingly, because Plaintiffs have failed to state a claim for breach of fiduciary duty, the Court RECOMMENDS that Plaintiffs' claims of failure to monitor fiduciaries, co-fiduciary liability, and knowing breach of trust be DISMISSED.

## D.      Dismissal Without Prejudice

In a footnote, Plaintiffs seek leave to amend their Complaint should the Court conclude that it is deficient. [#43 at 25 n.16] The entirety of Plaintiffs' argument is a three-sentence request, which cites generally to the standard for granting leave to amend and asserts that "Plaintiffs stand ready to add further allegations regarding the defects in Defendants' investment and service provider selection and monitoring processes."  [*Id.*]

The Tenth Circuit has held that a district court does not abuse its discretion when it dismisses a complaint with prejudice where the request to amend is made in such a perfunctory manner. *See Gold Res. Corp.*, 776 F.3d at 1118-19 ("The district court did not abuse its discretion in dismissing the complaint with prejudice where plaintiff's memorandum contained only one sentence at the very end of his brief alternatively requesting leave to amend in the event the district court should decide to dismiss his complaint."); *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186-87 (10th Cir. 1999) ("[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it.").

However, the Court is also cognizant that a trial court should "freely give leave [to amend a complaint] when justice so requires," Fed. R. Civ. P. 15(a)(2), thereby providing "litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Hardin v. Mintowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)). Plaintiffs have not previously amended their Complaint, and Defendants make no argument against potential amendment in their Reply.   Accordingly, the Court RECOMMENDS that Plaintiffs' Complaint be DISMISSED WITHOUT PREJUDICE, and that Plaintiffs be given fourteen (14) days from an order on this Recommendation to file an amended complaint.

IV.   **CONCLUSION**

For the reasons set forth above, the Court **RECOMMENDS** that:

1.  the Motion to Dismiss [#30] be **GRANTED** to the extent that is seeks dismissal of the Complaint;

2.  the Complaint be **DISMISSED WITHOUT PREJUDICE;** and

3.  Plaintiffs be given fourteen (14) days from an order on this Recommendation to file an amended complaint.[17]

DATED:  January 31, 2023                    BY THE COURT:

                                            s/Scott T. Varholak
                                            United States Magistrate Judge

---

[17] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.   "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."   *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions; *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).   *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).

# EXHIBIT A.3

2023 WL 1798171
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington.

JUSTIN BELDOCK, et al., Plaintiffs,

v.

MICROSOFT CORPORATION, et al., Defendants.

CASE NO. C22-1082JLR
|
02/07/2023

JAMES L. ROBART, United States District Judge

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS

## I. INTRODUCTION

**\*1** Before the court is the motion to dismiss filed by Defendants Microsoft Corporation ("Microsoft"), the Board of Trustees of Microsoft Corporation, and the 401(k) Administrative Committee of the Microsoft Corporation Savings Plus 401(k) Plan (collectively, "Defendants"). (Mot. (Dkt. # 27); Reply (Dkt. # 53).) Plaintiffs Justin Beldock, Gordon Broward, and Shaadi Nezami (collectively, "Plaintiffs"), who bring this action on behalf of themselves, the Microsoft Corporation Savings Plus 401(k) Plan (the "Plan"), and a proposed class, oppose the motion. (Resp. (Dkt. # 49).) The court heard oral argument on the motion on January 30, 2023. (See 1/30/22 Min. Entry (Dkt. # 56).) The court has considered the motion, all materials submitted in support of and in opposition to the motion,[1] and the governing law. Being fully advised, the court GRANTS Defendants' motion to dismiss and DISMISSES Plaintiffs' complaint with leave to amend.

## II. BACKGROUND
Below, the court sets forth the factual and procedural background relevant to this motion.

### A. Factual Background
The Plan is a defined contribution plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). (Compl. (Dkt. # 1) ¶ 2.) That is, the Plan is a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

29 U.S.C. § 1002(34). The Plan is a participant-driven 401(k) plan, meaning that participants direct the investment of their contributions into the investment options offered by the Plan. (Compl. ¶ 20.) As of December 2020, the Plan had 135,252 participants with account balances and assets totaling approximately $34.48 billion, placing it in the top 0.1% of all defined contribution plans by size. (Id. ¶ 4.)

Since at least December 31, 2009, the Plan has offered participants a suite of ten BlackRock LifePath Index target date funds (the "BlackRock TDFs"). (Id. ¶ 31.) Target date funds ("TDFs") are investment vehicles that offer "an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches." (Id. ¶ 26.) The BlackRock TDFs are offered in "vintages" at five-year intervals. (See id. ¶ 43 (including tables showing performance for various vintages of the BlackRock TDF).) Thus, there are BlackRock TDF vintages for 2025, 2030, 2035, and so forth, along with a BlackRock Retirement TDF. (Id.) Defendants designated the BlackRock TDFs as the Plan's Qualified Default Investment Alternative ("QDIA"), into which a participant's contributions are invested if the participant does not otherwise indicate where their assets should be allocated. (Id. ¶ 35.[2]) In December 2020, about 24% of the Plan's assets were invested in the BlackRock TDFs. (Id. ¶ 36.) As of late 2021, the BlackRock TDFs were the third largest target date suite by market share. (Id. ¶ 39.)

**\*2** TDFs are actively managed, meaning that their managers make changes to the funds' allocations to stocks, bonds, and cash over time. (Id. ¶ 26.[3]) These shifts in allocation are referred to as a TDF's glide path. (Id. ¶ 26.) TDF glide paths are managed either "to retirement" or "through retirement." (Id. ¶ 27.) A "to retirement" glide path "generally

assumes participants will withdraw their funds once they reach the presumed retirement age, or soon thereafter." (*Id.*) The asset allocation in a "to retirement" TDF "remains static once the retirement date is reached." (*Id.*) A "through retirement" glide path "expects participants will remain invested after reaching retirement and gradually draw down their funds." (*Id.*) "Accordingly, the terminal allocation of a 'through' TDF is not reached until a predetermined number of years after the target date." (*Id.*) "To retirement" strategies are "managed to protect against the risk of a market decline significantly diminishing assets, while the 'through' approach focuses on the risk of outliving savings." (*Id.* ¶ 28.) Thus, TDFs designed with a "to" strategy "typically de-risk faster than their 'through' peers." (*Id.*) The BlackRock TDFs are managed with a "to" strategy and invest in underlying passively managed index funds. (*See id.* ¶¶ 29, 43.)

Plaintiffs assert that the BlackRock TDFs are "significantly worse performing than many of the mutual fund alternatives offered by TDF providers and, throughout the Class Period, [4] could not have supported an expectation by prudent fiduciaries that their retention in the Plan was justifiable." (*Id.* ¶ 31.) They allege that Defendants breached their fiduciary duties by employing a "fundamentally irrational decision-making process" in adding and retaining the BlackRock TDFs. (*Id.* ¶¶ 34-35.) They do not, however, allege any specific facts regarding that decision-making process. (*See generally id.*) Instead, Plaintiffs compare the BlackRock TDFs' returns over time to the returns realized by four of the other top-six largest TDF suites (the "Comparator TDFs") and ask the court to infer, based on the BlackRock TDFs' alleged underperformance, that Defendants acted imprudently in retaining the BlackRock TDFs in the Plan. (*Id.* ¶ 39 (listing the six largest target date suites by market share); *id.* ¶ 43 (comparative performance tables). [5] ) Plaintiffs allege that a prudent fiduciary would have measured the returns of the BlackRock TDFs against these "specific, readily investable alternatives" rather than by the fund's own custom benchmarks and would have switched to a different TDF provider based on the BlackRock TDFs' alleged underperformance relative to the Comparator TDFs. (*Id.* ¶ 38.)

Plaintiffs provide nine pages of tables showing how the three- and five-year annualized returns for the BlackRock TDFs ranked against the Comparator TDFs at the end of each quarter since the beginning of the class period in August 2016. (*Id.* ¶ 43.) Indeed, for many of the quarters, the BlackRock TDFs ranked last or second-to-last among the five TDF

suites that Plaintiffs compare in their complaint. (*See id.*) By 2021, however, the BlackRock TDFs' performance began to improve, and by 2022, the later vintages were among the best-performing of the TDF suites. (*See id.* at 23-24.) In addition, the BlackRock Retirement TDF has "regularly generated better trailing returns than the two Comparator TDFs that also offer a Retirement vintage." (*Id.* ¶ 43 n.9.)

As Defendants point out, there are some key differences between the BlackRock TDFs and the Comparator TDFs. (*See* Mot. at 6-8.) For example, the BlackRock TDFs are a "to retirement" suite, while the Comparator TDFs are "through retirement" suites; the BlackRock TDFs and two of the Comparator TDFs invest only in passively managed funds while the remaining two invest in actively managed funds; the TDFs allocate their assets differently among bonds and equities; and the TDFs invest in different categories of bonds and equities. (Mot. at 7-8 (citing McMahan Decl. (Dkt. # 28) ¶ 4, Ex. 2 (Morningstar Manager Rsch., *Morningstar 2022 Target-Date Strategy Landscape*, Morningstar (Mar. 3, 2022) ("Morningstar Report")).) [6] ) In addition, the BlackRock TDFs have a "Gold" analyst rating from Morningstar, while only two of the four Comparator TDFs have a "Gold" rating. (Mot. at 6, 8 (citing Morningstar Report).)

## B. Procedural Background

**\*3** Plaintiffs, who are former employees of Microsoft and former participants in the Plan, filed this proposed class action on August 1, 2022. (Compl. at 1; *id.* ¶¶ 9-11.) All three Plaintiffs were invested in different vintages of the BlackRock TDF suite: Mr. Beldock maintained an investment in the BlackRock Retirement TDF; Mr. Gordon in the BlackRock 2020 TDF; and Mr. Nezami in the BlackRock 2030 TDF. (*Id.* ¶¶ 9-11.) They allege that Defendants breached their fiduciary duties to the Plan and Plan participants under ERISA by selecting and retaining the BlackRock TDFs as investment options in the Plan. (Compl. ¶¶ 70-74.) They also allege claims under ERISA for failure to monitor fiduciaries and co-fiduciary breaches, as well as a claim in the alternative for knowing breaches of trust based on Defendants' decisions to select and retain the BlackRock TDFs. (*Id.* ¶¶ 75-86.) They seek a declaratory judgment that Defendants' acts violated ERISA; a permanent injunction against Defendants prohibiting the practices described in the complaint and requiring Defendants to act in the best interests of the Plan and its participants; equitable, legal, or remedial relief for all losses and/or compensatory damages; and attorneys' fees, costs, and recoverable expenses. (*Id.* ¶ 8; *id.* at 42-43.)

The parties agreed on an extended briefing schedule for Defendants' motion to dismiss. (9/20/22 Order (Dkt. # 25).) Briefing was complete on December 16, 2022. (*See generally* Dkt.) The court heard oral argument on January 30, 2023. (*See* 1/30/23 Min. Entry.) The motion is now ripe for decision.

### III. ANALYSIS

Below, the court sets forth the standard of review, then evaluates Defendants' motion to dismiss.

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under this standard, the court construes the complaint in the light most favorable to the nonmoving party, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005), and asks whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Somers v. Apple, Inc.*, 729 F.3d 953, 965 (9th Cir. 2013) (stating that the allegations must "rise beyond mere conceivability or possibility" to meet the plausibility standard). The court is not required to accept as true legal conclusions or "formulaic recitation[s] of the legal elements of a cause of action." *Chavez v. United States*, 683 F.3d 1102, 1008 (9th Cir. 2012).

### B. Standing

The court has an "independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Therefore, before turning to the merits of Plaintiffs' claims, the court must address whether and to what extent Plaintiffs have plausibly alleged that they have standing to pursue this action.

To establish Article III standing, a plaintiff must show that (1) the party has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and conduct complained of;

and (3) it is likely that a favorable decision in the case will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). It is not enough for a plaintiff to have statutory standing (that is, a right of action) under ERISA: plaintiffs must also have Article III standing to pursue their claims in federal court. *Thole v. U.S. Bank NA*, --- U.S. ---, 140 S. Ct. 1615, 1620, 1622 (2020). Here, Defendants argue that (1) Mr. Beldock lacks standing to act as a plaintiff in this case because he did not suffer an injury cognizable under Article III, and (2) none of the three Plaintiffs has standing to pursue prospective injunctive relief on behalf of the Plan and the proposed class because any such relief would not benefit them. (Mot. at 21-22. [7] ) The court agrees with Defendants.

#### 1. Mr. Beldock

**\*4** Defendants contend that Mr. Beldock cannot show an injury in fact because he was only ever invested in the BlackRock Retirement TDF, which, according to Plaintiffs, "regularly generated better trailing returns than the two Comparator TDFs that also offer a Retirement vintage." (Mot. at 21 (citing Compl. ¶¶ 9, 43 n.9).) Indeed, the complaint is devoid of any allegation that Mr. Beldock suffered any concrete injury. [8] (*See generally* Compl.)

Plaintiffs make three arguments to support their view that Mr. Beldock has standing to bring his claims in this case. First, citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009), they argue that Mr. Beldock is entitled to seek relief for the Plan's losses because he makes his claims on behalf of the Plan under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2). (*See* Resp. at 21.) *Braden*, however, makes clear that a plaintiff must have Article III standing to sue for relief for the Plan. *Braden*, 588 F.3d at 592-93 (evaluating Article III standing before turning to statutory standing); *see also Thole*, 140 S. Ct. at 1622 ("There is no ERISA exception to Article III."). Thus, *Braden* does not obviate the requirement that Mr. Beldock prove that he suffered the type of concrete and particularized injury necessary for Article III standing.

Second, Plaintiffs assert that because TDFs are chosen for defined contribution plans as a complete suite, the fact that one vintage performed well does not foreclose a claim that Defendants failed to monitor the BlackRock TDF suite as a whole. (Resp. at 21-22.) Although it is true that a fiduciary has a continuing duty to properly monitor investments, *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015), Plaintiffs do not explain how any alleged failure to do so caused Mr. Beldock a

concrete and particularized injury that could be redressed by a favorable decision in this case.

Finally, Plaintiffs contend that Mr. Beldock was "deprived of the opportunity to invest in suitable TDFs as a result of Defendants' retention of the BlackRock TDFs" and that he could have invested in "appropriate pre-retirement vintages" if Defendants had replaced the BlackRock TDFs. (Resp. at 21-22.) Again, however, Plaintiffs themselves pointed out that the BlackRock Retirement TDF in which Mr. Beldock invested performed better than the retirement vintages offered by the Comparator TDFs. (Compl. ¶ 43 n.9.) And whether Mr. Beldock would have invested in pre-retirement vintages if the Plan had offered one of the Comparator TDFs is purely conjectural. *See Lujan*, 504 U.S. at 560 (stating that an injury in fact must be "actual or imminent, not conjectural or hypothetical" (internal quotation marks omitted)).

For the foregoing reasons, the court concludes that Mr. Beldock has not plausibly alleged that he has Article III standing to pursue the claims alleged in this case. The court GRANTS Defendants' motion to dismiss Mr. Beldock from this lawsuit for lack of standing.

### 2. Prospective Injunctive Relief

 **\*5**  Defendants argue that none of the three Plaintiffs, who are all former Microsoft employees and former participants in the Plan, have standing to seek prospective injunctive relief because they would not benefit from such relief if it were granted. (Mot. at 21-22.) Again, the court agrees with Defendants.

The Supreme Court has made clear that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (holding that a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief). Where there are multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 581 U.S. at 439.

To establish Article III standing to seek prospective injunctive relief, a plaintiff must plausibly allege that he or she is likely to suffer future injury from the conduct he or she seeks to enjoin. *Lyons*, 461 U.S. at 105-06; *see Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir. 2018) (holding

that the plaintiff in proposed class action had standing to seek injunctive relief where she alleged an "actual and imminent, not conjectural or hypothetical threat of future harm"); *Marks v. Trader Joe's Co.*, No. CV 19-10942 PA (JEMx), 2020 WL 2504333, at \*9 (C.D. Cal. Apr. 24, 2020) (holding former plan participants who no longer worked for Trader Joe's lacked standing to seek injunctive relief as a remedy for alleged breaches of fiduciary duty under ERISA. Here, none of the three Plaintiffs alleges that he is likely to become reemployed by Microsoft and to participate again in the Plan. (*See generally* Compl.) Accordingly, the court agrees with Defendants that none of the Plaintiffs plausibly alleges that he is likely to suffer future injury if the court does not enjoin the conduct challenged in the complaint.

The court is not persuaded by the cases Plaintiffs cite in their responsive brief. (*See* Resp. at 23-24.) First, *Cryer v. Franklin Templeton Res., Inc.*, No. C 16-4265 CW, 2017 WL 4023149 (N.D. Cal. July 26, 2017), and *Hay v. Gucci Am., Inc.*, No. 2:17-CV-07148, 2018 WL 481558 (D.N.J. Oct. 3, 2018), concern statutory standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), rather than Article III standing. Second, as the court noted above, *Braden*, 588 F.3d at 592-93, made clear that a plaintiff must have Article III standing to sue for relief on behalf of the Plan. Third, *Amara v. CIGNA Corp.*, 775 F.3d 510, 524-25 (2d Cir. 2014), does not analyze the issue of standing at all, whether statutory or constitutional. Instead, the Second Circuit simply noted in a footnote, without discussion, that the class would benefit from prospective injunctive relief. *Id.* at 524 n.9. In addition, *Amara* predates the Supreme Court's holding in *Thole* that an ERISA plaintiff must demonstrate Article III standing in addition to statutory standing. *Thole*, 140 S. Ct. at 1622. Finally, the court is not swayed by *Laurent v. Pricewaterhouse Coopers LLP*, 565 F. Supp. 3d 543, 550 (S.D.N.Y 2021), because it relies on *Amara* for its holding that cashed-out former plan participants had standing to pursue an injunction. Therefore, the court GRANTS Defendants' motion to dismiss Plaintiffs' claims for prospective injunctive relief.

### C. Breaches of Fiduciary Duty

 **\*6**  Plaintiffs allege that Defendants breached their fiduciary duties under ERISA Sections 404(a)(1)(A), (B), and (D). (Compl. ¶ 71.) Under these sections, a fiduciary:

shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; [and]...

(D) in accordance with the documents and instruments governing the plan[.]

29 U.S.C. §§ 1104(a)(1)(A), (B), (D). Plaintiffs conceded at oral argument, however, that they do not allege that Defendants failed to act in accordance with the documents governing the Plan. Accordingly, the court GRANTS Defendants' motion to dismiss Plaintiffs' claim for breach of fiduciary duty under ERISA Section 404(a)(1)(D) and turns to Defendants' motion to dismiss Plaintiffs' claims for breaches of the duties of prudence and loyalty.

1. Breach of the Duty of Prudence

ERISA Section 404(a)(1)(B)'s fiduciary duty of prudence focuses "on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013). This analysis is "context specific," and must give "due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, --- U.S. ---, 142 S. Ct. 737, 742 (2022). "Even in a defined-contribution plan where plaintiffs choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.*

(citing *Tibble*, 575 U.S. at 529-30). Thus, "[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id.* (citing *Tibble*, 575 U.S. at 529-30).

Defendants argue that the court should dismiss Plaintiffs' claim for breach of the fiduciary duty of prudence because (1) the Comparator TDFs are too different from the BlackRock TDFs in glide path, investment strategy, asset allocation, and whether they invest in active or passive funds, and thus are not meaningful benchmarks against which to measure the performance of the BlackRock TDFs and (2) Plaintiffs' allegations of underperformance do not support the inference that Defendants acted imprudently in retaining the BlackRock TDFs as investment options in the Plan. (Mot. at 9-10.) Plaintiffs counter that (1) the Comparator TDFs are meaningful benchmarks because they are the most likely alternative options to be selected by large 401(k) plans like Microsoft's Plan and (2) evidence of the BlackRock TDFs' ongoing underperformance since 2016 relative to the Comparator TDFs gives rise to a plausible inference that Defendants breached their fiduciary duty of prudence by failing to monitor the BlackRock TDFs and remove them from the Plan. (Resp. at 11-20.)

**\*7** The court need not decide whether the Comparator TDFs are meaningful benchmarks because even if they are, Plaintiffs have not plausibly alleged that Defendants breached their fiduciary duty of prudence by selecting the BlackRock TDFs, failing to monitor them, and retaining them in the Plan. As noted above, a complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Where there are "two possible explanations, only one of which can be true and only one of which results in liability," Plaintiffs "cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Indeed, "[s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true,...in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.*

In *White v. Chevron*, 752 F. App'x 453, 455 (9th Cir. 2018), the Ninth Circuit applied these rules and affirmed the district court's dismissal of the plaintiffs' claims for breaches of ERISA's fiduciary duties of loyalty and prudence. The court

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    5

concluded in that case that the plaintiffs' allegations were insufficient to support a plausible inference that the defendant breached its fiduciary duties because they "showed only that [the defendant] could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund [9] " and that "[n]one of the allegations made it more probable than not that any breach of a fiduciary duty had occurred." *Id.* at 455. The same is true here. Plaintiffs ask the court to infer, based on the quarterly charts of three- and five-year annualized returns they present in their complaint, that Defendants must have breached their fiduciary duty of prudence when they did not divest from the BlackRock TDFs. They allege no facts, however, that would "tend to exclude the possibility" that Defendants had reasons to retain the BlackRock TDFs that were consistent with their fiduciary duties. *See id.* at 454-55; *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108. Absent such allegations, Plaintiffs fail to raise their claim above a speculative level. *See Twombly*, 550 U.S. at 555. Other circuits are in accord. *See, e.g.*, *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty."); *Meiners v. Wells Fargo & Co*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged TDFs] were an imprudent choice at the outset.....No authority requires a fiduciary to pick the best performing fund."). Because Plaintiffs have failed to plausibly allege that Defendants breached their fiduciary duty of prudence, the court GRANTS Defendants' motion to dismiss that claim.

## 2. Breach of the Duty of Loyalty

ERISA § 404(a) distinguishes the duty of loyalty from the duty of prudence. *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2017 WL 2352137, at *6 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018). To state a claim for breach of the fiduciary duty of loyalty, Plaintiffs must plead facts sufficient to raise a plausible inference that Defendants engaged in self-dealing, took actions for the purpose of benefitting themselves or a third party at the expense of Plan participants, or acted under an actual or perceived conflict of interest in administering the Plan. *White*, 2017 WL 2352137, at *6 (dismissing breach of duty of loyalty claim where plaintiff alleged no facts showing any benefit

to the defendant resulting from the alleged conduct); *see also Davis v. Salesforce.com, Inc.*, No. 20-CV-01753-MMC, 2020 WL 5893405, at *7 (N.D. Cal. Oct. 5, 2020), *rev'd on other grounds*, No. 21-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) (dismissing breach of duty of loyalty claim where plaintiffs failed to allege facts "from which it can plausibly be inferred that the Plan's fiduciaries subjectively intended to benefit either themselves or a third party at the expense of the Plan's participants"); *CommonSpirit Health*, 37 F.4th at 1169-70 (dismissing breach of duty of loyalty claim where plaintiff failed to "plead facts suggesting 'the fiduciary's operative motive was to further its own interests' " (quoting *Brotherston v. Putman Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018))).

**\*8** Here, as Defendants point out, Plaintiffs make no allegations that Defendants acted with intent to benefit themselves or a third party. (Mot. at 20; *see generally* Compl.) Indeed, Plaintiffs conceded at oral argument that they do not allege that Defendants engaged in self-dealing and that their claim for breach of the duty of loyalty is based solely on the BlackRock TDFs' alleged underperformance. Thus, because Plaintiffs have not plausibly alleged a claim for breach of the fiduciary duty of loyalty under ERISA Section § 404(a)(1)(A), the court GRANTS Defendants' motion to dismiss this claim.

## 3. Secondary Claims

Plaintiffs agreed at oral argument that if the court dismisses their claims for breach of the duties of prudence and loyalty, it need not reach their claims in Counts 2 and 3 of their complaint for failure to monitor, co-fiduciary breaches, or knowing breaches of trust. Indeed, at least one circuit court of appeals has noted that these claims are derivative in nature and "must be premised [on] an underlying breach of fiduciary duty." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 583 (7th Cir. 2022) (quoting *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010)); *see also Coulter v. Morgan Stanley & Co.*, 753 F.3d 361, 368 (2d Cir. 2014) (finding that failure to monitor claims "cannot survive absent a viable claim for breach of a duty of prudence"). Because the court has granted Defendants' motion to dismiss Plaintiffs' breach of fiduciary duty claims, the court also GRANTS Defendants' motion to dismiss Plaintiffs' claims for failure to monitor, co-fiduciary breaches, and knowing breaches of trust.

## D. Leave to Amend

On a Rule 12(b)(6) motion, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). Accordingly, the court GRANTS Plaintiffs' request for leave to amend their complaint to address the deficiencies identified in this order. (*See* Resp. at 24-25.) Plaintiffs shall file their amended complaint by no later than **February 17, 2023**. If Plaintiffs fail to timely file an amended complaint, the court will DISMISS this matter with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion to dismiss (Dkt. # 27) and DISMISSES Plaintiffs'

complaint with leave to amend. Plaintiffs may file an amended complaint that addresses the deficiencies identified in this order no later than **February 17, 2023**.

Dated this 7th day of February, 2023.

A

JAMES L. ROBART

United States District Judge

**All Citations**

Slip Copy, 2023 WL 1798171

## Footnotes

1   The court also reviewed *amici curiae* briefs filed in support of Defendants' motion by (1) the Chamber of Commerce of the United States of America (Chamber Br. (Dkt. # 51)) and (2) a group comprised of American Benefits Council, the ERISA Industry Committee, American Retirement Association, and Committee on Investment of Employee Benefit Assets, Inc. (ABC Br. (Dkt. # 52)). The court did not, however, rely on either brief when deciding this motion.

2   The participant's contributions are invested into the fund with the target year closest to the participant's anticipated retirement year. (*Id.*)

3   The funds within the TDFs, however, may be either actively managed or passively managed. (*Id.* ¶ 29.) Passively managed funds "provide broad market exposure at minimal cost and avoid the risk of active management underperformance and style drift." (*Id.*) Actively managed funds "tend to provide more diversified asset class exposure while offering the potential for excess returns." (*Id.*)

4   The Class Period is from August 2, 2016, to the present. (*Id.* ¶ 57.)

5   Plaintiffs do not include the Fidelity Freedom Funds TDF suite as a comparator because, they assert, it would have been an "imprudent selection" during the class period. (*Id.* ¶ 40 n.7.)

6   The court may consider the Morningstar Report because Plaintiffs rely on it in their complaint. *See United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011); (Compl. ¶ 28 n.4).

7   Defendants do not argue that Mr. Broward and Mr. Nezami lack Article III standing to pursue claims for damages based on losses they allegedly suffered while they were participants in the Plan. (*Id.*)

8   At oral argument, the court asked Plaintiffs' counsel to identify where Plaintiffs allege that Mr. Beldock suffered an injury. Plaintiffs' counsel directed the court to paragraph 9 of the complaint. That paragraph (1) states that Mr. Beldock is a former employee of Microsoft and former Plan participant who lives in Liverpool, New

York and (2) lists the assets he invested in through the Plan. (Compl. ¶ 9.) It says nothing about how Mr. Beldock was injured. (*Id.*)

9    Plaintiffs stated at oral argument that they do not allege breaches of fiduciary duty based on excessive fees in this case.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---