# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00167-CMA-STV

LAQUITA JONES,
LATEESHA PROCTOR,
PATRICK SMITH, and
BEN MCCOLLUM,

      Plaintiffs,

v.

DISH NETWORK CORPORATION,
THE BOARD OF DIRECTORS OF DISH NETWORK CORPORATION,
THE RETIREMENT PLAN COMMITTEE OF DISH NETWORK CORPORATION, and
DOES 1-20

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on a Motion to Dismiss filed by Defendants DISH Network Corporation, Retirement Plan Committee of DISH Network Corporation, and the Board of Directors of DISH Network Corporation (the "Motion"). [#30]  The Motion has been referred to this Court.  [#33]  This Court has carefully considered the Motion and related briefing, the entire case file and the applicable case law, and has heard oral argument on the Motion [#63]. For the following reasons, the Court respectfully **RECOMMENDS** that the Motion be **GRANTED**.

I.      **BACKGROUND**[1]

This putative class action, brought under the Employment Retirement Income Security Act of 1974 ("ERISA"), alleges that Defendants breached their fiduciary duties of prudence and loyalty related to administration of the DISH Network Corporation 401(k) Plan (the "Plan"). [#1]  Plaintiffs are former DISH employees and former Plan participants. [*Id.* at ¶¶ 9-12]  Plaintiffs seek to certify a class for a period beginning six years before the filing of this action (*i.e.* January 20, 2016) and extending until the date of judgment.  [*Id.* at ¶ 1]  Defendants are Plan fiduciaries, charged with administering and controlling the Plan.  [*Id.* at ¶¶ 13-16]

The Plan is a participant-directed 401(k) plan.  [*Id.* at ¶ 21]  This means that participants direct their contributions into various investment options offered by the Plan, with DISH making contributions as well.  [*Id.*]  Plan expenses are paid for by Plan assets. [*Id.*]  Thus, the value of a participant's account is determined by the participant's contributions, their employer's contributions, and the market performance of their selected investments—minus any expenses charged to the participant's account.  [*Id.*]  This form of retirement plan is referred to as a "defined contribution plan" because of the employer's defined contributions into a participant's account (in contrast to a "defined benefit plan," under which an employer guarantees a certain level of benefits upon retirement).  [*Id.* at ¶¶ 2-4]  By the end of 2020, the Plan had 18,808 participants with account balances and

---

[1] The facts are drawn from the well-pleaded allegations in the Plaintiffs' Complaint (the "Complaint").  [#1]  The Court accepts these allegations as true at this stage of the proceedings.  *See Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)).

assets totaling about $841 million—placing it in the top 0.2% of all 401(k) plans by plan size.  [*Id.* at ¶ 4]

### A.    Recordkeeping and Administrative Fees

A common industry practice for fiduciaries of large defined contribution plans is to hire a third party to provide various recordkeeping and administrative services.  [*Id.* at ¶ 28]  The provider receives compensation for these services from the plan, which is then passed on to participants—either as direct deductions from participant accounts or as indirect "revenue sharing" arrangements with third-party investment providers.  [*Id.* at ¶¶ 30-32]   Here, all Plan assets were held in a trust by Fidelity Management Trust Company ("Fidelity"), which provided these recordkeeping and administrative services for the Plan.  [*Id.* at ¶¶ 24, 51]  According to the Complaint, the Plan paid "grossly excessive fees" when compared against the fees paid by comparable plans for comparable services.  [*Id.* at ¶¶ 50-59]  The Complaint attributes this excess to Defendants' failure to compare or benchmark the fees paid by the Plan against those paid by comparable plans.  [*Id.* at ¶¶ 58-59]

### B.    Fidelity Freedom Funds

Among other investment options available to participants, the Plan offers certain "target date funds" ("TDFs").  [*Id.* at ¶ 60]  A TDF is made up of a portfolio of underlying investment vehicles that gradually shifts to become more conservative as a target retirement year approaches.[2]  [*Id.*]  The Plan offers participants the "Fidelity Freedom Fund" target date suite—not to be confused with the "Fidelity Freedom *Index* Fund" target

---

[2] The planned shift in the underlying investment allocation is referred to as the TDF's "glide path."  [*Id.* at ¶ 60]

date suite.  [*Id.* at ¶ 61]  Although these fund families share similar names and glidepaths, there is a significant difference in their underlying investments.  [*Id.* at ¶ 66]  The Freedom Funds (the "Active Suite") primarily invest in actively managed Fidelity mutual funds.  [*Id.* at ¶ 63]  A key feature of an active fund is a management team that actively decides which securities to invest in, with the goal of beating benchmark market indices.  [*Id.* at ¶¶ 66-67]   In contrast, the Freedom Index Funds (the "Index Suite") place no investments under active management and instead invest in funds that simply track market indices.  [*Id.* at ¶ 63]  Plaintiffs each maintained an investment in a TDF within the Active Suite during the Class Period.  [*Id.* at ¶¶ 9-12]

The Complaint identifies several features of the Active Suite that should have alerted Defendants that the Active Suite was not a suitable investment option for the Plan. [*Id.* at ¶¶ 66-81]  First, the funds which underlie the Active Suite are high risk, and about half of the actively managed Fidelity mutual funds underlying the Active Suite trail their respective benchmarks over those underlying funds' lifetime.  [*Id.* at ¶¶ 66-69]   This underperformance includes two of the Active Suite's top three domestic equity positions. [*Id.* at ¶ 68]  In addition, over half of the underlying active funds did not have a basic five-year performance track record at the beginning of the Class Period, meaning that no meaningful analysis could possibly be performed on them.  [*Id.* at ¶ 70]  And while the Active Suite and the Index Suite share virtually identical glide paths, the investments underlying the Active Suite are higher risk than those underlying the Index Suite.  [*Id.* at ¶¶ 72-73]  Moreover, Active Suite managers have discretion to deviate from a fund's glide path by ten points in either direction, introducing more unnecessary risk to the Active Suite.  [*Id.* at ¶ 74]   These risk-increasing features of the Active Suite, and active

management in general, have been criticized by industry experts, particularly in light of most participants' desire to avoid risk in allocating their retirement investments.  [*Id.* at ¶¶ 74-75]

The Active Suite has also consistently underperformed other widely utilized TDF offerings.  [*Id.* at ¶ 79]  When compared to the primary TDFs offered by four of the five largest non-Fidelity managers, representative TDFs from the Active Suite saw the lowest three-year and five-year annualized returns as of 2015.  [*Id.* at ¶¶ 79-81]

In addition to this underperformance, TDFs in the Active Suite charge higher fees than the more hands-off TDFs in the Index Suite.  [*Id.* at ¶¶ 67, 76-77]  These higher fees are passed on to participants in the form of high expense ratios.[3]  [*Id.* at ¶ 76]  Thus, whereas certain TDFs within the Index Suite charge a mere .08% expense ratio, the expense ratios for TDFs within the Active Suite range from .42% to .65%.  [*Id.*]

Many investors have lost faith in the Active Suite.  [*Id.* at ¶ 78]  As a result, the Active Suite has seen substantial investment outflows, as opposed to the inflows experienced by the Index Suite.  [*Id.*]  In 2018, the Active Suite experienced about $5.4 billion in net outflows, compared to the estimated $4.9 billion inflows experienced by the Index Suite that same year.  [*Id.*]  Based on these indicators, Plaintiffs allege that "Defendants' decision to add the Active [S]uite over another prudent TDF suite, and their failure to replace the Active [S]uite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties."  [*Id.* at ¶ 63]

---

[3] The expense ratio is the total annual cost to an investor to invest in a TDF, expressed as a percentage of assets.  [#1, ¶ 76]

### C.  The Royce Total Return Fund

The Complaint alleges that the Plan contains another imprudent investment option—the Royce Total Return Fund Institutional Class (the "Royce Fund"). [*Id.* at ¶ 83] The Complaint does not allege that any Plaintiff maintained an investment in the Royce Fund during the Class Period. [*See id.* at ¶¶ 9-12] The Royce Fund's benchmark is the Russell 2000 Index. [*Id.* at ¶ 83] The Royce Fund has consistently underperformed its benchmark on a rolling five- and ten-year annualized basis. [*Id.*] This underperformance compared to the Royce Fund's benchmark, which began before the Class Period and has continued through it, has ranged from -.08% to -3.21%. [*Id.*] The Royce Fund has an expense ratio of 1.15%. [*Id.* at ¶ 84] Defendants have retained the Royce Fund despite the availability of lower cost and better performing funds. [*Id.*] For example, the Vanguard Russell 2000 Index Fund simply tracks the Russell 2000 Index, and has an expense ratio of .08%. [*Id.*]

### D.  This Lawsuit

Plaintiffs filed this lawsuit, alleging that Defendants breached their fiduciary duties to the Plan by allowing the Plan to be charged excessive recordkeeping and administrative fees and by offering inappropriate investment options to participants. [#1] The Complaint alleges three causes of action:  (1) breach of fiduciary duty under ERISA Sections 404(a)(1)(A), (B), and (D) (codified at 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D)); (2) failure to monitor fiduciaries and co-fiduciary breach; and (3) in the alternative, knowing breach of trust. [*Id.* at ¶¶ 104-20] Defendants filed this Motion to Dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), along with a

restricted memorandum of law in support.  [##30; 31]  Plaintiffs filed a response [#43][4]

and Defendants filed a reply in support of the Motion [#50].  Plaintiffs filed a sur-reply

[#55], and Defendants filed multiple notices of supplemental authority  [##51; 65; 69; 71].

The Court heard oral argument on the Motion on August 25, 2022.  [##63; 66]

## II.    LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss for lack of standing is considered under Federal Rule of Civil

Procedure 12(b)(1).  Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of

subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Standing is a question of subject

matter jurisdiction, and thus a basis for Rule 12(b)(1) dismissal.   A plaintiff has

constitutional standing when: (1) she has suffered an injury in fact, (2) there is a causal

connection between the injury and the conduct complained of, and (3) it is likely that the

injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560-61 (1992).

Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving

party may (1) facially attack the complaint's allegations as to the existence of subject

matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting

evidence to challenge the factual basis upon which subject matter jurisdiction rests."

*Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004)

(quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)).  Although the plaintiff

bears the burden of establishing standing, when the challenge is facial, the court must

---

[4] Plaintiffs subsequently filed a corrected Response, with the only amendment being to
the Table of Contents.  [#44-1]  This Court cites to Plaintiffs' originally filed Response
[#43], as the correction to the Table of Contents does not impact the Court's analysis.

accept as true all well-pleaded facts and construe all reasonable allegations in the light most favorable to the plaintiff. *United States v. Colorado Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996) (citations omitted). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).

### B. Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) empowers a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Generally, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v.*

*Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

"As a general rule, the only facts [a court] consider[s] in assessing the sufficiency of a complaint are those alleged in the complaint itself." *Emps.' Ret. Sys. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). However, a court "may consider 'documents that the complaint incorporates by reference,' 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and 'matters of which a court may take judicial notice.'" *Id.* (quoting *Gee*, 627 F.3d at 1186).

III.     **ANALYSIS**

Defendants move to dismiss this case on two grounds. First, Defendants argue that Plaintiffs lack standing to challenge any TDFs in the Active Suite in which Plaintiffs did not invest, or any fees charged to the Plan while Plaintiffs were active DISH employees. [#31, 11-12, 28 n.28] Second, Defendants argue that Plaintiffs fail to state a claim under Rule 12(b)(6) for which relief can be granted. [#31, 12-30] The Court addresses each ground for dismissal in turn.

A.     Standing

"To bring a suit under ERISA, a plaintiff must show both constitutional standing and a cause of action (statutory standing) under the ERISA statute." *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1192 (D. Colo. 2021) (citing *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)); *see also Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1622 (2020) ("There is no ERISA exception to Article III.").  To establish constitutional standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560-61).   "[S]tanding is not dispensed in gross," meaning that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).

Once an ERISA plaintiff establishes the "irreducible constitutional minimum" of Article III standing, *Lujan*, 504 U.S. at 560, Article III does not prevent that plaintiff from "assert[ing] the rights of parties not before the court" when the plaintiff alleges "a single practice by the defendant that injures both the plaintiff and a third party, although in different ways." *Barrett v. Pioneer Nat. Res. USA, Inc.*, No. 17-CV-1579-WJM-NYW, 2018 WL 3209108, at *4 (D. Colo. June 29, 2018) (citing 13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.9.2 (3d ed., Apr. 2018 update)); *see also Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132 (3d Cir. 2022) ("Article III does not prevent the Named Plaintiffs from representing parties who invested in funds that were allegedly

imprudent due to the same decisions or courses of conduct.*"); Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) (noting that as long as the named plaintiffs in an ERISA action have alleged individualized injuries with respect to all of their claims, they "may proceed under § 1132(a)(2) on behalf of the plan or other participants" even if relief "sweeps beyond [their] own injur[ies]").

To summarize, a named plaintiff bringing an ERISA class action must satisfy Article III standing requirements on a claim-by-claim basis, the same as any plaintiff in federal court. *See Thole*, 140 S. Ct. at 1622 ("Courts sometimes make standing law more complicated than it needs to be. There is no ERISA exception to Article III.").[5] If the named plaintiff has Article III standing to bring a claim, then that named plaintiff is constitutionally permitted to represent other parties who were also injured by the same alleged breach, even when those injuries go beyond what the named plaintiff experienced.[6]

Courts in this District have confirmed this approach. In *Barrett v. Pioneer Natural Resources*, the court found that a plaintiff lacked standing to assert a claim as to a Money Market Fund that the plaintiff never invested in. 2018 WL 3209108 at *2-4. This was

---

[5] The Court agrees with Defendants that this cited reasoning from *Thole* applies to both defined-benefit plans and defined-contribution plans. [*See* ##31, 12; 50, 18-19 & n.12] However, this reasoning has a different application in each instance. In *Thole*, the plaintiffs lacked standing to challenge a defined-benefit plan's investments because their "benefits are fixed and will not change, regardless of how well or poorly the plan is managed," meaning that mismanagement would not injure the plaintiffs. 140 S. Ct. at 1620. The United States Supreme Court distinguished this type of arrangement from a defined-contribution plan, under which a participant's account may very well be directly impacted by the plan's management. *Id.* at 1619. Accordingly, *Thole* confirms the requirement that ERISA plaintiffs must "have a concrete stake in [their] suit," but does not otherwise impact the standing analysis for defined-contribution plans. *Id.* at 1620.
[6] Whether a plaintiff with Article III standing may represent the interests of others injured by the same breach is a question of class certification. *Kurtz*, 511 F. Supp. 3d at 1193.

because the plaintiff "d[id] not allege that all investment choices or some sensibly grouped subset were offered imprudently," but "only that the Money Market Fund was an imprudent offering."  *Id.* at *3.  Because the plaintiff failed to adequately "allege a single practice as to the Money Market Fund that injured both him and Monkey Market Fund investors," the plaintiff lacked standing to sue for classwide relief related to the Money Market Fund.  *Id.* at *3-4.

Applying the same approach, the court in *Kurtz v. Vail Corporation* found that a plaintiff did have standing to challenge fifteen investment options offered by a plan, when the plaintiff herself only invested in five of those options.  511 F. Supp. 3d at 1192.  There, the plaintiff adequately alleged that the defendant's breach impacted "the [p]lan overall[,] or[,] at least, a large subset of offered funds, not a single fund."  *Id.* at 1194; *see also id.* at 1193 ("[P]laintiff alleges mismanagement of the entire [p]lan and all its funds through the options it provided, not breach related to an individual fund or funds.").  Because the alleged mismanagement "purportedly reduced retirement funds available through the [p]lan to [the] plaintiff," the plaintiff had adequately pleaded an actual injury to her own account caused by the allegedly imprudent actions of the defendant sufficient to confer Article III standing.  *Id.* at 1195.  Whether that plaintiff could adequately represent the interests of class members with different injuries based on different specific funds was an issue of class certification, not standing.  *Id.* at 1193.

Courts across the country apply this approach as well.  *See, e.g.*, *Albert v. Oshkosh Corp.*, 47 F.4th 570, 578 (7th Cir. 2022) (holding that a plaintiff had standing to challenge the inclusion of actively managed funds because "he invested in at least some actively managed funds"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009)

(holding that a plaintiff had standing to seek relief for the period before his participation in the plan because the same alleged breaches nevertheless caused injury to his personal account); *In re Omnicom ERISA Litig.*, No. 20-CV-4141, 2021 WL 3292487, at *6-10 (S.D.N.Y. Aug. 2, 2021) (finding that the named plaintiffs had standing to challenge a suite of funds despite not investing in every fund within that suite, but lacked standing to challenge "the alleged mismanagement of the [p]lan by virtue of its inclusion of [two specific funds]" because the named plaintiffs did not invest in those specific funds and were not injured by the defendant's decision to offer them).

The Third Circuit's opinion in *Boley v. Universal Health Services* provides the clearest recent example of this standing analysis in an ERISA class action. There, the Third Circuit began by breaking the allegations down into "three specific breaches of fiduciary duty." *Boley*, 36 F.4th at 131. The court first determined that the named plaintiffs had standing to challenge the allegedly excessive recordkeeping and administrative fees, because the "allegedly excessive annual fee would represent a concrete and personal injury to a plaintiff regardless of the funds in which he or she invested." *Id.* Next, the court held that the named plaintiffs had standing to challenge a suite of funds (incidentally, the same Fidelity Freedom Funds suite at issue here) even though the named plaintiffs had not invested in all funds within the challenged suite. *Id.* This was because each named plaintiff "invested in at least one of the Fidelity Freedom Funds," and, "[i]mportantly," plaintiffs alleged that "all of the funds in the suite were imprudent for the same reasons." *Id.* Thus, "[t]he decision to offer the [challenged suite] was, in effect, one decision that led to thirteen allegedly imprudent funds being included in the [p]lan." *Id.* at 132. The named plaintiffs had therefore established standing to challenge all of the funds

within that suite, because "class representatives need only show a constitutionally adequate injury flowing from [the allegedly imprudent] decisions or failures." *Id.* Finally, the court held the named plaintiffs had standing to bring a claim alleging a lack of a prudent investment evaluation process leading to an excessively expensive investment menu. *Id.* at 131-32. Each named plaintiff "invested in at least one fund with allegedly excessive fees," and therefore "adequately alleged that they suffered injury from [defendant's] imprudent investment evaluation process." *Id.*

Applying this analysis here, the Court begins by defining the claims in the Complaint. Plaintiffs claim that Defendants breached their fiduciary duties to the Plan in the following three ways: (1) paying excessive recordkeeping and administrative fees [#1, ¶¶ 50-59]; (2) retaining the Active Suite of Fidelity Freedom Funds [*id.* at ¶¶ 60-81]; and (3) retaining the Royce Fund [*id.* at ¶¶ 82-84].

To begin, the Court finds that Plaintiffs have standing to challenge the Plan's recordkeeping and administrative fees throughout the Class Period. In a footnote, Defendants assert a factual attack on Plaintiff's standing to challenge the recordkeeping fees assessed to the Plan "during the portions of the proposed class period in which [Plaintiffs] were active employee Plan participants." [#31 at 28 n.28] Defendants say that active employee Plan participants actually paid no recordkeeping fees. [*Id.*] Even assuming that Defendants are factually correct, the Court nevertheless finds that Plaintiffs have standing to challenge the recordkeeping fees collected throughout the Class Period. As the Eighth Circuit has explained when confronted with a similar argument:

> [The plaintiff] has satisfied the requirements of Article III because he has alleged actual injury to his own Plan account. That injury is fairly traceable to appellees' conduct because he has alleged a causal connection between their actions—even those taken before his participation in the Plan—and

his injury. Finally, the injury is likely to be redressed by a favorable judgment. *See Lujan*, 504 U.S. at 560, 112 S. Ct. 2130. [The plaintiff] has thus "made out a 'case or controversy' between himself and [the defendants] within the meaning of Art. III." *Warth*, 422 U.S. at 498, 95 S. Ct. 2197. The question whether recovery might be had for the period before [Plaintiff] personally suffered injury is not one of constitutional standing.

*Braden*, 588 F.3d at 592-93 (footnote omitted). The same analysis applies here. The Complaint alleges, and Defendants do not factually contest, that Plaintiffs were all subject to the recordkeeping fee at some point during the Class Period. [##1, ¶¶ 9-12; 31, 27] If, as alleged, this fee was excessive as a result of Defendants' imprudent failure to secure lower fees, then Plaintiffs have suffered an injury in fact traceable to Defendants' imprudence and redressable by a favorable judgment—thereby conferring Article III standing. Plaintiffs have therefore cleared the constitutional hurdle to bring this claim. Whether Plaintiffs may also represent the interests of those injured by the same imprudent failure to secure reasonable fees (even though those injuries may extend beyond the precise injuries experienced by Plaintiffs) is not a question of constitutional standing. *See Braden*, 588 F.3d at 593 ("The question whether recovery might be had for the period before [the plaintiff] personally suffered injury is not one of constitutional standing, but turns instead on whether the 'statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *Kurtz*, 511 F. Supp. 3d at 1193 (finding that "plaintiff's non-investment in certain funds is a class certification question, not a standing one").

Next, the Court finds that Plaintiffs have standing to pursue their claim challenging the retention of the Active Suite. Defendants argue that Plaintiffs could not have been injured by any funds in which they did not personally invest, and therefore suffered no

injury in fact as to the funds that they did not invest in.  [#31 at 11-12]   This defines Plaintiffs' claim too narrowly.  Plaintiffs do not bring individual claims for the retention of each individual Freedom Fund—the claim instead flows out of one basic decision made by Defendants to select and retain the Freedom Fund Suite.  As explained by the Third Circuit when faced with this argument:  "The decision to offer the suite of Fidelity Freedom Funds was, in effect, one decision that led to thirteen allegedly imprudent funds being included in the [p]lan . . . . To establish standing, class representatives need only show a constitutionally adequate injury flowing from [this] decision[]."  *Boley*, 36 F.4th at 132; *see also Albert v. Oshkosh Corp.*, 47 F.4th 570, 578 (7th Cir. 2022) (relying on *Boley* to hold that a plaintiff who "invested in at least some actively managed funds" had standing to challenge the fees associated with all of the allegedly imprudent funds).

The two in-District cases cited by the parties support this approach.  In *Kurtz*, the court found that the plaintiff had standing to challenge all funds impacted by the same course of mismanagement, even though the plaintiff only invested in five of the fifteen challenged funds.  511 F. Supp. 3d at 1192-95.  And in *Barrett*, relied upon heavily by Defendants [##31, 11-12; 50, 19], the court was confronted with an allegation of imprudence as to one single fund in which plaintiffs had not invested.  2018 WL 3209108, at *2.  The court distinguished this allegation from those that challenged "all investment choices *or some sensibly grouped subset that were offered imprudently*."  *Id.* at *3 (emphasis added).  The court went on to acknowledge that plaintiffs may assert the rights of parties not before the court when, as here, plaintiffs allege "a single practice by the defendant that injures both the plaintiff and a third party, although in different ways."  *Id.*

at *4 (citing 13A Charles Alan Wright et al., *Federal Practice & Procedure* § 3531.9.2 (3d ed., Apr. 2018 update)).[7]

Here, Plaintiffs challenge a "sensibly grouped subset of funds"—the Active Suite—by alleging that Defendants' decision to offer and retain the Active Suite as a whole (not fund-by-fund) constituted a breach of Defendants' fiduciary duty. [#1, ¶¶ 60-81] Plaintiffs each invested in certain Active Suite funds and allege a constitutionally adequate injury to their accounts as a result of Defendants' retention of these funds. [*Id.* at ¶¶ 9-12] Accordingly, Plaintiffs have Article III standing to challenge Defendants' course of action with regard to the Active Suite. Again, whether Plaintiffs adequately represent the interests of other parties with different injuries arising from the same course of action is not a question of constitutional standing. *See Braden*, 588 F.3d at 593; *Kurtz*, 511 F. Supp. 3d at 1193.

Finally, the Court finds that, based on the allegations in the Complaint, Plaintiffs lack standing to challenge the retention of the Royce Fund in the Plan.[8] The Complaint

---

[7] Defendants cite to out-of-District caselaw that appears to take a contrary view on how broadly to define a claim. *See Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 WL 4934834, at *6 (S.D.N.Y. Oct. 7, 2019) ("Viewed at a high level, Plaintiffs' challenges to the Selected Funds and Non-Selected Funds raise similar questions—for example, whether the fees paid to Morgan Stanley were inappropriately high [and] whether the funds were improperly retained . . . . But the evidence that Plaintiffs will have to put forward to establish liability will vary from fund to fund, and Plaintiffs' ability to establish liability as to decisions made in connection with one fund will do little to advance their case for liability as to other funds."). But, as discussed, courts in this District and the Circuit courts to have considered the matter have taken a broader approach, treating a claim challenging a single practice amongst a plan or subset of funds as conferring standing to challenge that practice, even if it impacts more than just the funds that the plaintiff invested in.

[8] Defendants do not explicitly challenge Plaintiffs' standing with respect to the Royce Fund. However, Defendants do argue generally that Plaintiffs lack standing to challenge any fund in which they did not invest. [##31, 11-12; 50, 18-19] Moreover, because federal courts are courts of limited jurisdiction, even "[i]f the parties do not raise the question of

attempts to cast this claim as broadly challenging the Plan's management overall. [#1, ¶ 82] However, with the exception of a conclusory statement that "Defendants have saddled participants with additional objectively imprudent investment options" and a general investment theory with no specific application to any other fund, the entirety of the claim revolves around the allegedly imprudent retention of a single fund—the Royce Fund. [*Id.* at ¶¶ 82-84]; *see also Sweda v. Univ. of Penn.*, 923 F.3d 320, 330 (3d Cir. 2019) (disregarding conclusory allegations such as "a prudent process would have produced a different outcome"). Plaintiffs have failed to adequately allege that Defendants' allegedly imprudent course of action with regard to the Royce Fund impacted any other fund within the Plan. Thus, the Court finds that the claim relates solely to Defendants' retention of the Royce Fund, and not the Plan as a whole or a subset of funds within the Plan.

In contrast to Claims One and Two, Plaintiffs did not suffer a cognizable injury arising from Defendants' course of conduct with respect to the Royce Fund. The Complaint does not allege that any Plaintiff invested in the Royce Fund. [*See id.* at ¶¶ 9-12] And, again, the Complaint fails to adequately allege that any imprudence related to the Royce Fund extended to the Plan as a whole or a sensibly grouped subset of Plan funds, including those in which Plaintiffs invested. Accordingly, Plaintiffs cannot claim a cognizable injury to their personal accounts arising out of Defendants' allegedly imprudent course of conduct, and therefore lack Article III standing to challenge Defendants' retention of the Royce Fund.

---

lack of jurisdiction, it is the duty of the federal court to determine the matter sua sponte." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).

### B.      Fiduciary Duty

Next, the Court turns to Defendants' arguments that Plaintiffs have failed to state a claim for breach of fiduciary duty under Rule 12(b)(6).  Section 404 of ERISA imposes a duty of prudence and a duty of loyalty upon plan fiduciaries.  *See* 29 U.S.C. § 1104(a). "To properly assert an ERISA claim for breach of fiduciary duty under [Section 404], a plaintiff must allege facts that plausibly demonstrate that:  (1) the defendant was a plan fiduciary,[9] (2) the defendant breached its fiduciary duty, and (3) that the breach resulted in harm to the plaintiff."  *Kurtz*, 511 F. Supp. 3d at 1196 (quoting *Troudt v. Oracle Corp.*, No. 16-cv-00175-REB-CBS, 2017 WL 663060, at *4 (D. Colo. Feb. 16, 2017)).   As discussed above, Plaintiffs have standing to pursue their claims as they relate to the recordkeeping fees and the retention of the Active Suite.

As an initial matter, Defendants' Motion and briefing refers to numerous documents outside the four corners of the Complaint.  "As a general rule, the only facts [a court] consider[s] in assessing the sufficiency of a complaint [under Rule 12(b)(6)] are those alleged in the complaint itself."  *Emps.' Ret. Sys.*, 889 F.3d at 1158 (citing *Gee*, 627 F.3d at 1186 (10th Cir. 2010)).   There are, however, exceptions.  *Id.*   To the extent that this Court relies on a document outside of the Complaint in this Recommendation, the Court will note when it does so and its basis for doing so.

### 1.  Recordkeeping and Administrative Fees

Plaintiffs allege that Defendants imprudently caused the Plan to be charged excessive recordkeeping and administrative fees.  [#1, ¶¶ 50-59]  Defendants argue that

---

[9] For the purposes of this Motion, Defendants do not contest that they are plan fiduciaries under ERISA.  [#31, 12 n.14]

Plaintiffs fail to state a claim for two reasons:   (1) Plaintiffs misunderstand and miscalculate the fees that the Plan paid; and (2) Plaintiffs fail to adequately compare the fees paid by the Plan to fees charged to other plans.  [##31, 25-30; 50, 14-17]

Accepting Plaintiff's fee calculations for the purposes of this Motion to Dismiss,[10] the Court nevertheless finds that Plaintiffs have failed to state a claim as to the recordkeeping and administrative fees charged by the Plan.   Plaintiffs claim that the amounts charged to the Plan were too high.   [*See* #1, ¶ 53 ("[T]he Plan should unquestionably have been able to obtain reasonable rates for [recordkeeping] services that were significantly lower than the effective per-participant [recordkeeping] rates [charged].")]   "In the absence of 'significant allegations of wrongdoing,' the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less."  *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) (quoting *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) and citing *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579-80 (7th Cir. 2022)).  That is, "the key to stating a plausible excessive-fees claim is to make a like-for-like comparison."  *Id*. (citing *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020)).

---

[10] Defendants fault Plaintiffs' "attempt to reverse-engineer [the Plan's recordkeeping] fees using the Plan's Form 5500s," and contend that Plaintiffs should have subtracted additional amounts in order to calculate the per-participant fee.  [#31, 25-28]  The Court does not find that it is appropriate to consider Defendants' factual attack on Plaintiffs' method of fee calculation under a Rule 12(b)(6) analysis, under which the Court accepts Plaintiffs' factual allegations regarding the fees as true.  In addition, Defendants rely on various invoices and account statements to establish that plan participants paid no recordkeeping fees while they were active DISH employees.  [*Id.* at 27-28]  While the Court may consider such matters in a factual attack on the Court's jurisdiction under Rule 12(b)(1), the Court see no basis for considering these documents under a Rule 12(b)(6) analysis.  The invoices and account statements are not referred to or otherwise relied on in the Compliant, nor have Defendants established that they are proper for judicial notice.

Plaintiffs rely on comparisons to the recordkeeping fees paid by eleven other large plans in order to support the claim that Defendants acted imprudently with respect to the Plan's recordkeeping fees.  [#1, ¶¶ 54-58]  The provided comparison, however, is utterly inapt.  Plaintiffs compare the *average* fee paid by the Plan over a five-year span to the fees paid by the comparator plans for just *one* selected year.  [*Id.* at ¶¶ 52, 55-56 & n.6]  This is not the "apples-to-apples" comparison that Plaintiffs allege it is, and that suffices for a Court to infer that a fee is excessive.  [*Id.* at ¶ 57 ("In other words, the fees in the table above are apples-to-apples comparisons.")]; *see also Matousek*, 51 F.4th at 279 (requiring a "like-for-like comparison" in order to state a plausible excessive-fees claim in the absence of allegations of wrongdoing).  Put differently, "because the math Plaintiffs used to calculate the [Plan's] annual per-participant recordkeeping fee differs so fundamentally from the math Plaintiffs used to calculate these other plans' . . . per-participant recordkeeping fees, these other plans' fees are not plausible comparators and say nothing helpful about whether the [Plan's] recordkeeping fees are too high."  *Fritton v. Taylor Corp.*, No. 22-cv-00415, 2022 WL 17584416, at *7 (D. Minn. Dec. 12, 2022).

In fact, for most comparator plans, Plaintiffs provide the fees paid by those plans for the year 2020.[11]  [#1, ¶ 56 n.6]  But the Plan's single-year fee for the year 2020, as calculated by Plaintiffs ($33 per participant) [*id.* at ¶ 52], was on par with the fees paid by the comparator plans for the given year (ranging from $23 per participant to $34 per participant) [*id.* at ¶ 55].  Indeed, the Plan's 2020 fee was actually *lower* than the fees

---

[11] Plaintiffs note that in some instances they relied on "the most recently filed Form 5500 [for the comparator plan] if [the] 2020 [Form 5500] is not available."  [#1, ¶ 56 n.6] Plaintiffs do not indicate which comparator plans did not have an available 2020 Form 5500, or which alternative year was used instead for those plans.

paid by two of Plaintiff's selected comparator plans. [*Id.* at ¶¶ 52, 55]  Far from "nudg[ing] their claim [that Defendants acted imprudently with respect to the Plan's recordkeeping fees] across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, such a comparison (which, on its face, places the Plan's 2020 fees within the provided range of reasonable fees paid by similar plans that year) instead nudges Plaintiffs' claim in the opposition direction.

Stripped of the comparison to fees paid by other plans, Plaintiffs simply allege that the Plan paid higher fees than Plaintiffs believe it should have. [*See* #1, ¶ 53]  This does not suffice to create a plausible inference that Defendants' decision-making process was flawed. *Matousek*, 51 F.4th at 280.  Accordingly, the Court RECOMMENDS that Plaintiffs' imprudence claim relating to the Plan's recordkeeping fees be DISMISSED.

### 2.  Fidelity Freedom Funds

Plaintiffs next allege that Defendants breached their fiduciary duties by imprudently selecting and retaining the Active Suite.  [#1, ¶¶ 60-65]  Since the Active Suite has been offered by the Plan "since at least December 31, 2009" [*id.* at ¶ 61]—well before the beginning of the Class Period—the Court construes Plaintiffs' claim as alleging that Defendants employ a deficient process for monitoring the investments that the Plan offers.  [# 66, 22:21-22 ("[T]his is not a claim about the original selection of the Freedom Fund.")]

"Under ERISA a 'prudent' fiduciary must act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'"  *Kurtz*, 511 F. Supp. 3d at 1196 (quoting 29 U.S.C. §

1104(a)(1)(B).  Plan fiduciaries are "under a continuing duty to conduct a regular review of their investment decisions and remove investments which have become improper to retain." *Birse v. CenturyLink, Inc.*, No. 17-CV-02872-CMA-NYW, 2019 WL 1292861, at *4 (D. Colo. Mar. 20, 2019) (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 528-30 (2015)). Nonetheless, "the prudence test . . . is one of conduct, and not a test of the result of performance of the investment."  *Kurtz*, 511 F. Supp. 3d at 1196 (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)).  As a result, "[i]t is not sufficient [for a plaintiff] to simply allege that an investment did poorly, and, therefore, a plaintiff was harmed."  *Birse*, 2019 WL 1292861, at *4.

Courts have recognized that "ERISA plaintiffs generally lack the inside information necessary to make out their [process-oriented] claims in detail unless and until discovery commences."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden*, 588 F.3d at 598); *see also Kurtz*, 511 F. Supp. 3d at 1197 ("[P]laintiffs may face challenges in gathering information about a fiduciary's procedure before discovery.").  As a result, "even when the alleged facts do not specifically address the process by which a Plan is managed, a fiduciary breach claim may still survive a motion to dismiss if the court can reasonably infer from circumstantial factual allegations that the process was flawed." *Kurtz*, 511 F. Supp. 3d. at 1197.  On the other hand, ERISA plaintiffs generally *do* have extensive information regarding the selected funds based on ERISA's disclosure requirements.  *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (citing *Braden*, 588 F.3d at 720); *see also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168 (6th Cir. 2022) ("ERISA's extensive disclosure requirements ease the [pleading] burdens

[confronted by ERISA plaintiffs].").  Thus, "the challenge for ERISA plaintiffs is to use the data about the selected funds and some circumstantial allegations about methods to show that 'a prudent fiduciary in like circumstances would have acted differently.'" *Meiners*, 898 F.3d at 822.  Put differently, "to plausibly establish a claim for a breach of duty to monitor, a plaintiff must allege facts plausibly establishing that no reasonable fiduciary would have maintained the investment."  *Birse*, 2019 WL 1292861, at *4.

Plaintiffs make no direct factual allegations regarding Defendants' process for monitoring the Active Suite.[12]  [*See generally* #1]  They instead allege that the Active Suite cost too much, underperformed, and had an undesirable risk allocation.  [*Id.* at  ¶¶ 60-81]  Plaintiffs' specific allegations regarding the Active Suite may be reduced to the following:  (1) most of the actively-manage funds underlying the TDFs within the Active Suite either had an insufficient track record or missed their respective benchmarks at the start of the Class Period [*id.* at ¶¶ 68-71]; (2) the Active Suite makes "riskier" investments than the Index Suite, and its managers have discretion to deviate from the glide path by up to 10 percentage points in either direction [*id.* at ¶¶ 72-75]; (3) the Active Suite's expense ratio exceeds that of the Index Suite by up to 0.57% [*id.* at ¶¶ 76-77]; (4) the Active Suite has experienced significant outflows in recent years and received negative analyst reviews, in contrast to the significant inflow experienced by the Index Suite [*id.* at ¶¶ 74, 78]; and (5) the Active Suite has underperformed the primary TDF offerings of four of the five largest non-Fidelity managers in the marketplace [*id.* at ¶¶ 79-81].

---

[12] To the extent that Defendants argue that Plaintiffs' claim should be dismissed due to Plaintiffs' failure to provide such direct factual allegations relating to Defendants' process [*see* #31, 15], the Court disagrees.  As discussed above, ERISA Plaintiffs may survive a motion to dismiss based on sufficient circumstantial allegations.

The Court begins with Plaintiff's allegations relating to the Index Suite.  To make a plausible allegation that a prudent fiduciary would have taken a different course "based on the cost or performance of the selected fund[s], a plaintiff must provide a sound basis for comparison—a meaningful benchmark."  *Meiners*, 898 F.3d at 822.  The parties dispute whether the Index Suite may serve as a meaningful benchmark for the Active Suite, and whether such a determination is appropriate at the motion to dismiss stage. [##31, 15-16; 43, 21-22; 50, 6-7]  Courts across the country have split on this question, often in cases involving these exact Suites.  *Compare Smith*, 37 F.4th at 1167 (holding on a motion to dismiss that the Active Suite and Index Suite are "inapt comparators" due to their "distinct goals and distinct strategies"); *Davis*, 960 F.3d at 484-85 (holding on a motion to dismiss that comparing actively managed funds to passively managed funds is "comparing apples and oranges" due to their "different aims, different risks, and different potential rewards"); *Meiners*, 898 F.3d at 823 (holding on a motion to dismiss that a fund with "a different investment strategy" is "not a meaningful benchmark" to a challenged fund); *with In re Biogen, Inc. ERISA Litig.*, No. 20-CV-11325-DJC, 2021 WL 3116331, at *6 (D. Mass. July 22, 2021) ("Disputes over the appropriateness of [comparing the Active Suite with the Index Suite], however, are inappropriate at the motion to dismiss stage."); *In re Omnicom ERISA Litig.*, No. 20-CV-4141 (CM), 2021 WL 3292487, at *13 (S.D.N.Y. Aug. 2, 2021) (finding "the question of whether two funds are proper comparators" should be deferred "until after discovery").

This issue need not be decided based on the pleadings in this case.  Importantly, Plaintiffs never actually allege that the Index Suite outperformed the Active Suite.  *Cf. In re Biogen*, 2021 WL 3116331, at *6 (permitting a claim to proceed when "[t]he crux of

Plaintiffs' allegation is that the Active suite has 'substantially underperformed the Index Suite'"); *In re Omnicron*, 2021 WL 3292487, at *11 (permitting a claim to proceed when "[t]he complaint alleges that the Active Suite consistently underperformed the benchmark Index Suite"); *In re: Prime Healthcare ERISA Litig.*, No. 20-cv-01529, 2021 WL 3076649, at *5 (C.D. Cal. July 16, 2021) (permitting a claim to proceed when the complaint included "data [which] is sufficient to support an inference that the Active suite was consistently underperforming the Index suite during the relevant time period").   Instead, Plaintiffs compare the Active Suite's expense ratio, "level of risk" incurred (i.e. investment strategy), and amount of investment inflow/outflow with that of the Index Suite.  [*See* #1, ¶¶ 66-67, 72-73, 76-78]  As detailed below, these comparisons fail to "plausibly establish[] that no reasonable fiduciary would have maintained" the Active Suite in the face of the Index Suite.  *Birse*, 2019 WL 1292861, at *4.

Plaintiffs point out that TDFs in the Active Suite charged higher expense ratios than those in the Index Suite, costing Plan participants over $2 million in higher fees in 2020 alone.  [#1, ¶¶ 76-77]  But, as Plaintiffs further explain, more actively managed TDFs generally incur higher expense ratios.  [*Id.* at ¶ 67]  This is because of the additional management resources needed to manage the underlying funds.  [*See id.*]; *see also Smith*, 37 F.4th at 1169 ("The actively managed funds need to charge higher fees, because they must hire management teams to actively select investments to buy and sell, whereas index funds require less management and less upkeep.").  Plaintiffs appear to concede that offering actively managed TDFs is not imprudent *per se*  [#43, 26], and no court has held that plans must avoid actively managed funds. *See Smith*, 37 F.4th at 1165 ("We know of no case that says a plan fiduciary violates its duty of prudence by offering

actively managed funds to its employees as opposed to offering only passively managed funds. Several cases in truth suggest the opposite." (citing *Washington Univ. in St. Louis*, 960 F.3d at 485 and *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022)); *Kurtz*, 511 F. Supp. 3d at 1200 (holding that it "cannot be true" that "actively managed funds can *never* be a prudent choice").  It follows that, without more, pointing out the additional expense inherently associated with actively managed funds as compared to passive funds does not suffice to state a claim of imprudence. Indeed, "[a] fiduciary is not required to 'scour the market to find and offer the cheapest possible fund,' as there are other factors for which a fiduciary—and a participant—might want to optimize besides cost."  *Kurtz*, 511 F. Supp. 3d at 1198 (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)).  Such factors may very well include a team of investment managers working to maximize a participant's investment.

Plaintiffs next find fault with the "level of risk" incurred by the Active Suite as compared to the Index Suite, and the ability of Active Suite managers to alter a fund's glidepath.  [#1, ¶¶ 72-75]  This comparison fails for a similar reason as the expense ratio. In Plaintiffs' words, "[t]he goal of an active manager is to beat a benchmark . . . by taking on additional risk."  [#1, ¶ 67]  To permit a claim of imprudence because the Active Suite pursued its goal by taking on risk would seemingly imperil every actively managed fund in every plan.  But, "[i]t's possible, indeed likely, that the absence of any actively managed funds suited for risk-tolerant investors would be imprudent."  *Smith*, 37 F.4th at 1167.  To many investors, the additional risk undertaken in order to—as Plaintiffs allege—"boost [participant] returns" and the ability for trained investment managers to—as Plaintiffs allege—"time market shifts in order to locate underpriced securities" is a feature, not a

bug. [#1, ¶¶ 73-74] For this reason, plan fiduciaries are tasked with undertaking a "whole-portfolio[] investment strategy that properly balances risk and reward, as well as short-term and long-term performance." *Birse*, 2019 WL 1292861, at *3. The inclusion of actively managed funds is an appropriate tool for plan fiduciaries to utilize in pursuing this strategy. Thus, the fact that "the Active [S]uite subjects its assets to significantly more risk than the Index [S]uite," or has a "higher exposure" to "riskier" equities and classes than the Index Suite does not suffice to state a claim of imprudence. [#1, ¶¶ 66, 73] This is especially true when, as here, the Plan offered both the higher-risk Active Suite as well as the more passively managed index options to its participants throughout the Class Period. [*See* ##30-2, 40; 30-11, 43; 30-12, 19; 30-13, 19; 30-14, 19  (the Plan's Form 5500s from 2016-2020, listing the Plan's schedule of assets held at the end of each year)];[13] s*ee Smith*, 37 F.4th at 1165 ("Keep in mind that [the plaintiff] could still choose an index fund investment for her 401(k), as [the plan] offered many such options. Offering actively managed funds in addition to passively managed funds was merely a reasonable response to customer behavior."); *Birse*, 2019 WL 1292861 at *5 ("[C]ourts must consider all relevant circumstances and the entire portfolio.").

---

[13] Plaintiffs do not contest the authenticity of these documents. The Court may consider the Plan's Form 5500s on this Motion because "they are documents referred to in the [C]omplaint and central to [Plaintiffs'] claims." *Kurtz*, 511 F. Supp. 3d at 1191-92 (citing *Gee*, 627 F.3d at 1186 and *Cnty. of Santa Fe v. Pub. Serv. Co.*, 311 F.3d 1031, 1035 (10th Cir. 2002)); [*see* #1, ¶ 61 ("According to the Plan's Form 5500s, since at least December 31, 2009, the Plan has offered the Fidelity Freedom fund target date suite.")]. These forms are also "government-mandated filings and publicly available," and therefore proper for judicial notice. *Kurtz*, 511 F. Supp. 3d at 1191-92 (citing *Troudt v. Oracle Corp.*, No. 116CV00175-REB-CBS, 2017 WL 663060, at *4 (D. Colo. Feb. 16, 2017), *report and recommendation adopted*, No. 116CV00175-REB-CBS, 2017 WL 1100876 (D. Colo. Mar. 22, 2017)).

Plaintiffs next allege that both analysts and investors lost faith in the Active Suite, particularly in comparison to the Index Suite.  [#1, ¶¶ 74, 78]  Plaintiffs cite a 2019 report from Morningstar (the "Morningstar Report") noting $5.4 billion in net outflows from the Active Suite in 2018, as compared to $4.9 billion in net inflows to the Index Suite that same year.  [#1, ¶ 78]  They also cite a 2018 Reuters report noting that nearly $16 billion had been withdrawn from the Active Suite over the prior four years.  [*Id.*]  This certainly indicates an apparent shift in investor preference from the Active Suite to the Index Suite. But again, the question is whether this investor preference, taken as true, "plausibly establish[es] that no reasonable fiduciary would have retained [the challenged] set of investments had the fiduciary engaged in proper monitoring." *Kurtz*, 511 F. Supp. 3d at 1196.  It does not, as made clear by looking at the entirety of the Morningstar Report relied on by Plaintiffs.[14]  As the Morningstar Report illustrates, the $5.4 billion in outflow from the Active Suite represents about 3% of the Active Suite's assets.  [#30-9, 8] Moreover, the Morningstar Report notes the respective inflow and outflow of the Index and Active Suites as an illustration of the trend for investors to prefer the cheapest TDF available.  [#30-9 at 7]   The Morningstar Report continues, noting that "[d]espite an average fee advantage of 50 basis points, the [Index Suite] lagged the [Active Suite] by roughly 38 basis points annually, on average, since the [Index Suite's] 2009 inception

---

[14] The Court may consider the entirety of the Morningstar Report.  Plaintiffs do not contest the authenticity of the copy attached as an exhibit by Defendants. [#30-9]   The Morningstar Report is "referred to in the [C]omplaint and central to [Plaintiffs'] claims." *Kurtz*, 511 F. Supp. 3d at 1191-92 (citing *Gee*, 627 F.3d at 1186 and *Cnty. of Santa Fe*, 311 F.3d at 1035); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

through 2018." [#30-9, 40]  It goes on to rank the Active Suite *higher* than the Index Suite. [*Id.* at 53]

Plan fiduciaries must balance many competing factors when crafting a plan. *See Birse*, 2019 WL 1292861, at *5 (noting some of these factors that must be weighed, including "the opportunity costs of a switch, the comparative risk of the funds, the comparative short-term and long-term returns of the funds, and the balance of the overall portfolio").  Reports of a roughly 3% annual outflow over a handful of years does not support an actionable inference that Defendants imprudently failed to engage in this balancing with respect to the Active Suite, especially when the report relied on by Plaintiffs highlights the Active Suite's positive performance and ranks it higher than Plaintiffs' proposed comparator Index Suite.  Plaintiffs' cited criticisms of the Active Suite, or active management in general,[15] fail for similar reasons.  Plaintiff notes that various experts took issue with Fidelity's active management strategy.  [#1, ¶ 74]  But a handful of skeptical reports does not create a duty to drop an investment, particularly when the expert consensus was clearly mixed.  Put differently, "[n]othing in [the reports cited] suggests that the Freedom Funds' reputation was bad enough when viewed in the market as a whole that a prudent plan administrator . . . should have precipitously dumped them. We would need significantly more serious signs of distress to allow an imprudence claim to proceed."  *Smith*, 37 F.4th at 1168 (citing *Griffin v. Flagstar Bancorp, Inc.*, 492 F. App'x 598, 604-05 (6th Cir. 2012)).

---

[15] For example, Plaintiffs allege that Morningstar has "repeatedly concluded that in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons." [#1, ¶ 67 (quotation omitted)]  This criticism of active funds generally says nothing about the Active Suite specifically.

Thus, none of Plaintiffs' comparisons between the Active Suite and the Index Suite permit a court to infer that no reasonable fiduciary would have retained the Active Suite. Again, Plaintiffs never allege that the Active Suite outperformed the Index Suite. To be sure, a showing of imprudence does not "come down to simply pointing to a fund with better performance." *Smith*, 37 F.4th at 1167; *see also Birse*, 2019 WL 1292861, at *5 (holding that "relative underperformance is insufficient to state a breach of fiduciary duty claim"). However, such an allegation "will often be necessary," *Smith*, 37 F.4th at 1167, and the Court finds this omission largely negates Plaintiffs' proffered comparisons between the Suites. Investors would be wise to pay a high expense ratio if the added services provide long-term value to their accounts. And to select a fund based solely on the expense ratio with no eye to fund performance or strategy would be a disservice to plan investors. Similarly, plan fiduciaries have no duty to only offer the lowest-risk investments to plan participants; indeed, doing so would likely be imprudent. *Id.* at 1165.

Next, Plaintiffs attempt to establish a comparison to a meaningful benchmark by comparing the Active Suite's performance against that of "the primary offerings of four of the five largest non-Fidelity managers in the TDF marketplace" at the beginning of the Class Period. [#1, ¶¶ 80-81] Plaintiffs provide the three- and five-year annualized returns as of the Fourth Quarter of 2015 of "several representative vintages of the Active [S]uite" against the returns of these "appropriate peers." [*Id.*] While Plaintiffs cite the existence of "other important performance metrics" when comparing investments, Plaintiffs make no further allegations regarding these "readily available alternatives." [*Id.*]

Assuming that these alternative funds may serve as meaningful benchmarks, the Court nevertheless finds that Plaintiffs' comparison to these peer funds fails to plausibly

allege that Defendants engaged in an imprudent monitoring process by failing to replace the Active Suite with one of these alternatives.  The *only* deficiency identified by Plaintiffs in comparison to the peer funds is underperformance at the beginning of the Class Period. But, again, a showing of imprudence does not "come down to simply pointing to a fund with better performance."  *Smith*, 37 F.4th at 1167; *see also Birse*, 2019 WL 1292861, at *5 (holding that "relative underperformance is insufficient to state a breach of fiduciary duty claim").  As explained by a court in the Southern District of New York:

> Put simply, the duty of prudence does not compel ERISA fiduciaries to reflexively jettison investment options in favor of the prior year's top performers. If that were the case, Plan sponsors would be duty-bound to merely follow the industry rankings for the past year's results, even though past performance is no guarantee of future success. Clearly, no court has ever suggested the existence of such a duty.

*Patterson v. Morgan Stanley*, No. 16-CV-6568, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019); *see also Smith*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty. Precipitously selling a well-constructed portfolio in response to disappointing short-term losses, as it happens, is one of the surest ways to frustrate the long-term growth of a retirement plan.").  To the contrary, "a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016).

This is especially true when, as here, the relative underperformance compared to the allegedly "suitable alternative" funds was slight going into the Class Period—often less than 1%, and never greater than 3.5%.  [#1, ¶ 80]; *see Birse*, 2019 WL 1292861 at

*5 n.2 (distinguishing the plaintiffs' allegations of 2-3% underperformance, which did not state a claim, from cases involving allegations of at least 10% underperformance, which some courts have found could state a claim).  Again, prudent plan fiduciaries weigh many factors in determining a plan's offerings—including "the opportunity costs of a[n] [investment] switch" as well as both "short-term and long-term returns of the funds." *Birse*, 2019 WL 1292861, at *5.  Plaintiffs have not made any allegations regarding these factors as compared to the allegedly suitable alternative funds.  An allegation that the Active Suite was modestly trailing TDFs offered by competitors going into the Class Period does not suffice to state a claim of imprudence.

Finally, Plaintiffs make allegations regarding the actively managed mutual funds that underlie the TDFs within the Active Suite.  [#1, ¶ 68-71]  Specifically, Plaintiffs allege that 22 of the 32 underlying investment vehicles in the Active Suite were deficient at the beginning of the Class Period—about half because they lacked a five-year track record, and about half because they had failed to outperform their respective benchmarks over the previous three- and five-year periods leading up to the Class Period.  [*Id.* at ¶¶ 68, 70-71]  The Court finds that these allegations regarding a subset of the Active Suite's underlying investments fail to create an inference that no reasonable fiduciary would have retained the Active Suite under these circumstances.

As an initial matter, other courts have found that an investment is not imprudent simply because it is untested.  *See Patterson*, 2019 WL 4934834, at *14 ("That the 2025 Trust was untested is also insufficient to establish imprudence in the selection and retention of the fund."); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 705 (W.D. Mo. 2019) ("Plaintiffs[] cite no authority holding that the implementation of a fund

without a long performance history is per se imprudent.").  And, as discussed above, the mere underperformance of a fund at a given time does not make that fund imprudent to retain.

More fundamentally, an allegation regarding a subset of a TDF's underlying investment vehicles ultimately says very little about the prudence of retaining the TDF at issue.  TDFs consist of a portfolio of investments.  [#1, ¶ 60]  Any ground lost by certain underlying investments could easily be made up by the remainder.  Under Plaintiffs' approach, a fiduciary could be forced to jettison an overall well-performing TDF simply because some of the TDF's underlying funds are performing poorly.  This does not comport with the duty of prudence imposed by ERISA.  *Cf. Birse*, 2019 WL 1292861 at *3 ("In order to establish a claim that a fiduciary has violated its duties under ERISA, the plaintiff must allege facts establishing that the fiduciary's investment decisions . . . are such that a reasonably prudent fiduciary would not have made that decision as part of a prudent, *whole-portfolio*, investment strategy . . . . Even if a claim is narrowly focused on one investment, the proper inquiry considers the *entire portfolio*."  (emphases added) (citation removed)).

Thus, considering the totality of Plaintiffs' allegations, the Court finds that Plaintiffs have failed to state an imprudence claim.  Plaintiffs make no direct allegations regarding Defendants' process for selecting and retaining Plan options.  Plaintiffs have further failed to adequately compare the Active Suite to a meaningful benchmark or otherwise allow a court to reasonably infer that the retention of the Active Suite was the result of an imprudent monitoring process. Accordingly, the Court RECOMMENDS that Plaintiffs' imprudence claim regarding the Active Suite be DISMISSED.

### 3.  Duty of Loyalty

Plaintiffs have also failed to state a claim for breach of the duty of loyalty.  Under ERISA, fiduciaries must act "for the exclusive purpose of providing benefits to participants and their beneficiaries."  29 U.S.C. § 1104(a)(1)(A)(i).  "A breach of the duty of loyalty requires factual allegations that a defendant's actions were for the purpose of providing benefits to himself or someone else—having that effect incidentally is not enough." *Kurtz*, 511 F. Supp. 3d at 1202.  "Furthermore, 'a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts.'"  *Id*. (quoting *Sacerdote v. New York Univ.*, No. 16-cv-6284, 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017)).

Plaintiffs argue that they adequately allege that "Defendants' retention of the Active Suite and failure to monitor fees directly enabled Fidelity to collect inflated compensation from participants."  [#43, 31]   But, as pled, these are—at most—allegations that Defendants' actions had the incidental effect of providing benefits to Fidelity.  [#1, ¶ 77 (alleging that excess fees "go[] straight into Fidelity's pockets," but making no factual allegations that Defendants acted for the purpose of benefitting Fidelity)]  That is, Plaintiffs put forward no factual allegations that Defendants' actions were for the *purpose* of benefitting themselves or Fidelity—only allegations that Fidelity incidentally benefitted from Defendants' allegedly imprudent process.[16]  Thus, Plaintiffs "failed to plead facts suggesting 'the fiduciary's operative motive was to further its own interests,' as required

---

[16] Plaintiffs argue in their briefing that their allegations "support a strong inference that Defendants' actions were taken:  (i) to save itself costs at the expense of Plan participants; or (ii) to favor its recordkeepers over the Plan participants."  [#43, 31]  These allegations do not appear in the Complaint, as, again, the Complaint only alleges an incidental benefit to Fidelity.  The Court also struggles to see how Defendants, as Plan fiduciaries, would save any costs by allowing Fidelity to overcharge the Plan.

to show a breach of the fiduciary duty of loyalty." *Smith*, 37 F.4th at 1170 (quoting *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018)).

Accordingly, the Court RECOMMENDS that Plaintiffs' claims for breach of loyalty be DISMISSED.

### C.    Derivative Claims

Plaintiffs also bring claims of failure to monitor fiduciaries, co-fiduciary liability, and knowing breach of trust.  [#1, ¶¶ 109-20]  These claims are derivative of Plaintiffs' claims for breach of fiduciary duty.  *See, e.g.*, 29 U.S.C. § 1105(a) (stating that a fiduciary may be liable for the breach of a co-fiduciary under certain circumstances); *Smith v. CommonSpirit Health*, No. CV 20-95-DLB-EBA, 2021 WL 4097052, at *13 (E.D. Ky. Sept. 8, 2021) ("[A] a monitoring claim must be dismissed where, as here, the underlying breach by the appointed fiduciary is not sufficiently pled. . . . Likewise, an invalid breach-of-fiduciary-duty claim forecloses a claim for breach of trust." (citations omitted)), *aff'd*, 37 F.4th 1160 (6th Cir. 2022).  Plaintiffs make no argument to the contrary.  [*See* #43, 32]

Accordingly, because Plaintiffs have failed to state a claim for breach of fiduciary duty, the Court RECOMMENDS that Plaintiffs' claims of failure to monitor fiduciaries, co-fiduciary liability, and knowing breach of trust be DISMISSED.

### D.    Dismissal Without Prejudice

In a footnote, Plaintiffs seek leave to amend their Complaint should the Court conclude that it is deficient. [#43 at 25 n.16] The entirety of Plaintiffs' argument is a three-sentence request, which cites generally to the standard for granting leave to amend and asserts that "Plaintiffs stand ready to add further allegations regarding the defects in Defendants' investment and service provider selection and monitoring processes."  [*Id.*]

The Tenth Circuit has held that a district court does not abuse its discretion when it dismisses a complaint with prejudice where the request to amend is made in such a perfunctory manner. *See Gold Res. Corp.*, 776 F.3d at 1118-19 ("The district court did not abuse its discretion in dismissing the complaint with prejudice where plaintiff's memorandum contained only one sentence at the very end of his brief alternatively requesting leave to amend in the event the district court should decide to dismiss his complaint."); *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186-87 (10th Cir. 1999) ("[A] request for leave to amend must give adequate notice to the district court and to the opposing party of the basis of the proposed amendment before the court is required to recognize that a motion for leave to amend is before it.").

However, the Court is also cognizant that a trial court should "freely give leave [to amend a complaint] when justice so requires," Fed. R. Civ. P. 15(a)(2), thereby providing "litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Hardin v. Mintowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)). Plaintiffs have not previously amended their Complaint, and Defendants make no argument against potential amendment in their Reply.   Accordingly, the Court RECOMMENDS that Plaintiffs' Complaint be DISMISSED WITHOUT PREJUDICE, and that Plaintiffs be given fourteen (14) days from an order on this Recommendation to file an amended complaint.

IV.     **CONCLUSION**

For the reasons set forth above, the Court **RECOMMENDS** that:

1. the Motion to Dismiss [#30] be **GRANTED** to the extent that is seeks dismissal of the Complaint;

2. the Complaint be **DISMISSED WITHOUT PREJUDICE;** and

3. Plaintiffs be given fourteen (14) days from an order on this Recommendation to file an amended complaint.[17]

DATED:  January 31, 2023                    BY THE COURT:

                                            s/Scott T. Varholak
                                            United States Magistrate Judge

---

[17] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the magistrate judge's proposed findings of fact, legal conclusions, and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review.    "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."  *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings of fact, legal conclusions, and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings of fact, legal conclusions, and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that the district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions; *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the magistrate judge's ruling by failing to file objections).   *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).